

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

CHRISOPHER STOLLER,

    Plaintiff,

    v.

Costco Wholesale Corporation, James Hamilton,
W. Craig Jelinch, Richard Galanti, Ron Galanti,
Ron Vachri, Paul Moulton, Franz Lazarus,
John McKay, James Murphy, Joseph Portera,
Timothy Rose, Dennis Zook, Kenneth Denman,
Chris Barbarino, Jeff Erickson, Greg Killian, Matt
Harris, Christine Carlson, Patricio Omar Chavez,
**(Costco Defendants)**
Ronald M. Serpico, Mary Ann Paolantonio,
Anthony N. Abruzzo, Sonny Hicotera, Jaime
Angulano, Mary Ramiez Taconi, Arturo Mota,
Anthony J. Prignano, Village of Melrose Park,
Melrose Park Police Department, Sam C. Pitassi,
Officer Michael DeCarlo Jr, Officer Marco Flores,
Damico Law
**(Melrose Park Defendants)**
Law Offices of Lisa T Damico Esq., Lisa T Damico
., **(Damico Defendants)**
Lipe Lyons Murrphy & Pontikis Ltd,
Jeffrey H. Lipe, Raymond Lyons,Jr.,
Edward J. Murphy, Bradley C. Nahrstadt, Thomas J.
Pontikis, **(Lipe Defendants)**
Attorneys, Assignees, agents John Doe's
1-thru 10,

    Defendants.

19cv140
Judge Dow Jr.
Mag. Judge Finnegan

JURY DEMAND

# FILED

JAN 0 8 2019

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

**COMPLAINT FOR VIOLATIONS OF 42 U.S.C. § 1983,
FALSE ARREST AND IMPRISONMENT, CONSPIRACY (UNDER
§1983 AND COMMON LAW) FAILURE TO PROTECT AND PREVENT
(BY ADEQUATELY TRAINING), MALICIOUS PROSECUTION,
ABUSE OF PROCESS[1], ASSAULT, BATTERY, NEGLIGENCE,
INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

COMES NOW, Plaintiff Christopher Stoller, 70, a disabled Senior Citizen, and a protected person under the Americans for Disability Act (ADA), complaining of the COSTCO WHOLESALE CORPORATION et al and in support of his complaint now states the following:

## NATURE OF THE ACTION

This is an action brought against the Defendants for their violations, OF 42 U.S.C. § 1983[2], Americans's With Disabilites Act of 1990, 42 USC s12101 et seq. (2000) ("ADA"), Equal Protection Clause, 42 U.S.C. § 1963 claim for "abuse of process", which include false arrest, deprivation of rights, false imprisonment, conspiracy under §1983 and common law, failure to protect and prevent (by adequate training), malicious prosecution, abuse of process[3], assault and battery, negligence, intentional and negligent infliction of emotional distress, abuse of process[4], willful and wanton misconduct, aiding and abetting, fraud, negligence, and defamation, which conduct was the legal cause of the injuries or damages to the Plaintiff..

## PARTIES

Plaintiff Christopher Stoller, 70, is a disabled senior citizen of the United States, a protected person as defined by the Americans for Disability Act (ADA) and he is a resident of Cook County, Illinois, and a .regular customer and member of Costco Wholesale Corporation

---

[2] *"42 U.S. Code § 1983 - Civil action for deprivation of rights".* Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress
[3]

4Abuse of process is a cause of action in tort arising from one party making misusing or perversion of regularly issued court process (civil or criminal) not justified by the underlying legal action. It is a common law intentional tort. https://en.wikipedia.org/wiki/Abuse_of_process  *Kumar v. Bornstein*, 354 Ill.App.3d 159, 820 N.E.2d 1167, 290 Ill.Dec. 100 (2d Dist. 2004); *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 339 Ill.App.3d 177, 790 N.E.2d 925, 274 Ill.Dec. 152 (2d Dist. 2003); *Kirchner v. Greene*, 294 Ill.App.3d 672, 691 N.E.2d 107, 229 Ill.Dec. 171 (1st Dist. 1998); *Sutton v. Hofeld*, 118 Ill.App.3d 65, 454 N.E.2d 681, 73 Ill.Dec. 584 (1st Dist. 1983); *Kurek v. Kavanagh, Scully, Sudow, White & Frederick,* 50 Ill.App.3d 1033, 365 N.E.2d 1191, 1195, 8 Ill.Dec. 805 (3d Dist. 1977).

membership number 111850480782[5]

## MALICIOUS PROSECTION TRIAL OF CHRISTOPHER STOLLER 11-21-17



**Malicious Prosecution Trial of Plaintiff Christopher Stoller
Melrose Park, Illinois   November 21, 2017
Verdict   NOT GUILTY !**

---

[5] Defendant Christine Carlson. The loss prevention agent for Costco Wholesale and Defendant Matt Harris, a manager of Costco Wholesale unlawfully canceled Christopher Stoller's Costco Membership on November 11, 2016. See **Exhibit 13**

3

Defendant(s)

All of the Defendants will be refered collectively as "Defendants

Costco branch  1607 store located at 8400 W. North Ave Melrose Park, Il 60160



Defendant, Costco[6] Wholesale Corporation[7], ("Costco") which is headquartered at 999

Lake Drive, Issaquash, Wa 98027  (428) 313-8100)      www.costco.com      in  based  upon

---

[6] The **Costco Mission Statement**. "**Costco's mission** is to continually provide our members with quality goods and services at the lowest possible prices.achieve our**mission** we will conduct our business with the following Code of Ethics in mind: Obey the law.Apr 28, 2017 https://www.thebalancesmb.com/costco-mission-statement-2891829 See **Exhibit 13**.

[7] This statistic shows the number of Costco operating warehouses worldwide from 2011 to 2018. In 2018, Costco operated a total of 762 warehouses worldwide. Of those, there were 527 Costco warehouses in the U.S. and Puerto Rico combined. In 2018, Costco generated approximately 138.4 billion U.S. dollars in net sales worldwide, averaging approximately 176 million U.S. dollars in sales per warehouse that year. https://www.statista.com/statistics/269769/costcos-number-of-warehouses-worldwide/

information and belief is at all times herein mentioned a corporation, organized and existing under the laws of the United States of America, with one of its branch 1607 store located at 8400 W. North Ave Melrose Park, Il 60160 were the incident complained of occurred. . At all times pertinent to the Complaint, Costco individually and through its agents, alter egos, subsidiaries, divisions or parent companies materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the other named Costco Defendants James Hamilton, W. Craig Jelinch, Richard Galanti, Ron Galanti, Ron Vachri, Paul Moulton, Franz Lazarus, John McKay, James Murphy, Joseph Portera, Timothy Rose, Dennis Zook, Kenneth Denman, Chris Barbarino, Jeff Erickson, Greg Killian, Matt Harris, Christine Carlos, and Patricio Omar Chavez ("Costco defendants") in the unlawful, misleading and fraudulent conduct alleged herein, which conduct was the legal cause of the injuries or damages to the Plaintiff.



1. Hamiiton E. James ("James"), Chairman of the Board., individually and in his official capacity and is in charge of the Board of Directors of Costco, and all of the officers, agents, servants and employees under his control. James engaged in the conduct complained of in the course and scope of his employment and/or management of Costco. James is liability directly, under the Doctrine of Respondent Superior[8] and under the

8    It is well-settled that under the Doctrine of Respondent Superior an employer may be liable for the negligent, willful, malicious or even criminal acts of its employees when such acts are committed in the course and scope of employment and in furtherance of the business of the

5

Pinkerton Theory of Liability[9] and the inequitable conduct of the agent. Agent's inequitable acts

may be imputed to the principle whether or not the principle knew of the agent's misconduct.

James acted with malice, fraud, gross negligence, oppressiveness, abuse of process, which was

not the result of mistake of fact, law, or honest error or judgment, overzealousness, mere

negligence or other human failing but that , acted with willful and wanton misconduct in the

course and scope of his employment.        Hamiiton E. James 's negligence, willful, malicious and

wanton acts against the Plaintiffs were committed in the course and scope of his employment

with Costco and in furtherance of the business of Costco, which conduct was the legal cause of

the injuries or damages to the Plaintiff..

---

employer. Mitchell v. Norman James Const. Co., 291 Ill. App.3d 927(1st Dist. 1999)

9     Under the Pinkerton Theory of Liability, a defendant may be found guilty of a
substantive offence committed by a co-conspirator if the offence was committed in furtherance
of the conspiracy at the time the defendant was a member of the conspiracy; this is true even if
the defendant neither participated in nor had knowledge of the substantive offense. A principal
seeking specific performance may be bound by an agent's inequitable conduct. *E.g., Handelman
v. Arquilla*, 95 N.E. 2d 910, 913 (Ill. 1951) (rejecting specific performance based on agent's
material misrepresentation); *Alexander v. Hughes*, 472 P.2d 818, 819-20 (Or. 1970) (affirming
the denial of specific performance when the agent misled the opposing party about the nature of
the document signed). The restatement and the cited cases are consistent with the duties of both
agents and principals owed to the third parties in the context of the sale of real property. See
*Lombardo v. Albu*, 199 Ariz. 97, 100-01, §§13-15, 14 P.3d 288, 291-92 (2000) (noting common
law and regulatory duties). In addition, the rule that the principal is bound by his agent's
conduct is consistent with long-established principles of equity.

6



2.    W. Craig Jelinch, ("Jelinch") the President, CEO and Director of Costco[10] .,

individually and in his official capacity and is in charge of of Costco, and all of the officers,

agents, servants and employees under his control. James engaged in the conduct complained

of in the course and scope of his employment and/or management of Costco. James is liability

directly, under the Doctrine of Respondent Superior[11] and under the Pinkerton Theory of

Liability[12] and the inequitable conduct of the agent. Agent's inequitable acts may be imputed to

---

[10]  Craig Jelinek assumed the position of President, Chief Operating Officer and Director in February 2010. Prior to being named President by the Board of Directors, he held various senior management positions in Operations and Merchandising, including the position of Executive Vice President and COO of Merchandising since 2004. Prior to joining the Company in 1984, Mr. Jelinek held various management positions with Fed-Mart and Gemco.

11    It is well-settled that under the Doctrine of Respondent Superior an employer may be liable for the negligent, willful, malicious or even criminal acts of its employees when such acts are committed in the course and scope of employment and in furtherance of the business of the employer. Mitchell v. Norman James Const. Co., 291 Ill. App.3d 927(1st Dist. 1999)

12    Under the Pinkerton Theory of Liability, a defendant may be found guilty of a substantive offence committed by a co-conspirator if the offence was committed in furtherance of the conspiracy at the time the defendant was a member of the conspiracy; this is true even if the defendant neither participated in nor had knowledge of the substantive offense. A principal seeking specific performance may be bound by an agent's inequitable conduct. *E.g., Handelman v. Arquilla*, 95 N.E. 2d 910, 913 (Ill. 1951) (rejecting specific performance based on agent's material misrepresentation); *Alexander v. Hughes*, 472 P.2d 818, 819-20 (Or. 1970) (affirming the denial of specific performance when the agent misled the opposing party about the nature of the document signed). The restatement and the cited cases are consistent with the duties of both agents and principals owed to the third parties in the context of the sale of real property. See *Lombardo v. Albu*, 199 Ariz. 97, 100-01, §§13-15, 14 P.3d 288, 291-92 (2000) (noting common law and regulatory duties). In addition, the rule that the principal is bound by his agent's

7

the principle whether or not the principle knew of the agent's misconduct. James acted with malice, fraud, gross negligence, oppressiveness, abuse of process, which was not the result of mistake of fact, law, or honest error or judgment, overzealousness, mere negligence or other human failing but that , acted with willful and wanton misconduct in the course and scope of his employment. Jelinch,'s negligence, willful, malicious and wanton acts against the Plaintiffs were committed in the course and scope of his employment with Costco and in furtherance of the business of Costco, which conduct was the legal cause of the injuries or damages to the Plaintiff.



13. Lisa T. Damico Esq., ("Damico") Managing Partner in the law firm of Damico Law Offices, aided and abetted her client Melrose Park,, participated in, encouraged, advised, counseled, sanctioned, condoned and ratified the unlawful conduct of Melrose Park abuse of process and malicious prosecution[13] of Christopher Stoller. Defendant Damico, is liable for aiding and

---

conduct is consistent with long-established principles of equity.

[13] Knowing that Costco did not have any lawful evidence (ie the alleged stolen glove), upon which to prosecute use for evidence to prosecute Christopher Stoller, for allegedly stealing a glove from Costco ("Exhibit 2"), in direct violation of 18 U.S. Code § 1622 - Subornation of perjury, aiding and abetting and causing Defendant Christine Carlson to lie under oath, when testifying against Christopher Stoller. See official transcript of the trial **Exhibit 6**

8

abetting under the Doctrines of Respondent Superior, Pinkerton Theory of Liability and Partnership Liability, as agent/principal. Defendant Damico acted with malice, fraud, gross negligence, oppressiveness, abuse of process, which was not the result of mistake of fact, law, or honest error or judgment, overzealousness, mere negligence or other human failing but that Damicoi, acted with willful and wanton misconduct in the course and scope of her employment of defendant Damico Law Offices and her employment by Defendant Malrose Park in the abuse of process and directing the malicious prosecution of Christopher Stoller knowing that there was no probably cause to have Christopher Stoller arrested for stealing a glove and for the substantiate false prosecution.. (**Exhibit 6**)[14] Stoller charges Lisa T. Damico with depriving him of liberty in violation of the Fourteenth amendment's due process clause and committing torts of malicious prosecution, abuse of process, intentional infliction of emotional distress, and conspiracy, in violation of Federal and Illinois State law. Specifically she solicited fabricated testimony from Defendant Christine Carlson, the Costco Lost Prevention Agent see **Exhibit 6** the trial transcript and from Defendant Melrose Park Police Officer coerced a witness Defendant Christine Carlson to give fabricated testimony that Damico as well as the Carlson knew to be false. See the official transcript **Exhibit 6** true and correct copy of photo Defendants Officer Michael DeCarlo and Christine Carlson who both lied under oath and gave fabricated evidence at the bequest of Defendant Attorney Lisa T. Damico, taken at Plaintiff's Trial. which conduct was the legal cause of the injuries or damages to the Plaintiff.

---

[14] Lisa T. Damico cannot claim prosecutorial immunity because; the malicious prosecution of Christopher Stoller was a civil matter and not a criminal matter.

9



**Def. M. DeCarlo**

**Def. Christine Carlson**

**Malicious Prosecution Trial of Christopher Stoller
Melrose Park, Illinois  November 21, 2017**

**Def Officer Michael DeCarlo**



14.  Defendant Melrose Park Police Officer Michael DeCarlo Jr, that at all times hereinafter mentioned, the Defendant, was and still is an officer with the Melrose Park

Police. DeCarlo is charged with aiding and abetting Defendant Melrose Park and Defendant Costco, Christine Carlson [15], acted with malice, fraud, gross negligence, oppressiveness, unlawful malicious prosecution of Christopher Stoller, abuse of process, which was not a result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence or other human failing but that DeCarlo acted with willful and wanton misconduct in the course and scope of his employment with the Melrose Park Police Department, conspiring with Defendant Melrose Park, Costco to falsely arrest Christopher Stoller with **no probably cause**, to lie under oath, knowing that Defendant Costco did not have any lawful evidence (ie the alleged stolen gloves), upon which to prosecute, use for evidence to prosecute Christopher Stoller, for allegedly stealing a glove from Costco ("Exhibit 2") The actions of Michael DeCarlo deprived Plaintiff of his right to be free from unreasonable searches and seizures as protected by the Fourth. which conduct was the legal cause of the injuries or damages to the Plaintiff.

Fourteenth Amendment of the United States Constitution and 42 U.S.C. §1983.

15. Defendant Marco Flores ("Flores) Officer that at all times hereinafter mentioned, the Defendant, was and still is an officer with the Melrose Park Police. Flores charged with aiding and abetting Defendant Melrose Park and Defendant Costco, Christine Carlson [16], acted with malice, fraud, gross negligence, oppressiveness, unlawful malicious prosecution of Christopher Stoller, abuse of process, which was not a result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence or other human failing but that Flores acted with willful and wanton misconduct in the course and scope of his employment with the Melrose Park Police Department, conspiring with Defendant Melrose Park, Costco to falsely arrest

15      (*Thornwood v. Jenner & Block*, 344 N.E.2d 15 (Ill. App. 2003)),

16      (*Thornwood v. Jenner & Block*, 344 N.E.2d 15 (Ill. App. 2003)),

11

Christopher Stoller with **no probably cause.** The actions of Marco Flores deprived Plaintiff of his right to be free from unreasonable searches and seizures as protected by the Fourth Amendment,. which conduct was the legal cause of the injuries or damages to the Plaintiff.



15. Defendant Christine Carlson, am employee of Castco, the Loss Prevention agentAgent acted with malice, fraud, gross negligence, oppressiveness, unlawful malicious prosecution of Christopher Stoller, abuse of process, which was not a result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence or other human failing but that Carlson acted with willful and wanton misconduct in the course and scope of her employment with Costco, conspiring with Defendant Melrose Park Police to lie under oath see official transcript Exhibit 6, knowing that Costco did not have any lawful evidence (ie the alleged stolen glove), upon which to detain lawfully prosecute Christopher Stoller, for allegedly

12

stealing a glove from Costco ("**Exhibit 2**") The actions of Christine Carlson deprived Plaintiff of his right to be free from unreasonable searches and seizures as protected by the Fourth and Fourteenth Amendment of the United States Constitution and 42 U.S.C. §1983. which conduct was the legal cause of the injuries or damages to the Plaintiff.



Defendant, Melrose Park Police Department, a division of the Village of Melrose Park Illinois, which employs Defendant Chief of the Melrose Park Police, Sam C. . Pitassi [17], is the Chief of Police of the, located in Melrose Park, Illinois. Upon information and belief, that at all times hereinafter mentioned, the Defendant, was and still is the Chief of Police. Sam C. Pistassi is in charge of the Melrose Park Police Department and all of the officers, agents, servants and employees under his control, which include the following named Defendants: Officer Pitassis. acted with malice, fraud, gross negligence, oppressiveness, unlawful malicious prosecution of Christopher Stoller, abuse of process, which was not a result of mistake of fact or law, honest

[17] Sam C. Pitassi stated on May 24, 2014 "I admired their commitment and resolve in coming in and accomplishing the task of keeping us safe," Pitassi recalls. "Plus, my uncle and godfather (Nick Perrino) was a police officer in Chicago in the 1960s, and he inspired me to pursue law enforcement as a career." The son of Peter and Christine (nee Millonzi) Pitassi, Pitassi moved to Melrose Park with his family from the Grand Avenue Italian enclave in Chicago when he was 4. After high school, he earned an associate's degree in police science at Triton College in 1972 and a bachelor's degree in criminal justice from Lewis University in 1974. He joined the Melrose Park Police Department that same year; married Rosa Ruotolo, a native of Naples, Italy, in 1985; and steadily rose through the ranks until he was appointed chief in 2007. https://www.franoi.com/profiles/melrose-park-police-chief-sam-pitassi/

error or judgment, overzealousness, mere negligence or other human failing but that Pitassis acted with willful and wanton misconduct in the course and scope of hisr employment with the Melrose Park Police, conspiring with Defendant Costco to have Christopher Stoller arrested without probably cause, have his Officer Michael DeCarlo lie under oath during the malicious prosecution of Plaintiff Christopher Stoller see **Exhibit 6** the official transcript of, knowing that Costco did not have any lawful evidence (ie the alleged stolen glove), upon which to lawfully prosecute Christopher Stoller, for allegedly stealing a glove from Costco ("Exhibit 2") and that there was no probably cause to arrest and to detain Christopher Stoller. that the actions of the various Defendants as will be described herein deprived Christopher Stoller of his of the right to be free from unreasonable searches and seizures as protected by the Fourth and Fourteenth Amendment of the United States Constitution and 42 U.S.C. §1983, which conduct was the legal cause of the injuries or damages to the Plaintiff.



Defendant, Village of Melrose Park is located in Melrose Park, Illinois, Cook County. Upon information and belief, that at all times hereinafter mentioned, the Defendant, was and still is a governmental unit organized and existing under and by virtue of the laws of the State of Illinois. Defendant(s), Village of Melrose Park, its agents, servants, and employees, which are the following Defendants: Ronald M. Serpico, Mary Ann Paolantonio, Anthony N. Abruzzo, Sonny Hicotera, Jaime Angulano, Mary Ramiez Taconi, Arturo Mota, Anthony J. Prignano operated, maintained and controlled the Melrose Park Police Department, its officers, its agents, servants, and employees, which conduct was the legal cause of the injuries or damages to the Plaintiff.

**Law firm of Lipe Lyons Murphy & Pontikis aided and abetted their Client Costco in the Malicious prosecution of Christopher. See a true and correct <u>photo of the Lipe Lyons Murphy & Pontikis</u>**



Lipe Lyons Murphy & Pontikis Ltd., the law firm who represents Defendant Costco, hired by the

insurance company to represent (Defendan)t Christine Carlson, the lost prevention agent for

Costco and Costco., in an attempt to malicious prosecute the Plaintiff for a an alleged crime that

they knew or should have known that Chirstopher Stollere did not commit (to steal a pair of

gloves, and Lipe firm lawyers, experienced litigators, knew or should have known that there was

no probable cause to arrest Christopher, but the Lipe law firm with over 100 years collective of

litigation experience, use that experience to deprive Christopher Stoller, 70 a disabled person of

his civil rights, due process rights and aided and abetted in the unlawful abuse of process, and

malicious prosecution of Christopher Stoller. This Defendant law firm aided and abetted their

client(s) Defendant Costco and Christine Carlson [18] acted with malice, fraud, gross negligence,

oppressiveness, unlawful malicious prosecution of Christopher Stoller, abuse of process, which

was not a result of mistake of fact or law, honest error or judgment, overzealousness, mere

negligence or other human failing but that Lipe, Lyons Murrphy & Pontikis[19] Ltd., ("Lipe") law

---

18      (*Thornwood v. Jenner & Block*, 344 N.E.2d 15 (Ill. App. 2003)),

[19] **Dedicated Service**
Those two simple words encapsulate the firm's philosophy regarding legal representation.
Lipe Lyons Murphy Nahrstadt & Pontikis was founded after the five name partners, with
decades of experience, departed from their former firm together in order to better serve their
long-standing clients. A testament to the relationships that the firm builds with each of its clients,
the firm and its clients work in partnership to maximize the value afforded to each client. This
dedication to client service serves as the foundation of every firm undertaking.
Our case handling philosophy is simple. We investigate and evaluate cases promptly and
accurately. We work closely with our clients in order to determine the most effective and
efficient way to resolve a dispute. We attempt to resolve cases on a fair and equitable basis as
soon as possible, with minimal expense to our clients. If a fair and equitable resolution cannot be
reached, we are ready, willing and able to take a case to verdict. Collectively, the name partners
of the firm have tried more than 100 cases to verdict.
The attorneys of Lipe Lyons Murphy Nahrstadt & Pontikis practice in state and federal court and
are experienced in a variety of practice areas including commercial litigation, general liability,
insurance coverage and bad faith, labor and employment, product liability, professional liability
and transportation. We invite you to explore our web site and see how our commitment to
dedicated service can work for you. https://www.lipelyons.com/firm-overview

firm acted with willful and wanton misconduct conspiring with Defendant Costco and counseled and prepared Christine Carlson to lie under oath (See **Exhibit 6** the court room transcript), knowing that Costco did not have any lawful evidence (ie the alleged stolen glove), no probabloy cause, to arrest Christopher Stoller. No valid evidence upon which to Christopher Stoller, for allegedly stealing a glove from Costco ("Exhibit 2"), in direct violation of 18 U.S. Code § 1622 - Subornation of perjury[20] and ARDC Rule 8.4(c) and (d). and Lipe law firm is liable directly and under the Pinkerton Theory of Liability and the inequitable conduct of the agent(s). Agent's inequitable acts may be imputed to the principle whether or not the principle knew of the agent's misconduct, which conduct was the legal cause of the injuries or damages to the Plaintiff.



Jeffrey H. Lipe
Partner
Email: jn 5 pe yons.com
Tel: 3·2 448 6232
⌊ V-Card

Jeffrey H. Lipe[21], Managing Partner of the defendant law firm of that Lipe, Lyons Murrphy & Pontikis Ltd., ("Lipe") , which does business in Northern District of Illinois, 230 West Monroe

---

[20] Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined under this title or imprisoned not more than five years, or both.

Jeffrey H. Lipe is a founding partner of Lipe Lyons Murphy Nahrstadt & Pontikis Ltd., head of the firm's general liability practice, and a member of the professional liability, commercial litigation, product liability, construction, transportation and labor and employment practice groups. Mr. Lipe focuses his practice on product liability, construction litigation, commercial litigation, employment counseling and litigation, premises liability, and transportation liability matters. Mr. Lipe is a trial attorney with over 30 years of experience and has tried more than 30 cases to jury verdict in state and federal courts. He has particular experience with the preparation and trial of catastrophic injury and wrongful death claims.

17

Street, Suite 2260 Chicago, IL 60606- Defendant Lipe is being sued in his individually capacity and in his official capacity and at all times mentioned herein, advises/consults and is charged with being a co-conspirator, conspiring with the Defendants, aiding and abetting the Defendants to malicious prosecute Christopher Stoller, assisting Costco to bring a fraudulent malicious prosecution lawsuit[22] against the Plaintiff, under the color of the law. Jeffrey H. Lipe is liable under the Doctrine of Respondent Superior, the Pinkerton Theory of Liability and under the liability theory that principle/agent, and partnership liability. Jeffrey H. Lipe is also in clear violation of ARDC Rule 5.1, 3.3(a) and 8.4(c) and (d). Jeffrey H. Lipe acted with malice, fraud, gross negligence, oppressiveness, abuse of process, which was not the result of mistake of fact, law, or honest error or judgment, overzealousness, mere negligence or other human failing but that Jeffrey H. Lipe acted with willful and wanton misconduct in the course and scope of his employment, which conduct was the legal cause of the injuries or damages to the Plaintiff.

---

[22] Knowing that Costco did not have any lawful evidence (ie the alleged stolen glove), upon which to prosecute use for evidence to prosecute Christopher Stoller, for allegedly stealing a glove from Costco ("Exhibit 2"), in direct violation of 18 U.S. Code § 1622 - Subornation of perjury



Raymond Lyons, Jr.
Partner
Email: rl@lipelyons.com
Tel: 312 448 6233
↓ V-Card

Raymond Lyons Jr[23], ( "Lyons")  Principal Partner

of the law firm of Lipe, Lyons Murrphy & Pontikis  is being sued in his individually capacity

and in his official capacity and at all times mentioned herein, advises/consults and is charged

with being a co-conspirator, conspiring with the Defendants, aiding and abetting the Defendants

to maliciously prosecute Christopher Stoller is liable under the Doctrine of Respondent Superior,

the Pinkerton Theory of Liability and under the liability theory that principle/agent, and

partnership liability.  Lyons is also in clear violation of ARDC Rule 5.1, 3.3(a) and 8.4(c) and

(d).  Lyons acted with malice, fraud, gross negligence, oppressiveness, abuse of process, which

was not the result of mistake of fact, law, or honest error or judgment, overzealousness, mere

negligence or other human failing but that Lyons acted with willful and wanton misconduct,

which conduct was the legal cause of the injuries or damages to the Plaintiff.

---

Raymond Lyons is a partner of Lipe Lyons Murphy Nahrstadt & Pontikis Ltd. and a member
of the firm's product liability, construction, transportation and tort defense practice groups. He
focuses his practice on defending product liability, construction, transportation, catastrophic
injury and wrongful death lawsuits brought in state and federal courts around the country. Mr.
Lyons has more than 30 years of jury trial experience and has litigated hundreds of cases in state
and federal courts throughout the United States, including successfully trying more than 40 cases
to verdict. He has represented numerous clients in a range of industries, including TruGreen
Limited Partnership, TruGreen Lawncare LLC, The Terminix International Company, L.P.,
ServiceMaster Company, Manchester Tank & Equipment Company, McWane, Inc., Tyler Pipe,
Inc., Gehl Company, Walsh Construction, Gertz Electric Company, National Indemnity
Insurance Company, and Zurich Insurance Company.



Bradely C. Nahrstadt[24] partner of of the law firm of Lipe Lyons Murphy & Pontikis, which does

business in Cook County, with an office at , which does business in Northern District of Illinois,

230 West Monroe Street, Suite 2260 Chicago, IL 60606 Defendant Nahrstadt is being sued in his

individually capacity and in his official capacity and at all times mentioned herein,

advises/consults and is charged with being a co-conspirator, conspiring with the Defendants,

aiding and abetting the Defendants to maliciously prosecute Christopher Stoller, without

probably cause, aided and abetted the defendants in bringing a fraudulent malicious prosecute

law suit againe Christopher Stoller, under the color of the law. Represented Costco employee,

Christine Carlson, counseled her to fabricate testimony, set in the court room on November 21,

2017 aidded and abetted Christine Carlson to lie under oath during the malicious prosecution of

Chirstopher Stoller see Exhibit 6 the official transcript of the trial, Defendant Nahrstadt directly,

Bradley C. Nahrstadt is a partner of Lipe Lyons Murphy Nahrstadt & Pontikis Ltd., co-chair of
the insurance coverage practice group, and a member of the product liability, professional
liability and tort defense practice groups. He focuses his practice on defending product liability,
professional liability, premises liability, insurance coverage and bad faith and commercial
matters in state and federal courts around the country, and also has handled a number of matters
at the appellate level.

is liable under the Doctrine of Respondent Superior, the Pinkerton Theory of Liability and under the liability theory that principle/agent, and partnership liability. Defendant Nahrstadt is also in clear violation of ARDC Rule 5.1, 3.3(a) and 8.4(c) and (d). Defendant Nahrstadtl acted with malice, fraud, gross negligence, oppressiveness, abuse of process, which was not the result of mistake of fact, law, or honest error or judgment, overzealousness, mere negligence or other human failing but that Defendant Nahrstdt acted with willful and wanton misconduct during the course and scope of his employment with the law firm of Lipe, Lyons Murphy & Pontikis Ltd., which conduct was the legal cause of the injuries or damages to the Plaintiff.



1.      Edward J. Murphy[25] Partner of the law firm the law firm of Lipe Lyons Murphy & Pontikis, which does business in Northern District of Illinois, 230 West Monroe Street, Suite 2260 Chicago, IL 60606. Defendant Nesbit is being sued in his individually capacity and in his official capacity and at all times mentioned herein, advises/consults and is charged with being a co-

---

Edward J. Murphy is a partner of Lipe Lyons Murphy Nahrstadt & Pontikis Ltd., and a member of the firm's product liability, insurance coverage, and commercial litigation practice groups. He focuses his practice on product liability, aviation, insurance coverage/bad faith,

conspirator, conspiring with the Defendants, aiding and abetting the Defendants to bring a fraudulent malicious prosecution lawsuit against the Plaintiffs, knowing that there was no probably cause to arrest Stoller, nor for the Village of Melrose Park to try Stoller for a crime that he did not commit under the color of the law. Edward J. Murphy is liable directly and under the Doctrine of Respondent Superior, the Pinkerton Theory of Liability and under the liability theory that principle/agent, and partnership liability. Edward J. Murphy is also in clear violation of ARDC Rule 5.1, 3.3(a) and 8.4(c) and (d). Edward J. Murphy acted with malice, fraud, gross negligence, oppressiveness, abuse of process, which was not the result of mistake of fact, law, or honest error or judgment, overzealousness, mere negligence or other human failing but that Edward J. Murphy acted with willful and wanton misconduct in the course and scope of his employment which conduct was the legal cause of the injuries or damages to the Plaintiff.



Thomas J. Pontikis[26] Partner of the law firm the law firm of Lipe Lyons Murphy & Pontikis, which does business in Northern District of Illinois, 230 West Monroe Street, Suite 2260 Chicago, IL 60606. Defendant Pontikis is being sued in his individually capacity and in his official capacity and at all times mentioned herein, advises/consults and is charged with being a co-conspirator, conspiring with the Defendants, aiding and abetting the Defendants to bring a fraudulent malicious prosecution lawsuit against the Plaintiff, knowing that there was no probably cause to arrest Stoller, nor for the Village of Melrose Park to try Stoller for a crime that he did not commit under, the color of the law. Defendant Pontikis is liable directly and under the Doctrine of Respondent Superior, the Pinkerton Theory of Liability and under the liability theory that principle/agent, and partnership liability. Defendant Thomas J. Pontikis is also in clear violation of ARDC Rule 5.1, 3.3(a) and 8.4(c) and (d). Defendant Pontikis acted with malice, fraud, gross negligence, oppressiveness, abuse of process, which was not the result of mistake of fact, law, or honest error or judgment, overzealousness, mere negligence or other human failing but that Defendant Pontikis acted with willful and wanton misconduct in the course and scope of his employment which conduct was the legal cause of the injuries or damages to the Plaintiff.

2. The purpose of said relationship, exceeding said authority for alternatively while purporting to act to further the purpose of said relationship instead engaged in self dealing and

---

[26] Thomas J. Pontikis is a partner of Lipe Lyons Murphy Nahrstadt & Pontikis Ltd. He focuses his practice on insurance defense, commercial litigation, mass and toxic torts, product liability, construction litigation, professional malpractice and construction defect litigation. Mr. Pontikis has more than 26 years of jury trial experience, handling cases in state and federal courts throughout the United States. He has represented numerous clients in a range of industries, including Ford Motor Company, General Electric Company, Terminix, Viacom/CBS and Zurich Insurance Company.

23

acted to harm said relationship over alternatively, colluded and conspired with other Defendants.

# **Unknown officer Defendant**
## **John Doe 1**



3. This action is also brought against Does 1-10, which may include Defendants' Police officers, lawyers, predecessors, partners, associates, agents, employees, affiliates and subsidiaries, process servers, contractors, developers, law firms, and realtors which hereafter are also included in the term "defendants." Plaintiffs are ignorant of the true names and capacities of defendants (John Doe 1 pictured above) sued herein and Does 1-10 inclusive, and therefore sues these defendants by such fictitious name. Plaintiffs will add their names (his name) to this Complaint to allege their true names and capacities when ascertained.

24

Defendant, Melrose Park Police Department and Defendant, Sam C. Pitassi, is the Chief of Police of the, located in Melrose Park, Illinois. Upon information and belief, that at all times hereinafter mentioned, the Defendant, was and still is the Chief of Police. Sam C. Pistassi is in charge of the Melrose Park Police Department and all of the officers, agents, servants and employees under his control, which include the following named Defendants: Officer Michael DeCarlo, Jr., and Officer Marco Flores.

Defendant, Village of Melrose Park is located in Melrose Park, Illinois, Cook County. Upon information and belief, that at all times hereinafter mentioned, the Defendant, was and still is a governmental unit organized and existing under and by virtue of the laws of the State of Illinois. Defendant, Village of Melrose Park, its agents, servants, and employees, which are the following Defendants: Ronald M. Serpico, Mary Ann Paolantonio, Anthony N. Abruzzo, Sonny Hicotera, Jaime Angulano, Mary Ramiez Taconi, Arturo Mota, Anthony J. Prignano operated, maintained and controlled the Melrose Park Police Department, its officers, its agents, servants, and employees.

Defendant, Damico Law Offices, Lisa T Damico Esq., is located in Chicago, Illinois, County of Cook.

Defendants, Lipe, Lyons Murphy & Pontikis, Ltd, is located in Chicago, Illinois, County of Cook. Jeffrey H. Lipe, Raymond Lyons, Jr., Edward J. Murphy, Bradley C. Nahrstadt, Thomas J. Pontikis,

4.  James Hamilton, W. Craig Jelinch, Richard Galanti, Ron Galanti, Ron Vachri, Paul Moulton, Franz Lazarus, John McKay, James Murphy, Joseph Portera, Timothy Rose, Dennis Zook, Kenneth Denman, Chris Barbarino, Jeff Erickson, Greg Killian, Matt Harris, Christine Carlos, and Patricio Omar Chavez engaged in the conduct complained of in the course

25

and scope of his/her employment and/or management of Costco. The above named Defendants' liability directly lies under the Doctrine of Respondent Superior[27], the Pinkerton Theory of Liability[28] and the inequitable conduct of the agent. The agent's inequitable acts may be imputed to the principle whether or not the principle knew of the agent's misconduct. The above named Defendants' negligence, willful, malicious and wanton acts against the Plaintiff were committed in the course and scope of his/her employment with Costco and in furtherance of the business of Costco.

5.      At all times relevant to this Complaint, Sam C. Pitassi, Chief of Police was responsible for the supervision of Officer Michael D. DeCarlo, Jr., and unknown officers who employed by the Melrose Park Police Department. Defendant Sam C. Pitassi is being sued in his official and individual capacity. All other Defendant Officers are each sued in his/her individual capacity. Each Defendant Officer acted under color of law and within the scope of his/her employment during the relevant events, including the investigation, the false arrest and trial of Christopher Stoller.

6.      At all times relevant to this Complaint Lisa T. Damico, was the outside civil attorney for Melrose Park. The law firm of Lipe, Lyons Murphy & Pontikis Ltd, attorneys

---

27It is well settled that under the Doctrine of Respondent Superior an employer may be liable for the negligent, willful, malicious or even criminal acts of its employees when such acts are committed in the course and scope of employment and in furtherance of the business of the employer. Mitchell v. Norman James Const. Co., 291 Ill. App.3d 927(1st Dist. 1999)

28Under the Pinkerton Theory of Liability, a defendant may be found guilty of a substantive offence committed by a co-conspirator if the offence was committed in furtherance of the conspiracy at the time the defendant was a member of the conspiracy; this is true even if the defendant neither participated in nor had knowledge of the substantive offense.   A principal seeking specific performance may be bound by an agent's inequitable conduct. *E.g., Handelman v. Arquilla*, 95 N.E. 2d 910, 913 (Ill. 1951) (rejecting specific performance based on agent's material misrepresentation); *Alexander v. Hughes*, 472 P.2d 818, 819-20 (Or. 1970) (affirming the denial of specific performance when the agent misled the opposing party about the nature of the document signed). The restatement and the cited cases are consistent with the duties of both agents and principals owed to the third parties in the context of the sale of real property.   See *Lombardo v. Albu*, 199 Ariz. 97, 100-01, §§13-15, 14 P.3d 288, 291-92 (2000) (noting common law and regulatory duties).   In addition, the rule that the principal is bound by his agent's conduct is consistent with long-established principles of equity.

26

Jeffrey H. Lipe, Raymond Lyons Jr, Edward J. Murphy, and Bradley C. Nahrstadt were the attorney for Costco. The above named Defendants are being sued in their individual capacity. They acted under color of law and within the scope of their employment during the relevant events, including the investigation, the false arrest and trial of the fictitious theft of glove charge at issue.

7.     At all times relevant to this Complaint, Ronald M. Serpico was the Mayor of Melrose Park, Illinois. Defendant Serpico is being sued in his official and his individual capacity. Defendant Serpico acted under color of law and within the scope of his employment during the relevant events, including the investigation the false arrest and trial of the fictitious theft of glove charge at issue.

8.     The misconduct described herein was also undertaken by Defendants Christine Carlson, Jeff Erickson, Matt Harris, Patricio Omar Chavez within the scope of their employment and under color of law such that their employer, Costco Wholesale Corporation, who is liable for their actions. County.

9.     As a direct and proximate result of the misconduct of the above named Defendants described above, the Plaintiff suffered injuries, including severe emotional distress and ongoing pain.

## POLICIES AND PRACTICES

10.    The constitutional violations that caused Christopher Stoller's malicious prosecution and the claims set forth in this Complaint were also the result of the Village of Melrose Park and the Costco Wholesale Corporation's lack of a lost prevention policy and widespread practices of failing to discipline employees and officers who withhold exculpatory or impeachment evidence, or who fabricate evidence.

27

11. The constitutional violations that caused Christopher Stoller's malicious prosecution and the claims set forth in this Complaint were not isolated events. To the contrary, they were the result of the Village of Melrose Park policies and widespread practices of pursuing convictions without regard to the truth, through reliance on profoundly flawed investigations that withhold exculpatory evidence, fabricate evidence, and coerce witnesses.

12. The constitutional violations that caused Christopher Stoller's malicious prosecution and the claims set forth in this Complaint were also the result of the Village of Melrose Park policies and widespread practices of failing to adequately train and supervise its police officers and employees on their obligations not to withhold exculpatory or impeachment evidence, and not to fabricate evidence.

13. The constitutional violations that caused Christopher Stoller's malicious prosecution and the claims set forth in this Complaint were also the result of the Village of Melrose Park and the Costco Wholesale Corporation policies and widespread practices of failing to intervene to prevent individual officers and lost prevention employees from violating citizens' constitutional rights.

14. In accordance with these policies and widespread practices, Melrose Park Police officers, Costco Wholesale Corporation employees refused to report misconduct committed by their colleagues, including the misconduct at issue in this case.

15. The Village of Melrose Park, the Melrose Park Police Department, Costco Wholesale Corporation failure to train, supervise, and discipline its officers and employees effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers and their Attorneys committed against Christopher Stoller in this case. Constitutional violations

28

such as those that occurred in this case are encouraged and facilitated because of the Village of Melrose Park and the Costco Wholesale Corporation practices and policies, as alleged above.

16.     The Village of Melrose Park and officials within the Melrose Park Police Department as well as the Costco Wholesale Corporation employees failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Christopher Stoller's ongoing injuries.

17.     In accordance with these policies and widespread practices, Melrose Park Police Officers refused to report misconduct committed by their colleagues, including the misconduct at issue in this case.

18.     The Village of Melrose Park failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Christopher Stoller in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated because of the city's practices and policies, as alleged above. The policies and practices described in the foregoing paragraphs were consciously approved by Village of Melrose Park policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

## JURISDICTION

19.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

20.     This Court has jurisdiction over Plaintiff's constitutional claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. §

1367. Venue is proper under 28 U.S.C. § 1391(v). The events giving rise to this Complaint occurred in this judicial district.

21.     This Court original subject matter jurisdiction of the federal questions presented pursuant to 28 U.S.C. § 1333 and § 1343.

22.     Venue is proper in the Northern District of Illinois.

23.     Jurisdiction of this court arises under 28 U.S.C. secs 1331, 1337, 1343(a), and 1367(a); 42 U.S.C. secs. 1983, 1985, 1986, and 1988; and 18 U.S.C. 1961-1968.

24.     Jurisdiction of this court for the above claims is authorized by F.R.Civ.P. 18(a), and arises under the doctrine of pendent jurisdiction as set forth in *United Mine Workers v. Gibbs.*

## NATURE OF THE CASE

25.     This lawsuit seeks redress from the above named Defendants who caused Stoller to be falsely arrested, without probably cause and was subjected unreasonable search, and force, in violation of his rights under the Fourth Amendment to the U.S. Constitution.

26.     Unlike other cases where a person is caught up in the criminal justice system for a crime for which they were not involved, not only did the Defendants fabricate a case against Christopher Stoller, they fabricated a crime, the theft of a pair of gloves by Christopher Stoller and upon which, no stolen gloves were ever recovered from Christopher Stoller after the Melrose Park Police Officers, Defendants Michael DeCarlo Jr., and Marco Flores arrested Christopher Stoller on November 21, 2017 without probably cause. See the Official court Transcript marked as **Exhibit 6**, incorporated herein as if fully copied and attached and made a part hereof..

27.     Defendants caused Christopher Stoller to be falsely charged for retail theft (Exhibit(s) 2, 4, & 6   by fabricating evidence, fabricating evidence that Christopher Stoller was lying about what happened the morning of November 21, 2017, in the Costco Wholesale Store in

30

Melrose Park, Illinois and withholding exculpatory evidence. See **Exhibit 6** the Transcript of the Trial in corporated herein by reference and made a part hereof. Christopher Stoller was found not guilty on Nov. 21, 2017 after the Plaintiff's put on their case by a directed verdict of the judge.(Exhibit 6)

## DEFENDANTS' VIOLATIONS OF THE PLAINTIFF INCLUDE

28.     Christopher Stoller, hereby asserts the following claims against the Defendants in the above-entitled action:

(a)     Violation of 42 U.S.C. 1983: arrest

(b)     Violation of 42 U.S.C. 1983: detention and confinement

(c)     Violation of 42 U.S.C. 1983: strip search

(d)     Violation of 42 U.S.C. 1983: conspiracy

(e)     Violation of 42 U.S.C. 1983: refusing or neglecting to prevent

(f)     Malicious prosecution

(g)     Malicious abuse of process

(h)     Violation of Ill. Civil Rights Act

(i)     False arrest and imprisonment

(j)     Battery

(k)     Conspiracy

(l)     Intentional infliction of emotional distress.

## DAMAGES

29.     As a result of the foregoing, Plaintiff Christopher Stoller has suffered tremendous damage, including physical sickness and injury, and emotional damages, all caused by the Defendants' (individually and in their official capacity) misconduct.

30.     Because of Defendants' intentional discrimination and defamation, they have subjected Christopher Stoller to emotional distress, ridicule, name-calling, harassment and being targeted by malicious statements imputing egregious actions to him.

31.     Defendants' actions were intentional, malicious, willful, wanton and callous and showed reckless disregard for Plaintiff's civil and constitutional rights.

32.     As a result of the events described herein. Plaintiff has endured fear, humiliation, embarrassment, mental pain, suffering, inconvenience and financial injury, including lost business profits.

33.     As a direct, foreseeable, and proximate result of the said wrongful acts by Defendants, Plaintiff suffered and will continue to suffer humiliation, anxiety, shame, despair, embarrassment, depression, mental pain, anguish, and injury to his reputation and economic loss, all to Plaintiff's damage in an amount to be proven at time of trial.

34.     Plaintiff has suffered physical injuries and has incurred medical bills in an amount to be ascertained, resulting from the acts of Defendants.

## BACKGROUND FACTS

35.     On November 19, 2016, Christopher Stoller, 68, then, a disabled senior citizen, a protected person as defined by the Americans for the Disability Act (ADA) went to Costco Wholesale, located on 8400 W. North Ave, in Melrose Park, Illinois to do some shopping. The Plaintiff purchased $54.43 of groceries.

32

36.     Christopher Stoller was in the handicap motorized cart and attempted to leave the store when Defendant Christine Carlson, Costco Loss Prevent Agent, she approached him after he had driven the handy cap cart out of the store and accused Christopher Stoller of stealing a pair of gloves and for him to come back into the Costco office with her. Christopher Stoller stated, "I did not steel any gloves!" Ms. Carlson screamed, "If you don't come into the store, I will cancel your Costco Membership[29] and Ms. Carlson took the Plaintiff's groceries back into the Costco Store. Christopher Stoller than drove out of the Costco Parking Lot on the electric shooter.

37.     The Defendants, Assistant General Managers, Matt Harris, Jeff Erickson and Defendant Patricio Omar Chavez Merchant/Stocker surrounded Christopher Stoller to prevent the electric cart from moving. Defendant Chavez then picked up the electric cart and dropped it causing a serve injury to Christopher Stoller's back ("**Exhibit 1**[30]").

38.     Christopher Stoller attempted to make a phone call his attorney, when the Melrose Park Police arrived, Defendant/Police Officers Michael DeCarlo Jr., and Flores. DeCarlo and Flores stopped Christopher Stoller from calling his attorney and conducted an unlawful search of Christopher Stoller.

39.     Afterwards, Officer DeCarlo , without probably cause, stated Christopher Stoller was under arrest for retail thief for stealing a pair of gloves. Christopher Stoller said, "Aren't you going to read me my Miranda rights?" Officer DeCarlo said, "This is Melrose Park, we don't

---

[29] See the report of Ms. Carlson marked as **Exhibit 2**

[30] **Exhibit 1** Dr. Mark Sokolowski, M.D.,CIME Medical Report on the Bank Injury that Christopher Stoller sustained.

have to read anyone their Miranda rights here" neither Defendant Officers DeCarlo nor Flores read Stoller his Miranda Rights. DeCarlo said, "Miranda rights are for TV!"

40.     Officers DeCarlo and Flores were unable to find any of the alleged stolen gloves on Christopher Stoller, who denied stealing any gloves from Costco.

41.     Christopher Stoller told the officers that he wanted to speak to his attorney. Officers DeCarlo and Flores refused to allow Christopher Stoller to call his lawyer on his I phone. DeCarlo said, "You don't need an attorney in Melrose Park, we know how to deal with a theif.."

42.     Defendant Officers DeCarlo and Flores placed under arrest, hand cuffed him and placed him in their police car. DeCarlo said "that the Melrose Park knows how to deal with criminals like you!"

43.     The Melrose Park Police officers DeCarlo and Flores took Christopher Stoller back to the Costco store in hand cuffs, in front of all of the customers of the Melrose Park Costco Store. Christopher Stoller while in handcuffs heard the Costco customers saying that the "Cops caught a thief, look at him!"

44.     At time, Defendant Christine Carlson, the Costco Loss Prevention Agent, told the Melrose Park Police Officers DeCarlo and Flores "That's the guy (Christopher Stoller) who I saw steal the gloves and put those gloves in his pocket, that's the guy!" Christine Carlson knowingly and willfully falsified a document, a false writing, a fraudulent statement when Carlson presented to the Police the attached falsified document[31] to evidence that Christopher

---

[31] This was a violation of 18 U.S § 1001 Statements or entries. Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully— (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years or, if the offense involves

Stoller stole the gloves See ("**Exhibit 2**") when Ms Carlson knew that Christopher Stoller did not seal any gloves..

45.     Defendants conduct was motivated by malice.   Christine Carlson, the loss prevention person for Costco, manufactured false verbal and written evidence, knowing it to be false, presented to the Melrose Park Police officers ("**Exhibit 2")**, in order to have the Plaintiff falsely arrested.

46.     Officer DeCarlo said to Defendant Carlson, "Hey I searched this guy and he did not have any gloves on him?" Defendant Carlson said, "Arrest him, I saw him steal the gloves." Christopher Stoller stated, "I did not steal any gloves!

47.     Officer DeCarlo wrote a ticket charging Christopher Stoller with retail theft, under Chapter 10 Section 04-010 of its local ordnance[32].

48.     On November 21, 2017, a trial was set for Christopher Stoller.

49.     The Administrator for the Village of Melrose Park, who is not a Cook County Judge, appointed as a hearing officer that hears Civil Ordnance violation, Russell Syracuse stated on Page 79, Line 22 of the official transcript marked as ("**Exhibit 3**"). "This is not a criminal proceeding.  This is a civil matter."[33]

50.     Appearing on behalf of the Village of Melrose Park, Defendant Attorney Lisa T. Damico, who was **not** a criminal prosecutor, pursuant to Section 1983 and the Illinois Law

international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

[32] Chapter 10 Section 04-010 of the Melrose Park Ordnance is motor vehicle violation, under the Municipal Code, which has nothing to do with retail theft. Which required Christopher Stoller was required to Appear in the Melrose Park Municipal Court  on December 6, 2016 at 1:00PM   1 North Broadway, Melrose Park, Illinois 60160 See **Exhibit 4.**

[33] The Village of Melrose Park attorney Defendant Lisa T. Damico cannot claim prosecutor immunity because this was a Civil Action see transcript Exhibit 6 .

35

deprived Christopher Stoller of his due process by engaging in suggestive identification procedures, deliberately suppressing exculpatory evidence (there was no evidence of the alleged stolen glovers), that there were no stolen gloves recovered from the plaintiff. Christopher Stoller did not steal any gloves, as well known to the Defendants.

51.     Defendant Damico coerced Defendant Christine Carlson, the Loss Prevention Agent and Officer Michael DeCarlo to provide false, fabricated   evidence under oath (perjury) and subornation perjury ("**Exhibit 6**" the Official Court Transcript).

52.     Defendant Attorney Lisa T. Damico[34], the Melrose Park attorney  conspired with Defendants' Christine Carlson, Officer DeCarlo,  Matt Harris, Chris Barbarino and Jeff Erickson Costco Defendants) to frame Christopher Stoller for "retail theft of a pair of gloves" that Defendant Lisa T. Damico knew that Christopher Stoller did not take from the Melrose Park Costco store and there was no probable cause to arrest Christopher Stoller, no  evidence which would have even supported the claim of Christopher Stoller stealing a pair of gloves (no gloves were ever recovered).

53.     On November 19, 2016 Defendant was charged with Chapter 10 Section 04 010 of the Village of Melrose Park local ordinance. See true and correct copy of the attached Compliance Violation Number C102277 ("**Exhibit 4**").

54.     Chapter 10.04 of the village of Melrose Park Municipal deals solely with the Code Regarding the Operation of Motor Vehicles ("**Exhibit 7**") Village of Melrose Park Cook County Illinois Ordinance No. 1354.

55.     The actual charge against the Defendant as described by the Melrose Police

---

[34] Cannot claim prosecutorial immunity in this case, because Attorney Lisa T. Damico was **not** a prosecutor in a criminal prosecution, the underlying case was a Civil Matter and not a criminal case.

Department (MPPD) Incident Number 201600026297 Blotter states:

> Offender Stoller opened a shrimp cocktail container, ate several shrimp
> inside totaling $11.99 then took a pair of gloves, placed them in his pocket
> totaling $24.99 and passed the last point of purchase without paying for said
> item.

56.     This case dismissed in favor of the Defendant because the Charging instrument violated Illinois Statutes Chapter 725 Criminal Procedure §5/114-1(8) the charge did not state an offense under §/114(c). See **Exhibit 6** a copy of the Court Transcript of the Nov. 21, 2017 malicious prosecution.

57.     The charge Compliance Violation Number C102277 was void *ab initio* and was dismissed with prejudice on November 21, 2017, for it fails to allege the commission of an offense and citing to the statutory provision as well known to the Defendants. (See **Exhibit 6**, the court room transcript)

58.     Plaintiff Stoller was not found guilty of said uncharged offense[35].

59.     The Defendants asserted that the miscitation prejudiced the Plaintiff in that the instrument did not set forth the crime charged with sufficient specificity to apprise the Plaintiff of the offense with which he was charged[36]. (See **Exhibit 6** the court room transcript)

---

[35]*People v. Lloyd* 2013 IL 113510. The court in *Lloyd* stated "we can only consider the evidence regarding the actual charges the State chose to bring against him and not the fact that he may be guilty of the uncharged offense". *Lloyd* 2013 IL 113510. To allege the commission of an offense, any proper criminal charge must be in writing, stating the name of the offense, setting forth the nature and elements of the offense and citing to the statutory provision alleged to have been violated. (Ill. Rev. Stat. 1983 Ch. 38 par. 111-3). Any conviction upon a defective charging instrument would warrant reversal.

[36] *People v. Boyd* (1980), 87 Ill. App.3d 978, 409 N.E.2d 866. *People v. Melton*, 282 Ill. App. 3d 408, 415 (1996) 2-1110. Motion in non-jury case to find for defendant at close of evidence. In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. *Kokinis v. Kotrich* (Ill.1980) 81 Ill.2d 151, 40 Ill. Dec. 812, 407 N.E.2d 43.

37

## PLAINTIFF MOVES FOR A DIRECTED VERDICT AND WAS GRANTED A FINDING OR JUDGMENT IN HIS FAVOR 735 ILCS 5/2-1110

60.     It was not possible for the Defendants to have established a *prima facie* case, in that the charging instrument did not state name of the offense and did not cite to the proper statutory provision alleged to have been violated. (Ill. Rev. Stat 1983, Ch. 38, par. 11-3).

61.     Christopher Stoller was found **not guilty** of the uncharged offense at trial on November 21, 2017. See official Transcript ("**Exhibit 6**" at page 83 Line 20-21). The court stated on the record, "Do to the defect in the complaint, I am going to dismiss the Complaint."

## COUNT I
## VIOLATION OF CIVIL RIGHTS – FALSE ARREST
## PLAINTIFF AGAINST DEFENDANTS

62.     The Plaintiff repeats, reiterates and realleges each and every allegation contained in all prior paragraphs with the same force and effect as if more fully set forth herein. At all times relevant herein, the conduct of the Plaintiff was subject to 42 U.S.C. Secs. 1983, 1985, 1986, and 1988.

63.     That on or about November 19, 2016, at about 12:54p.m., the Plaintiff was in the Costco Wholesale Store located in Melrose Park, Illinois.

64.     Defendant Melrose Park Police Officer Michael DeCarlo Jr., and Officer Flores, wrongfully and falsely arrested, imprisoned and detained Plaintiff, Christopher Stoller, without any legal cause. (See pages 66-71 of the Official Court Room Transcript marked as "**Exhibit 6**" and the true and correct copies of transcripts pages 66-70).

65.     The Melrose Park Police did not have probably cause to arrest Stoller, they searched Stoller, padded him down and did not find any evidence of the stolen gloves.

38

66.     At Stoller's trial Defendant Christine Carlson, Costco's loss prevention agent, testified on November 21, 2017, at Page 48 of the Official Court Transcript beginning with Line 6 of ("**Exhibit 6")**, Ms. Carlson  tells Defendant Matt Harris, Costco's Assistant General Manager, after she had unlawfully removed the Plaintiff groceries that he had purchased from Costco ("**Exhibit 7**") from the electric disability cart, in which Christopher Stoller  was setting in, to call the police. Ms. Carlson gave false information, to Matt Harris, knowing it to be false, and that conduct was motivated by malice. In order to give the police probably cause, so Costco would not be liable for calling the Melrose Park Police, and for Costco not to be liable, for charges of false arrest and false imprisonment.

67.     This arrest was in violation of Plaintiff's Fourth Amendment Rights to the Constitution of the United States as this was an unreasonable seizure, and as a result, the Defendants, *ie* Costco Wholesale Corporation, Melrose Park, Melrose Park Police Department DeCarlo and Flores, Defendants are  liable to Plaintiff pursuant to 42 U.S.C. section 1983.

68.     As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

    69. **WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants.  Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant,  in punitive damages against these Defendants and whatever other relief that this court fees is fair.

.COUNT II

## VIOLATION OF CIVIL RIGHTS FOR EXCESSIVE USE OF FORCE PLAINTIFF AGAINST DEFENDANTS PARK, MELROSE PARK POLICE DEPARTMENT, SAM C. PITASSI, OFFICER DECARLO JR, OFFICER FLORES (MPPD) DEFENDANTS

66.     Plaintiff repeats and realleges each and every allegation contained in all prior paragraphs, with the same force and effect as if more fully and at length set forth herein.

67.     That on or about November 19, 2016, at about 12:54P.M. while the Plaintiff was lawfully and properly in the Costco Wholesale Store in Melrose Park Illinois, Officers/Defendants Michael DeCarlo Jr and Flores without just cause or provocation and with great force and violence unreasonably seized the Plaintiff. The Defendants intentionally and forcefully handcuffed the Plaintiff. Defendants caused handcuffs to be unreasonably placed upon the wrists of the Plaintiff disabled senior citizen, who later had to go to the hospital.

68.     This use of force was excessive and was in violation of Plaintiff's Fourth Amendment Right to the Constitution of the United States as this was an unreasonable seizure, and as a result, the Defendant is liable to Plaintiff pursuant to 42 U.S.C. § 1983.

69.     As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants. Plaintiff is also seeking leave of court to

request 1 Million Dollars ($1,000,000.00) from each defendant, in punitive damages against these Defendants and whatever other relief that this court fees is fair.

## COUNT III

## MONELL LIABILITY[37] PLAINTIFF AGAINST DEFENDANTS MELROSE PARK, MELROSE POLICE DEPARTMENT, SAM C.PITASSI, OFFICER MICHAEL D. DECARLO JR, OFFICER MARCO FLORES (MPPD) DEFENDANTS

70. Plaintiff repeats, reiterates and realleges each and every allegation contained in all prior Paragraphs are incorporated herein with the same force and effect as if more fully set forth at length hereat.

71. As alleged above, Plaintiff is informed and believes and alleges thereon that Defendants, DEFENDANTS RONALD M. SERPICO, MELROSE PARK, MELROSE PARK POLICE DEPARTMENT, SAM C. PITASSI, OFFICER MICHAEL DECARLO JR, OFFICER MARCO FLORES (MPPD) DEFENDANTS, were responsible for the customs and policies, and/or the policymakers for the customs and policies as set forth below.

72. The above named Defendants were acting under of state law and through its employees, agents and/or representatives, engaged in a course of action and behavior, rising to the level of a policy, custom and systemic condoned practice, which deprived Plaintiff of the rights, privileges and immunities secured by the United States Constitution.

73. These rights include, but are not limited to, Plaintiff's Fourth and Fourteenth Amendment Rights to equal protection, and related rights in that the Defendants' and each of

---

[37] Under *Monell v. Department of Social Serv.*, 436 U.S. 658 (1978), a municipal government can be held liable under Section 1983 when as here that a deprivation of a federal right(s) occurred as a result of the "policy" of the Melrose Park and the Melrose Park Police whose acts may fairly be said to be those of the municipality. The Melrose Park municipal action was (i) taken with the requisite degree of culpability and (ii) causally linked to the Plaintiff's deprivation of federal right)s).

them promulgated a custom and/or policy of arresting and/or treating disabled senior citizens by charging them with frivolous motor vehicle violation for frivolous retail thief charges without any substantial evidence.

74.    The Defendants' acts as alleged above were the moving force behind the violations of Plaintiff's rights.

75.    The acts of the Defendants caused Plaintiff injury as set forth above.

76.    Because of the foregoing, Defendants and each of them are liable pursuant to 42 U.S.C. Section 1983.

77.    As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, MELROSE PARK, MELROSE PARK POLICE DEPARTMENT, SAM C.PITASSI, OFFICER MICHAEL D. DECARLO JR, OFFICER MARCO FLORES (MPPD) DEFENDANTS, in an amount in excess of ONE HUNDRED AND FIFTY THOUSAND DOLLARS ($150,000.00) from each defendant,, plus the costs of this suit, for all compensatory damages, resulting from the willful and wanton and other acts and omissions of Defendants. Plaintiff is also seeking leave to request ONE HUNDRED THOUSAND DOLLARS ($100,000.00) in punitive damages against these Defendants individually and in their official capacity.

## COUNT IV
## VIOLATIONS OF 42 U.S.C. §1983 DETENTION AND CONFINEMENT PLAINTIFF AGAINST ALL DEFENDANTS

78.     Plaintiff repeats and realleges and incorporates by reference the allegations in All previous Paragraphs above with the same force and effect as if herein set forth.

79.     As a result of their concerted unlawful and malicious detention and confinement of Plaintiff, Defendants deprived Plaintiff of both his right to his liberty without due process of law and his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. Sec. 1983.

80.     As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants. Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant, in punitive damages against these Defendants and whatever other relief that this court fees is fair.

## COUNT V
## CONSPIRACY TO ENGAGE IN A MALICIOUS PROSECUTION PLAINTIFF
## AGAINST DEFENDANTS

81.    Plaintiff repeats, reiterates and realleges each and every allegation contained in all previous Paragraphs  with the same force and effect as if more fully and at length set forth herein.

82.    Defendants MELROSE PARK, MELROSE PARK POLICE DEPARTMENT, SAM C.PITASSI, OFFICER MICHAEL D. DECARLO JR, OFFICER MARCO FLORES, CHRISTINE CALSON, JEEF ERICKSON, MATT HARRIS, PATRICIO OMAR CHAVEZ, LISA T. DAMICO, DAMICO LAW OFFICES, JEFFREY H. LIPE, RAYMOND LYONS JR, EDWARD J. MURPHY, BRADLEY C. NAHRSTADT  conspired, as set forth above, in causing a frivolous retail theft charge to be filed against Plaintiff on November 19, 2018.

83.    On or about November 19, 2018, Defendants entered into an agreement, ratified and approved the on going conspiracy, in which the frivolous retail thief charge was filed against the Plaintiff.

84.    On or about the November 19, 2016, the Defendants their agents, servants and employees falsely and maliciously and without probable cause or provocation caused Plaintiff to be charged with retail thief.

85.    In furtherance of their conspiracy, the Defendants and each of them gave false information and withheld vital information in connection with the retail thief charge alleged above, as well known  to Defendants, who ratified and approved same before the Melrose Park Police, which caused Officers Michael DeCarlo and Officer  Marco to falsely arrest Christopher Stoller. When the Defendants all new that the retail theft charge was a sham for stealing gloves. The Defendants had no evidence that Stoller stole any gloves, no evidence of the gloves were

44

ever recovered. Defendants Attorney(s) Bradley C. Nahrstadt and Lisa T. Damico met with Christine Carlson, the loss prevention "Agent for Costco and coached her to perjure[38] herself under oath, and to persist in attempting to give false testimony in order to convict Christopher Stoller of a charge that he was not guilty of knowing that there was no evidence of an stolen gloves ever recovered on November 19, 2016, the day of the false arrest. See the Official Transcript ("**Exhibit 6")**, filled with perjury and Attorney Lisa T. Damico subornation of perjury[39].

86.     The November 19, 2016, the false arrest of Christopher Stoller was falsely and maliciously ratified, and approved by all the Defendants.

87.     Judge Russell Syracuse, for the Village of Melrose Park on November 21, 2017, dismissed, vacated and favorably terminated the 'false" arrest charge against Plaintiff see a copy. See official Transcript ("**Exhibit 6"** Page 83, Line 20-21).

88.     That the commencement and/or continuation of the false arrest charge proceedings by the Defendants against the Plaintiff was without probable cause, and with actual malice.

89.     That by reason of the aforesaid unlawful and malicious prosecution resulting in the "false" arrest charge on November 19, 2016, the Plaintiff was deprived of his liberty, was

---

[38] **18 U.S. Code § 1621 - Perjury generally**

Whoever—(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or (2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true; is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

[39] 18 U.S. Code § 1622 - Subornation of perjury .Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined under this title or imprisoned not more than five years, or both.

brutally hand cuffed, subjected to great indignity, humiliation, pain and great distress of mind and body, was later hospitalized and was held up to scorn and ridicule, was injured in his character and reputation, was prevented from attending his usual business and avocation, was injured in his reputation in the community and the said Plaintiff has been otherwise damaged.

90.     Because of their concerted unlawful and malicious conspiracy of Defendants Plaintiff was deprived of both his liberty without due process of law and his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. §1983 and 1985.

91.     As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, and each of them, in their individual and official capacity, an amount, in excess of 1 Million Dollars each, ($1,000,000.00), plus the costs of this suit, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of all the Defendants. Plaintiff is also seeking leave of court to request an additional $1 Million Dollars ($1,000,000.00) in punitive damages against each Defendant individually and in their official capacity.

## COUNT VI
## VIOLATIONS OF 42 U.S.C. §1983

92.     Plaintiff repeats and realleges and incorporates by reference the allegations in All previous Paragraphs above with the same force and effect as if herein set forth.

93.     At all times relevant to this Complaint, Defendant Officer Michael DeCarlo Jr and Officer Marco Flores, Melrose Park Police Officers were acting under the direction and control of the Village of Melrose Park, a Municipality[40], located in Cook County Illinois.

94.     Acting under color of law and pursuant to official policy or custom, Defendant Officer Michael DeCarlo Jr and Officer Marco Flores and/or the Mayor of Melrose Park Ronald M. Serpico, the Chief of Police of the Melrose Park, Sam C Pitassi, knowingly, recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis Defendants Officer Michael DeCarlo Jr and Officer Marco Flores  in their duties to refrain from:

**(a)**     Unlawfully and maliciously harassing a citizen who was acting in accordance with his constitutional and statutory rights, privileges, and immunities;

**(b)**     Unlawfully and maliciously arresting, imprisoning and prosecuting a citizen who was acting in accordance with his constitutional and statutory rights, privileges, and immunities,

**(c)**     Conspiring to violate the rights, privileges, and immunities guaranteed to Plaintiff by the Constitution and laws of the United States;

**(d)**     Otherwise depriving Plaintiff of his constitutional and statutory rights, privileges, and immunities.

---

[40]  Melrose Park, the Mayor of Melrose Park Ronald M. Serpico, the Chief of Police of the Melrose Park Police Sam C Pitassi, the responsible policymakers of Melrose park had actual or constructive knowledge of the misconduct of  Officer Michael DeCarlo Jr and Officer Marco Flores, but covered it up and failed as a matter of specific intent or deliberate indifference to stop or correct the practice F 3d 831 at *3(4th Cir 1996) . See *Wrigh v. Town of Glenarden*, 89  F 3d 831 at *3(4th Cir 1996)

95.     Defendant(s) Melrose Park, the Melrose Park Police, Ronald M. Serpico, Sam C. Pitassi, had they diligently exercised their duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed. Defendant(s) Melrose Park, the Melrose Park Police, Ronald M. Serpico, Sam C. Pitassi, had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with gross negligence failed or refused to do so. Defendants/Officers Michael DeCarlo Jr and Officer Marco Flores knew or should have known that there was no probably cause, no evidence, upon which the arrest of Christopher Stoller could be justified under the law. Defendants Officer Michael DeCarlo Jr and Officer Marco but "manufactured that "charge" of retail theft of a gloves in order unlawfully arrest the Plaintiff.

96.     Defendant(s) Melrose Park, the Melrose Park Police, Ronald M. Serpico, Sam C. Pitassi, directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of Defendant(s) Michael DeCarlo Jr and Officer Marco heretofore described.

97.     As a direct and proximate cause of the negligent and intentional acts of Defendants, as set forth above, Plaintiff suffered physical injury, went to his doctor who issued a report of Stoller's injuries marked as ("**Exhibit 2"**).

98.     As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**WHEREFORE,** Plaintiff demands judgment against all the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of FIVE HUNDRED

THOUSAND DOLLARS ($500,000.00) and request leave of court to further demands judgment against each of said Defendants, jointly and severally, punitive damages in the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00), plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## COUNT VII

## MALICIOUS PROSECUTION[41]PLAINTIFF AGAINST DEFENDANTS LISA T. DAMICO, DAMICO LAW OFFICES, BRADLEY C. NAHRSTADT, EDWARD J. MURPHY, THOMAS J. PONTIKIS, LIPE, LYONS MURPHY & PONTIKIS LTD , JOHN DOE 1

99.   Plaintiff repeats and realleges and incorporates by reference the allegations in all previous above with the same force and effect as if herein set forth.

100.   Defendants instituted a "phony" retail thief charge against the plaintiff with malice on November 19, 2016 and/or had after the fact constructive knowledge of the wrongdoing and failed to do anything about it. Defendants caused a frivolous legal prosecution of the fictitious theft charge.

101.   Defendants LISA T. DAMICO, DAMICO LAW OFFICES, BRADLEY C. NAHRSTADT, EDWARD J. MURPHY, THOMAS J. PONTIKIS, LIPE, LYONS MURPHY & PONTIKIS LTD, JOHN DOE 1 played an active part in the initiation of the frivolous theft charge and/or frivolous prosecution of same.

102.   Lisa T. Damico subordinated the perjuriously statements of Christine Carlson.

---

[41] In an action for malicious prosecution, the plaintiff must prove four elements: that the prosecution was (1) malicious; (2) instituted by or with the cooperation of the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff. *O'Connor v. Tice*, 281 Va. 1, 7, 704 S.E.2d 572, 575 (2011); *Baker v. Elmendorf*, 271 Va. 474, 476, 628 S.E.2d 358, 359 (2006). On Page 40 of the Official Court Transcript **Exhibit 6**, the Administrative Law Judge Russell Syracuse states on the record that this is not a criminal prosecution, it is a "$100.00 civil offense ticket" on page 40 at line 22. Defendant Melrose Park Civil Attorney Lisa T. Damico makes a judicial admission on the official transcript confirming, "It is a trial on a ticket." At page 40 line 22. Administrative Law Judge Russell Syracuse states on line 24 page 40-41 Exhibit 6 "This is not a criminal charge." As such, Defendant Attorney Lisa T. Damico is not entitled to prosecutorial immunity for prosecuting a criminal offense, because in this case she was acting as a Melrose Park Counsel trying Civil matters.

103.    Defendant played an active part in the initiation of the phony theft charges and/or the prosecution of same, resulting in the unlawful arrest, excess force, false imprisonment and trial of Plaintiff.

104.    The charges were not based upon probable cause that is the state of the facts in the mind of the prosecutor would not lead a man of ordinary caution and prudence to believe, or entertain an honest or strong suspicion that Plaintiff was guilty of theft of a glove. No gloves were ever recovered.

105.    Defendants had a duty to ascertain whether there was a reasonable and probable cause for a retail theft of glove charge, to wit, knowing that Plaintiff was not guilty of the retail theft of a glove.

106.    Defendants knew that Christopher Stoller was innocent man. They had a duty to follow the law and failed that duty.

107.    Defendants recklessly caused Christine Carlson to make false statements accusing the Plaintiff of stealing a glove from Costco and those statements resulted in Plaintiff's arrest for theft of a glove.

108.    Defendants instigated or participated in the prosecution by pressuring Judge Russell Syracuse to find the Plaintiff guilty of the retain theft of a glove.

109.    The false arrest  charge used by Melrose Police Department, terminated in the favor of the Plaintiff when Judge Russell Syracuse for the Village of Melrose Park on November 21,2017, dismissed, vacated and favorably terminated the 'false" arrest charge against Plaintiff see a copy.

110.    Defendants Melrose Park, the Police Department of Melrose Park, the Mayor of Melrose Park, Ronald M. Serpico, the Chief of Police of the Melrose Park, Sam C Pitassi are

liable under the Doctrine of Respondent Superior.

111.    As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants. Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant, in punitive damages against these Defendants and whatever other relief that this court fees is fair.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS PLAINTIFF
### (Against all Defendants)

109.    Plaintiff repeats, reiterates and realleges each and every allegation contained in all previous Paragraphs with the same force and effect as if more fully and at length set forth herein.

110.    As alleged above, the Defendants and each of them engaged in extreme and outrageous conduct by intentionally causing the Plaintiff to be falsely arrested and maliciously prosecuted.

111.    As a direct, foreseeable, and proximate result of said wrongful acts by Defendants as alleged above, caused the Plaintiff to suffer extreme emotional distress. This includes but is not limited to humiliation, anxiety, shame, despair, embarrassment, depression, mental pain, anguish, and injury to his reputation.

112.    As a result of the actual emotional distress suffered by Plaintiff, he has sought and

51

receives mental health therapy and his business and related affairs have substantially suffered.

113.    As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants. Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant, in punitive damages against these Defendants and whatever other relief that this court fees is fair.

## COUNT IX
## DEFENDANTS VIOLATED PLAINTIFF'S DUE PROCESS

114.    Plaintiff repeats, reiterates and realleges each and every allegation contained in all previous Paragraphs with the same force and effect as if more fully and at length set forth herein.

115.    As described in detail above, the Attorney Lisa T Damico, Defendant Officers, DeCarlo Jr, and Flores while acting individually, jointly, and each in conspiracy with one or more other persons, deprived Plaintiff Christopher Stoller of his constitutional right to a fair trial by withholding and suppressing exculpatory and impeachment evidence and by fabricating evidence against Plaintiff.

116.    In the manner described more fully above, the Attorney Lisa T. Damico, Witness Christine Carlson, Defendants/Officers, DeCarlo Jr, and Flores deliberately withheld exculpatory

and impeachment evidence from Plaintiff and from the court, among others, thereby misleading and misdirecting the civil prosecution of Plaintiff Christopher Stoller.

117.    In addition, in the manner described more fully above, the Defendants Lisa T. Damico, Christine Carlson, Defendants/Officers, DeCarlo Jr, and Flores, knowingly fabricated and solicited false evidence implicating Plaintiff the crime, and pursued and almost obtained Plaintiff's conviction using that false evidence.

118.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

119.    The constitutional injuries complained of herein were proximately caused by the intentional misconduct of Defendants Lisa T. Damico, Witness Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores other Unknown Defendant Officers, or were proximately caused when Defendants Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores & other Unknown Defendant Officers were deliberately, recklessly indifferent to their subordinates misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

120.    As a result of the Defendants Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores Officers, misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

121.    The misconduct described in this Count was also undertaken pursuant to the policies and practices of the Costco Wholesale Corporation lack of a loss prevention policy and the Melrose Park Police Department in the manner described more fully above. In this way, the

53

Village of Melrose Park (itself and/or through the Police Department, Costco Wholesale Corporation) also violated Plaintiff Christopher Stoller's rights through the actions of their agents and employees by maintaining policies and practices that were a moving force driving the foregoing constitutional violations. As such, the Village of Melrose Park and Costco Wholesale Corporation are also liable.

122. As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, **WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants. Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant, in punitive damages against these Defendants and whatever other relief that this court fees is fair.

# COUNT X
## MALICIOUS PROSECUTION

124. Plaintiff repeats, reiterates and realleges each and every allegation contained in all previous Paragraphs with the same force and effect as if more fully and at length set forth herein.

125. In the manner described more fully above, Defendant Lisa T. Damico, Christine Carlson, Defendants/Officers, DeCarlo Jr, and Flores individually, jointly, and each in conspiracy with one or more persons, known and unknown, and all pursuant to the Village of

54

Melrose Park and the Costco Wholesale Corporation policies and widespread practices, deprived Plaintiff Christopher Stoller of his constitutional rights.

126.   The Defendants/Officers, DeCarlo Jr, and Flores accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff Christopher Stoller without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

127.   In so doing, the Defendants Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores caused Plaintiff to be unreasonably seized and defendant Lisa T. Damico caused Christopher Stoller to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated.

128.   The Defendants Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores subjected Plaintiff Christopher Stoller to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff Christopher Stoller was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores Officers' fabrication, suppression, and withholding of evidence.

129.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff Christopher Stoller's clear innocence.

55

130. Likewise, Defendants Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores other Unknown Defendant Officers were supervisors, and had knowledge of the misconduct of DeCarlo Jr and Flores, and other Unknown Defendant Officers.

131. The constitutional injuries complained of herein were proximately caused by the intentional misconduct of Defendants Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores & other Unknown Defendant Officers, or were proximately caused when Defendants & other Unknown Defendant Officers were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

132. As a result of the misconduct of the Defendants Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

133. The misconduct described in this Count was also undertaken pursuant to the policies and practices of the Costco Wholesale Corporation and the Melrose Park Police Department in the manner described more fully above. In this way, the Village of Melrose Park, the Costco Wholesale Corporation also violated Plaintiff Christopher Stoller's rights through the actions of their agents and employees by maintaining policies and practices that were a moving force driving the foregoing constitutional violations. As such, the Village of Melrose Park and Costco Wholesale Corporation are also liable.

134. As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

56

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants. Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant, in punitive damages against these Defendants and whatever other relief that this court fees is fair.

## COUNT XI

### UNLAWFUL DETENTION

**(Against Defendants Lisa T. Damico, Christine Carlson, Defendants/Officers, DeCarlo Jr, Flores, Unknown Defendant Officers and the Village of Melrose Park, Costco Wholesale Corporation)**

135. Plaintiff repeats, reiterates and realleges each and every allegation contained in all prior Paragraphs with the same force and effect as if more fully and at length set forth herein

136. As described more fully above, Costco Wholesale Corporation Defendants Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores, and unknown Defendant Officers caused Plaintiffs Christopher Stoller to be unlawfully and unreasonably detained without justification.

137. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

138. As a result of the above-described wrongful infringement of his rights, Plaintiffs suffered damages, including but not limited to emotional distress and anguish.

139. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Costco Wholesale Corporation and the Melrose Park Police Department in that the Village of Melrose Park has a policy, practice, and custom of involuntarily detaining

anyone that that a loss prevention employee of Costco Wholesale Corporation points a finger at, for unreasonable periods of time, and falsely charging them with crimes that they did not commit.

140.    Costco Wholesale Corporation and the Village of Melrose Park has failed to act to remedy the patterns of abuse described in the preceding paragraph(s), despite actual knowledge of the same, thereby causing the types of injuries alleged here.

141.    The misconduct described in this Count was undertaken by the Defendant Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores , and unknown Defendant Officers, within the scope of their employment and under color of law such that their employer(s) ie Damico Law Offices, Costco Wholesale Corporation and the Village of Melrose Park are liable for their actions.

142.    As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants. Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant,  in punitive damages against these Defendants and whatever other relief that this court fees is fair.

**COUNT XII**
**CONSPIRACY TO DEPRIVE PLAINTIFF OF HIS CONSTITIONAL RIGHTS**
**(Against all Individual Defendants)**

58

143. Plaintiff repeats, reiterates and realleges each and every allegation contained in prior Paragraphs with the same force and effect as if more fully and at length set forth herein.

144. Each of the Defendant Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores acting in concert with one or more co-conspirators, reached an agreement to deprive Plaintiff Christopher Stoller of his constitutional rights, all as described in the various paragraphs of this Complaint.

145. Each of Defendants Costco Wholesale Corporation, Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores and unknown Defendant Officers, acting in concert with one or more co-conspirators, reached an agreement to deprive Plaintiff Christopher Stoller of his constitutional rights, all as described in various paragraphs of this Complaint.

146. In so doing, these co-conspirators conspired to accomplish an unlawful purpose, or to accomplish a lawful purpose by an unlawful means.

147. In furtherance of their conspiracy, one or more of the co-conspirators committed an overt act, and each was a willful participant in joint activity.

148. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiffs' constitutional rights.

149. As a result of the Individual Defendants' misconduct described in this Count Plaintiff suffered loss of liberty and injury, including physical and emotional harm.

150. The misconduct described in this Count was also undertaken pursuant to the policies and practices of Costco Wholesale Corporation, the Melrose Park Police Department in the manner described more fully above. In this way, the Village of Melrose Park also violated Plaintiff Christopher Stoller's rights through the actions of their agents and employees by

maintaining policies and practices that were a moving force driving the foregoing constitutional violations.

151.    As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants. Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant, in punitive damages against these Defendants and whatever other relief that this court fees is fair.

## COUNT XIII
## FALSE IMPRISONMENT
**(Against Defendants Costco Wholesale Corporation, Lisa T. Damico, Christine Carlson, Defendant Officers, DeCarlo Jr, Flores Biswell, and Unknown Defendant Officers)**

152.    Plaintiff repeats, reiterates and realleges each and every allegation contained in all prior Paragraphs with the same force and effect as if more fully and at length set forth herein.

153.    Plaintiff Christopher Stoller was arrested and detained despite Defendants DeCarlo Jr and Flores, and Unknown Defendants/Officers 'knowledge that there was no lawful justification for doing so.

154.    In the manner described more fully above, Defendants Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores and Unknown Defendant Officers unlawfully and unreasonably imprisoned Plaintiff Christopher Stoller without justification.

60

155.    As a result of the above-described wrongful infringement of their rights, Plaintiff suffered damages, including but not limited to emotional distress and anguish.

156.    Defendants Christine Carlson, Defendant Officers, DeCarlo Jr, and Flores and Unknown Defendant Officers' conduct was undertaken intentionally, with malice and reckless indifference to the constitutional rights of Christopher Stoller.

157.    The misconduct described in this Count was undertaken by the Defendant Christine Carlson within the scope of her employment and under color of law such that their employer, Costco is liable. Defendant Officers, DeCarlo Jr, and Flores and unknown Defendant Officers, within the scope of their employment and under color of law such that their employer, City of Quincy, is liable for their actions.

158.    As a result of the misconduct of the Defendants described in this Count, Plaintiff Christopher Stoller suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

    **WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants. Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant, in punitive damages against these Defendants and whatever other relief that this court fees is fair.

## COUNT XIV
## FAILURE TO INTERVENE

**(Against Defendant Costco Wholesale Corporation, Damico Law Offices, Lisa T. Damico, Lipe, Lyons Murphy & Pontikis Ltrd., Jeffrey H. Lipe, Raymond Lyons, Jr., Edward J. Murphy, Bradley C. Nahrstadt, Thomas J. Pontikis, Christine Carlson, Jeff Erickson, Matt Harris, Patricio Omar Chavez, Officers, DeCarlo Jr and Flores, Village Of Melrose Park)**

159.    Plaintiff repeats, reiterates and realleges each and every allegation contained in all prior Paragraphs with the same force and effect as if more fully and at length set forth herein.

160.    During the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity to do so.

161.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiffs' constitutional rights.

162.    The misconduct described in this Count was also undertaken pursuant to the policies and practices of the Costco Wholesale Corporation, the Melrose Park Police Department in the manner described more fully above. In this way, the Village of Melrose Park and the Costco Wholesale Corporation  also violated Plaintiff Christopher Stoller rights through the actions of their agents and employees by maintaining policies and practices that were a moving force driving the foregoing constitutional violations.

163.    As a result of Defendants' misconduct described in this Count, undertaken pursuant to the Melrose Park and Costco Wholesale Corporation policies and practices as described above, Plaintiff Christopher Stoller suffered injury, including physical and emotional harm.

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants. Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant, in punitive damages against these Defendants and whatever other relief that this court fees is fair.

## COUNT XV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against all Defendants)

164.    Plaintiff repeats, reiterates and realleges each and every allegation contained in all prior Paragraphs with the same force and effect as if more fully and at length set forth herein.

164.    In the manner described more fully above, by fabricating false evidence against Christopher Stoller, maliciously prosecuting him, and/or by withholding exculpatory and impeaching evidence from him, the Individual Defendants engaged in extreme and outrageous conduct.

165.    Moreover, in the manner described more fully above, by causing Christopher Stoller, to be unlawfully detained Defendants within the scope of their employment and under color of law such that their employer Defendants engaged in extreme and outrageous conduct

166.    Defendants' actions set forth above were rooted in an abuse of power or authority.

167.    Defendants' actions set forth above were undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

63

168.    Defendants' actions set forth above were undertaken with malice, willfulness, and reckless indifference to the rights of others.

169.    The misconduct described in this Count was undertaken by the Defendant Costco Wholesale Corporation, Damico Law Offices, Lisa T. Damico, Lipe, Lyons Murphy & Pontikis Ltd., Jeffrey H. Lipe, Raymond Lyons, Jr., Edward J. Murphy, Bradley C. Nahrstadt, Thomas J. Pontikis, Christine Carlson, Jeff Erickson, Matt Harris, Patricio Omar Chavez, Officers, DeCarlo Jr and Flores, within the scope of their employment and under color of law such that their employers, are liable for their actions. The misconduct described in this Count was also undertaken by Christine Carlson, Jeff Erickson, Matt Harris, and Patricio Omar Chavez within the scope of their employment and under color of law such that their employer, Costco Wholesale Corporation is liable for their actions.

170.    As a direct and proximate result of the misconduct described in this Count, Plaintiff suffered injuries, including severe emotional distress and ongoing pain.

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants.  Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant,  in punitive damages against these Defendants and whatever other relief that this court fees is fair.

## COUNT XV1
### *Pe se* Defamation[42]
### (Against all Defendants)

164.     Plaintiff repeats, reiterates and realleges each and every allegation contained in all prior Paragraphs with the same force and effect as if more fully and at length set forth herein.

165.  Defendant Costco employee Christine Carlson as well known to all of the defendants wrote a report **that impute Christopher Stoller** had committed a crime. See **Exhibit 2.**

166. The Melrose Park Police Officer wrote out a false complaint against Christopher Stoller that impute that Chritopher Stoller had committed a crime See **Exhibit 4.**  Christopher Stoller did not commit a crime.

167. The said statements were defamatory *per se* because they accused the plaintiffs of the crime of thief, and they demeaned and defamed the plaintiffs. The plaintiff suffers today from the said defamation.

168. The statements actually supported by the evidence are defamatory as a matter of law because they were NOT subject to innocent construction.

169. which conduct was the legal cause of the injuries or damages to the Plaintiff..

---

[42] The Plaintiff has  presented facts showing the are guilty of *per se* defamation.
The defendants made a false statement about the plaintiff (Exhibits 2 & 4), the defendant made an unprivileged publication of that statement to a third party, and the publication caused damages. *Hadley v. Doe*, 2015 IL 118000, ¶ 30. A defamatory statement is one that harms a person's reputation because it lowers the person in the eyes of others or deters others from associating with her or him. *Id.*
Statements may be considered defamatory *per se* or defamatory *per quod. Tuite v. Corbitt*, 224 Ill. 2d 490, 501 (2006). A statement is defamatory *per se* if its defamatory character is obvious and apparent on its face, and injury to the plaintiff's reputation may be presumed. *Id*
 Here, the plaintiff is pursuing only a claim of defamation *per se*. Under Illinois law, there are five categories of statements considered defamatory *per se*, only three of which are relevant to this case: (1) **words that impute a person has committed a crime," (See Exhibit 2 &4)** (2) "words that impute a person is unable to perform or lacks integrity in performing her or his employment duties," and (3) "words that impute a person lacks ability or otherwise prejudices that person in her or his profession." *Green v. Rogers*, 234 Ill. 2d 478, 491-92 (2009).

**WHEREFORE**, the Plaintiff prays for judgment against Defendants, individually and in their official capacity and each of them, in an amount of 1 Million Dollars ($1,000,000.00) each, plus the costs of this suit, attorney fees, for all compensatory damages, resulting from the willful, wanton, and other acts and omissions of Defendants. Plaintiff is also seeking leave of court to request 1 Million Dollars ($1,000,000.00) from each defendant, in punitive damages against these Defendants and whatever other relief that this court fees is fair.

Christopher Stoller
415 Wesley, Apt. 1
Oak Park, IL 60302
(773) 746-3163
Cns40@hotmail.com

## VERIFICATION

Under penalties as provided by law under Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct except as to matters therein stated to be on information and belief, and as much matters, the undersigned certifies as aforesaid that I verify believe the same to be true, and the attached documents are true and correct copies of the originals.

Christopher Stoller

# EXHIBIT INDEX

EXHIBIT 1    Costco Grocery Receipt

EXHIBIT 2    *pe se* defamatory report

EXHIBIT 3    Medical Report

EXHIBIT 4    Melrose Park Police Ticket

EXHIBIT 5    Motion for Directed Finding

EXHIBIT 6    Official Transcript of the Malicious Prosecution Trial Nov. 21, 2017

EXHIBIT 7    Compliance Violation Number C102277

EXHIBIT 8    Village of Melrose Park, Cook County Illinois Ordance 1354

EXHIBIT 9    Medical Report    See    Exhibit 3

EXHIBIT 10

EXHIBIT 11   Costco Grocery Receipt    SEE    Exhibit 1

EXHIBIT 12   Defamation Document    SEE    Exhibits 2+4

EXHIBIT 13   Costco Lost Prevention Report 1085    Exhibit 2

EXHIBIT   14   Costco Mission Statement

EXHIBIT   15   Number of Costco Stores

# EXHIBIT 1



**Melrose #1085**
8400 West North Ave
Melrose Park, IL 60160

3G Member 111850480782

| | | | |
|---|---|---|---|
| | 416076 KSDAILY 500C | 12.69 | E |
| E | 1070713 FUDGE COOKIE | 7.99 | E |
| | 87745 ROTISSERIE | 4.99 | A |
| | 629240 KS STOOL 400 | 5.39 | E |
| E | 599203 HAYS | 3.99 | E |
| E | 1068067 HOUSE KIT | 9.79 | E |
| E | 1070713 FUDGE COOKIE | 7.99 | E |
| | SUBTOTAL | 52.83 | |
| | TAX | 1.60 | |
| **** | TOTAL | 54.43 | |

XXXXXXXXXXXX7524          SWIPED
Seq#: 9971          App#: 311339
Cash Card          Resp: Approved
          AMOUNT: $22.09
REMAINING BALANCE: $50.00

          Cash Card          22.09
          SUBTOTAL          30.74
          TAX          1.60
**** TOTAL          52.43

XXXXXXXXXXXX0527          SWIPED
Seq#: 9973          App#: 276532
EFT/Debit          Resp: APPROVED
Tran ID#: 632400009973....
Merchant ID: 95108511

APPROVED - Purchase
  AMOUNT: $52.34
CASHBACK: $20.00

          EFT/Debit          52.34
          CHANGE          20.00

A 10.5% Tax          0.52
E 2.25% TAX          1.08
TOTAL TAX          1.60
TOTAL NUMBER OF ITEMS SOLD =          7
17/19/2016 12:00 1085 9 96 15
OP#: 15 Name: MARTA O
          Thank You!
     Please Come Again
Whse:1085 Trm:9 Trn:96 OP:15



**Melrose #1085**
8400 West North Ave
Melrose Park, IL 60160
(708) 397-2905

          901943 BRATWURST/SO          1.50 A
          SUBTOTAL          1.50
          TAX          0.16
**** TOTAL          1.66
          CASH          20.06
          CHANGE          18.40

A 10.5% Tax          0.16
TOTAL TAX          0.16
TOTAL NUMBER OF ITEMS SOLD -          1
17/19/2016 12:04 1085 503 33 248
OP#: 248 Name: monica
          Thank You!
     Please Come Again
Whse:1085 Trm:503 Trn:33 OP:248

# EXHIBIT 2

# COSTCO WHOLESALE

**LOSS PREVENTION**

# REPORT - US

| | REPORT NUMBER |
|---|---|
| | 1085C-35 |

| WAREHOUSE NAME AND NUMBER | TYPE OF INCIDENT |
|---|---|
| Melrose Park #1085 | ☒ SHOPLIFTING  ☐ FRAUD  ☐ EMPLOYEE THEFT  ☐ OTHER |

| DATE | 11-19-2016 | DAY OF WEEK | ☐ MON  ☐ TUES  ☐ WED  ☐ THURS  ☐ FRI  ☒ SAT  ☐ SUN | TIME: 12:00  ☐ AM  ☒ PM |
|---|---|---|---|---|

## SUBJECT INFORMATION

| NAME (LAST, FIRST, MI) | ALIASES | TELEPHONE |
|---|---|---|
| Stoller, Chris N. | N/A | ( ) |

| ADDRESS | CITY, STATE, ZIP CODE |
|---|---|
| 401 W. Lake St. | Northlake, IL 60164 |

| SEX | AGE | DOB | | RACE | ☐ ASIAN  ☐ HISPANIC  ☐ BLACK |
|---|---|---|---|---|---|
| M | 67 | 12-29-1948 | ☒ ADULT | | ☐ NATIVE AMERICAN  ☒ WHITE  ☐ POLYNESIAN |
| HEIGHT | WEIGHT | HAIR | ☐ JUVENILE | | ☐ OTHER Specify _____ |
| 5'7 | 196lb | Grey | | | |

| EYES | FACIAL HAIR | OCCUPATION | BUSINESS NAME | BUSINESS PHONE |
|---|---|---|---|---|
| Green | None | N/A | N/A | ( ) |

| DRIVER'S LICENSE # | OTHER ID # (SPECIFY) | BUSINESS ADDRESS |
|---|---|---|
| 3461-1448-370S | N/A | N/A |

| COSTCO MEMBER?  ☒ YES  ☐ NO | MEMBERSHIP #  111850480782 | CARD SURRENDERED?  ☐ YES  ☒ NO | CARD CANCELLED?  ☒ YES  ☐ NO | VEHICLE (MAKE, MODEL, YEAR)  N/a | VEHICLE (LIC. #., STATE)  N/A |
|---|---|---|---|---|---|

| INFORMATION NECESSARY IF SUSPECT IS AN EMPLOYEE | DATE OF HIRE | DATE TERMINATED | POSITION | EMPLOYEE NO | DEPARTMENT |
|---|---|---|---|---|---|

## MERCHANDISE INFORMATION

| DESCRIPTION OF MERCHANDISE | ITEM NO. | QTY | PRICE EACH | TOTAL |
|---|---|---|---|---|
| Fownes Brothers Men's Leather Gloves | 1058069 | 1 | $24.99 | $24.99 |
| Shrimp | 18730 | 1 | $11.99 | $11.99 |
| | | | | |
| | | | | |
| | | | **TOTAL** | $36.98 |

**DISPOSITION OF MERCHANDISE**
☐ RETURNED TO SHELF ☐ RETAINED AS EVIDENCE AT WAREHOUSE ☒ OTHER _DeD_
☐ RETAINED BY POLICE AS EVIDENCE ☐ PHOTO TAKEN AND ATTACHED TO REPORT ☐ PURCHASED

## WITNESS INFORMATION

| WITNESS #1 | NAME & ADDRESS | TELEPHONE NO. |
|---|---|---|
| | Christine Carlson 8400 W. North Ave. Melrose Park, IL 60160 | (708) 397-2905 |
| WITNESS #2 | NAME & ADDRESS | TELEPHONE NO |
| | Matt Harris 8400 W. North Ave. Melrose Park, IL 60160 | (708) 397-2905 |

## DISPOSITION INFORMATION

| TIME OF INCIDENT | TIME OF DETAINMENT | TIME POLICE CALLED | TIME POLICE ARRIVED | TO PD CUSTODY | CITED AND RELEASED | RELEASED TO PARENT (TIME & NAME) | TO SELF CUSTODY |
|---|---|---|---|---|---|---|---|
| 11:30am | 12:15pm | 12:20pm | 12:30pm | N/A | 1:00pm | N/A | N/A |

| POLICE OFFICERS' NAMES  DeCarlo | I.D. NUMBER/POLICE DEPARTMENT  #52 Melrose Park PD | PD CASE #  16-26297 | TELEPHONE NO.  (708) 344-8409 |
|---|---|---|---|

| REPORT PREPARED BY:  Christine Carlson | SIGNATURE OF REPORTING EMPLOYEE | DATE  11-19-16 |
|---|---|---|

DISTRIBUTION: ORIGINAL TO WAREHOUSE
COPY TO POLICE DEPARTMENT
COPY TO CORPORATE SECURITY

Form #SC04US 01/07 (Retention = Current & 7 Fiscal Years)

MP LTD 7

# REPORT (CONTINUATION)

CASE NUMBER OR SUBJECT'S LAST NAME
**1085C-35**

Subject's first words at time of detention: _____

_____

_____

_____

_____

_____

_____

_____

**NARRATIVE:** (Include who, what, when, where, why and how. Include subject's explanation in detail. Attach written statement of subject(s) or Record of Interview and copies of pertinent cash register receipts.) _____

On Saturday November 19, 2016 at approximately 11:25am, I Carlson, Christine witnessed a male, now known to me as Christopher Stoller in a motorized scooter in the sundries area eating cocktail shrimp from a pre-made deli platter (#18730/$11.99). After he consumed the majority of the shrimp, he threw the remaining shrimp away along with the package. I retrieved the package from the trash can and made my way to the office in order to alert management that I would be approaching Mr. Stoller at the registers in order to ensure he would pay for the shrimp. I took this situation especially seriously because we have had an issue with losing shrimp to theft/ grazing the past few Saturdays. While I was in the office I kept surveillance on Mr. Stoller via still and PTZ cameras. I watched as Mr. Stoller entered the center aisles and selected 3 pairs of Fownes Brothers men's leather gloves (#1058069/$24.99each). He placed them in the basket of the motorized scooter and drove off. Once he was against the back hardlines bulk wall, he removed one pair of gloves from the packaging and placed the gloves in his left jacket pocket. He then drove down aisle 105, where I later retrieved an empty box of Fownes Brothers men's leather gloves. He placed the remaining packages of gloves on a clothing table, concealing them under multiple jackets. Mr. Stoller then made his way to the front end and paid for the merchandise in his cart at a register. He did not at any time purchase shrimp or gloves on November 19, 2016. Mr. Stoller proceeded to the food court where he purchased food and a drink. Before picking up the food, he walked to the restrooms. I asked a male coworker, Omar Chavez, who was in the office with me to follow Mr. Stoller into the bathroom and to report back to me if he lost visual contact with Mr. Stoller at any time or if Mr. Stoller left behind gloves in the bathroom. I witnessed Mr. Stoller exit the restroom with Omar directly behind. He stated that he was able to see Mr. Stoller the entire time in the washroom and no gloves were left behind. Mr. Stoller went back to the food court where he picked up his food and consumed it. As he left to exit the warehouse, I approached Mr. Stoller in the vestibule and introduced myself as security for Costco. I asked Mr. Stoller to come back into the building with me for a discussion. He told me that he would not come with me and continued to ride away on the scooter. I told Mr. Stoller that I saw him consume the shrimp and we would need to fill out paperwork and settle the debt. Mr. Stoller responded by saying "F*** off, just cancel my membership". Mr. Stoller then stopped to allow a group of members to walk in front of him. I took this opportunity to remove the box of items he had purchased in the basket of his scooter in order to entice him to stay. Mr. Stoller told me to keep his groceries and then entered the parking lot on the scooter. At this point I contacted store management. Assistant Manager Matt Harris was the first to arrive and I explained to him what had transpired. He asked me what direction Mr. Stoller left in. I was unsure and followed Matt as he entered the parking lot to search for him. At this time, another Assistant Manager Jeff Erickson and previously mentioned employee Omar Chavez also responded to my radio call and searched the parking lot in a different direction. Jeff and Omar spotted Mr. Stoller near the gas station and told Matt and myself his location over the radio. Matt and I headed in that direction and mett Jeff, Omar and Mr. Stoller on the north side of the parking lot. When I arrived I witnessed Jeff asking Mr. Stoller questions about what took place. General Manager Chris Barbarino came to the scene and inquired as to what had happened. As I was explaining the situation, I noticed that Omar had the motorized scooter that Mr. Stoller was in lifted approximately one inch off the ground. I told Chris that we can not hold Mr. Stoller against his will if he chooses not to cooperate. Chris agreed and instructed all employees to step away. Mr. Stoller stayed in the same spot without force for another approximately 30 seconds. During this time it became clear that AGM Matt was on the

REPORTING EMPLOYEE INITIALS

MP LTD 8

# REPORT (CONTINUATION)

PAGE **3** OF **3** PAGES

CASE NUMBER OR SUBJECTS LAST NAME
**1085C-35**

phone with police asking for their assistance. Chris asked Mr. Stoller if he would like his groceries back but Mr. Stoller said he did not. He drove the scooter another fifteen feet and then got off and left the property on foot, while myself and other employees went back inside the building. Shortly thereafter, police had contacted AGM Matt that they had located and picked up Mr. Stoller near the storage facility across the street from Costco. I met Officer DeCarlo outside of the warehouse and explained to him what happened. He then wrote Mr. Stoller a village citation for retail theft and issued a trespass warning. Mr. Stoller was released and asked again if he would like his groceries back. Mr. Stoller still refused to collect his groceries and left the property on foot.

*che*

REPORTING EMPLOYEE INITIALS

Form #SC04US 01/07 (Retention = Current & 7 Fiscal Years)

MP LTD 9

# EXHIBIT 3

CHRIS STOLLER

01/06/17: Chief Complaint: Neck pain with radiation to trapezial regions, lumbar pain, bilateral knee pain, symptoms subsequent to injury at a retail store.

History of Present Illness: Mr. Stoller is a 68-year-old male who comes in today for a followup. I last saw him on December 2, 2016. He rates his back pain at 6.5/10 and his leg and buttock pain at 6.5/10. It remains difficult for him to sleep at night. With Norco, he has had some improved relief, but muscle spasms continue to awaken him. He had difficulty getting insurance approval for his MRI, but is now scheduled to do so in the near future. He denies any other neurologic changes.

On physical examination, Chris is a 68-year-old male. He ambulates with the assistance of a rolling walker today. Gait pattern is antalgic. Sagittal profile is positive. Extension reproduces back pain with radiation to both buttocks and legs. Straight leg raise is bilaterally positive. He has bilateral knee tenderness to palpation and crepitation. Strength is intact throughout both legs in all muscle groups with paresthesias in his bilateral L5 and S1 dermatomes. Spurling's sign is mildly positive bilaterally. Strength is intact throughout both arms in all muscle groups with sensation intact to light touch in all dermatomal distributions.

I reviewed his therapy notes today.

Assessment/Plan: Chris Stoller is a 68-year-old male with the following diagnoses, causally related to injury at a retail store.
1. Exacerbation of cervical pain.
2. Features of cervical radiculopathy.
3. Exacerbation of lumbar pain.
4. Exacerbation of lumbar radiculopathy.
5. Exacerbation of knee pain.
My recommendations are as follows:
1. Proceed with new MRI of his lumbar spine. He had some difficulty obtaining insurance approval, but is now scheduled to proceed in the near future.
2. Continue physical therapy, as he is able. Transportation issues have prevented him from regularly attending therapy. He is unable to drive due to his pain and functional limitations, and is reliant upon public transportation. With the recent adverse weather conditions, it has been difficult for him to attend.
3. Continue his current analgesic regimen. He understands the potential side effects and will use it appropriate caution.
4. Reevaluation in approximately three months.
5. The patient indicates understanding. All questions were answered.
Mark Sokolowski, M.D., CIME

# EXHIBIT 4

OFFICER'S COPY

CFT-1-17-

**STATE OF ILLINOIS** IN THE ADMINISTRATIVE HEARING DEPARTMENT OF THE VILLAGE OF MELROSE
**COUNTY OF COOK** PARK, IN THE NAME AND BY THE AUTHORITY OF THE VILLAGE OF MELROSE
**VILLAGE OF** ILLINOIS, A MUNICIPAL CORPORATION, PLAINTIFF VS.
**MELROSE PARK**

OFFICER'S COURT KEY: G

**COMPLIANCE VIOLATION NUMBER**
C102277

**COURT DATE**
MONTH 12 DATE 6 YEAR 20 16
HOUR 1.00 M in the courtroom

DEFENDANT'S NAME (PRINT): Stoller Chris N.

ADDRESS: 415 Wesley Ave Oak Pk Zip Code 60302

Birth Date 12 / 24 / 48 Sex M Weight 197 Height 507 Oper License / Chauf.

Did then drive and operate a certain motor vehicle, to wit, a ___ Make of Vehicle ___ License Plate No. ___ State ___ Yr. ___

On 21 Mo. 10 Day Yr. 20 16 at 1254 o'clock M

upon a public highway, 8400 W. North av 16-26297

CHAPTER 10 SECTION 04 010 OF ITS LOCAL ORDINANCE

BY (Describe): retail theft

ONE N. BROADWAY
MELROSE PARK, ILLINOIS

**Pay on or before the court date or appear in court on that date.**

Subscribed and sworn to before me 11-14 20 16

Penalty for this violation must be paid BEFORE Court Date $ 100.00

Si usted tiene alguna pregunta, favor de llamarnos al tel. 708-344-8409

# EXHIBIT 5

## COOK COUNTY, ILLINOIS
## VILLAGE OF MELROSE PARK

| | |
|---|---|
| MELROSE PARK, | MPPD 16-26297 |
| Plaintiff, | |
| VS. | C102277 |
| CHRISTOPHER STOLLER, | |
| Defendant | |

## NOTICE OF MOTION

**TO:**   Lisa T. Damico
DAMICO LAW OFFICES
53 West Jackson Boulevard, Suite 721
Chicago, Illinois 60604
lisa@damicoiawoffices.com

**PLEASE TAKE NOTICE** that on the _2~/_ day of _Nov_ , 20_17_, at _1:00_ a.m., or as soon thereafter as counsel may be heard, and shall then and there present Defendant's Motion to Dismiss the Charge and Request for a Direct Finding, copy hereby duly served upon you.

/s/Philip M. Kiss
Phillip M. Kiss
Attorney for Defendant
5250 Grand Ave, Ste 14-408
Gurnee, IL 60031

Service of this document is being made by hand delivery on November 20, 2017.

Christopher Stoller

1

**COOK COUNTY, ILLINOIS**
**VILLAGE OF MELROSE PARK**

MELROSE PARK,                                    MPPD 16-26297

       Plaintiff,

VS.                                             C102277

CHRISTOPHER STOLLER,

       Defendant

## MOTION TO DISMISS THE CHARGE AND REQUEST FOR A DIRECT FINDING

COMES NOW Defendant Christopher Stoller by and through counsel Phillip M. Kiss and request this honorable Court to dismiss charge § 5/114-1 and for a direct finding in a bench trial 735 ILCS 5/2 100 and in support of said motion now states as follows:

### BACKGROUND

1.     On November 19, 2016, Defendant was charged with Chapter 10 Section 04-010 of the Village of Melrose Park local ordinance. See true and correct copy of the attached Compliance Violation Number C102277 (**Exhibit 1**).

2.     Chapter 10.04 of the Village of Melrose Park Municipal, deals solely with the Code Regarding the Operation of Motor Vehicles. See (**Exhibit 2**) Village of Melrose Park Cook County Illinois Ordinance No. 1354.

3.     The actual charge against the Defendant described by the Melrose Police Department (MPPD) Incident Number 201600026297 Blotter states: Exhibit 3

2

Offender Stoller opened a shrimp cocktail container, ate several shrimp inside totaling $11.99 then took a pair of gloves, placed them in his pocket totaling $24.99 and passed the last point of purchase without paying for said item.

## ARGUMENT

4.      This case must be dismissed as a matter of law because the charging instrument violates Illinois Statutes Chapter 725 Criminal Procedure §5/114-1(8). The charge does not state an offense. Under §/114(c) Since the Defendant's motion presents only an issue of law the court shall determine it without the necessity of further pleadings.

5.      The charge Compliance Violation Number C102277 is void ab initio and must be dismissed with prejudice as a matter of law. It fails to allege the commission of an offense and citing to the statutory provision.

6.      Defendant cannot be found guilty of an uncharged offense. *People v. Lloyd,* 2013 IL 113510. The court in *Lloyd* stated "we can only consider the evidence regarding the actual charges the State chose to bring against him and not the fact that he may be guilty of the uncharged offense ". *Lloyd* 2013 IL 113510.

7.      To allege the commission of an offense, any proper criminal charge must be in writing, stating the name of the offense, setting forth the nature and elements of the offense and citing to the statutory provision alleged to have been violated. (Ill. Rev. Stat. 1983 Ch. 38 par. 111-3).

8.      Any conviction upon a defective charging instrument warrants reversal.

9.      The Defendant asserts that the miscitation prejudices the Defendant in that the instrument does not set forth the crime charged with sufficient specificity to apprise the defendant of the offense with which he is charged; *People v. Boyd* (1980), 87 Ill. App.3d 978, 409 N.E.2d 866. *People v. Melton,* 282 Ill. App. 3d 408, 415 (1996).

3

## DEFENDANT MOVES FOR A DIRECTED VERDICT

## A FINDING OR JUDGMENT IN HIS FAVOR 735 ILCS 5/2-1110 2-1110

10.    Motion in non-jury case to find for Defendant at close of evidence.  In all cases tried without a jury, Defendant may, at the close of Plaintiff's case, move for a finding or judgment in his or her favor; *Kokinis v. Kotrich* (Ill.1980) 81 Ill.2d 151, 40 Ill. Dec. 812, 407 N.E.2d 43, in a Bench Trial setting, the court follows a two-step process.

11.    First, the Court must determine if the Plaintiff has established his *prima facie* case. If not, the motion for directed finding should be granted. If the Court finds the Plaintiff has established his *prima facie* case, the court must then weigh all the evidence, including evidence which favors the Defendant.

12.    It is not possible for the Plaintiff to have established a prima facie case in that the charging instrument does not state name of the offense and does not cite to the proper statutory provision alleged to have been violated. (Ill. Rev. Stat 1983, Ch. 38, par. 11-3).  Any decision by this court affirming a conviction based upon the case that the Plaintiff has put on before this court would be clear and reversible error by the Court of Appeals.

13.    The Defendant cannot be found guilty of an uncharged offense; *People v. Lloyd*, 2013 IL 113510.

**WHEREFORE,** Defendant Christopher Stoller prays that the court grant his request for a directed verdict and a finding or judgment in its favor 735 ILCS 5/2-1110.

Respectfully submitted,

/s/Philip M. Kiss
Phillip M. Kiss
Attorney for Defendant
5250 Grand Ave, Ste 14-408
Gurnee, IL 60031

# EXHIBIT 1

COMPLIANCE VIOLATION CITATION

STATE OF ILLINOIS ⎫ IN THE ADMINISTRATIVE HEARING DEPARTMENT OF THE VILLAGE OF MELROSE
COUNTY OF COOK ⎬ PARK, IN THE NAME AND BY THE AUTHORITY OF THE VILLAGE OF MELROSE
VILLAGE OF ⎭ ILLINOIS, A MUNICIPAL CORPORATION, PLAINTIFF VS.
MELROSE PARK

OFFICER'S COURT KEY    **COMPLIANCE VIOLATION NUMBER**

G    **C102277**

DEFENDANT'S NAME (PRINT)   Last                    First                    M.I.

ADDRESS _____ City _____ State _____ Zip Code _____

Birth Date | Mo | Day | Yr | Sex | Weight | Height | Oper License ☐ | Chauf ☐

Did then drive and operate a certain motor vehicle, to wit, a    Make of Vehicle    Lic. State

upon a public highway of this state, to wit,

situated within the Village aforesaid, in Cook County, Illinois, and did then and there unlawfully violate

License Plate No.    State    Yr.

COURT DATE
MONTH | DATE | YEAR
on _____ 
HOUR
at _____ M    in the courtroom

ONE N. BROADWAY
MELROSE PARK, ILLINOIS

CHAPTER _____ SECTION _____ OF ITS LOCAL ORDINANCE

BY (Describe) _____

THIS COMPLAINANT FURTHER STATES THAT HE HAS JUST AND REASONABLE GROUNDS TO BELIEVE AND DOES BELIEVE THAT THE PERSON NAMED ABOVE COMMITTED THE OFFENSE HEREIN SET FORTH, CONTRARY TO THE ORDINANCES OF THE VILLAGE AFORESAID.

Subscribed and sworn to before me _____ 20 ____

_____ Deputy Clerk

Officer _____    Star No. _____

**Pay on or before the court date or appear in court on that date.**

REMIT PAYMENT IN PERSON:
Melrose Park Police Dept.
One N. Broadway
Melrose Park, IL 60160
Phone: (708) 344-8409
Hours: 9 am - 5 pm (Mon - Fri)

OR USE ATTACHED MAILER ENVELOPE
PAYABLE via Internet: www.melroseparkpd.com

Th... Viol... err... aft... ega...

...al Code Violation Citation. If you pay the penalty amount shown below, before the court date, you will not have to appear in court and this ...ving record (if applicable). If you wish to avoid a court appearance, you must mail this Citation to the address on the reverse side of this ...amount. Failure to pay this Citation before the court date will require you to appear on the date and time shown above. If you are found liable ...may be assessed against you, including fines up to $750.00 per violation. Failure to appear in court will result in a default judgment ...mitted by law and reporting of the violation to the Secretary of State (if applicable).

Pen...

...ourt Date $ _____ .00

Si usted tiene alguna pregunta, favor de llamarnos al tel. 708-344-8409

WITHOUT ADMITTING GUILT I PROMISE TO, COMPLY WITH THE TERMS OF THIS CITATION.

X _____

# EXHIBIT 2

========================================

### VILLAGE OF MELROSE PARK
### COOK COUNTY, ILLINOIS

### ORDINANCE NO. 1354

**AN ORDINANCE AMENDING CHAPTER 10.04 OF THE VILLAGE OF MELROSE PARK MUNICIPAL CODE REGARDING THE OPERATION OF MOTOR VEHICLES, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.**

### ADOPTED BY THE
### PRESIDENT AND BOARD OF TRUSTEES
### OF THE
### VILLAGE OF MELROSE PARK

### THIS 8TH DAY OF FEBRUARY 2010

**RONALD M. SERPICO, Village President**
**MARY ANN PAOLANTONIO SALEMI, Village Clerk**

**Board Of Trustees**

**CATHLEEN COSSIDENT ITALIA**
**ANTHONY J. PRIGNANO**
**ARTURO J. MOTA**
**MARY RAMIREZ TACONI**
**JAIME ANGUIANO**
**ANTHONY N. ABRUZZO**

================================

Published by authority of the
President and Board of Trustees
Of the Village of Melrose Park,
Cook County, Illinois on
This 9TH day of FEBRUARY 2010



ORDINANCE NO. 1354

**AN ORDINANCE AMENDING CHAPTER 10.04 OF THE VILLAGE OF MELROSE PARK MUNICIPAL CODE REGARDING THE OPERATION OF MOTOR VEHICLES, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.**

\* \* \* \* \*

**WHEREAS,** the Village of Melrose Park, County of Cook, State of Illinois (the "Village") is a duly organized and existing municipality and unit of local government created under the provisions of the laws of the State of Illinois, and is operating under the provisions of the Illinois Municipal Code, and all laws amendatory thereof and supplementary thereto, with full powers to enact ordinances and adopt resolutions for the benefit of the residents of the Village; and

**WHEREAS,** the Village President (the "President"), the Honorable Ronald M. Serpico, the Village Clerk, the Honorable Mary Ann Paolantonio Salemi, and the Board of Trustees of the Village (the "Village Board"), the Honorable Cathleen Cossident Italia, Arturo J. Mota, Anthony J. Prignano, Mary Ramirez Taconi, Jaime Anguiano and Anthony N. Abruzzo, having taken office on April 30, 2009, constitute the duly elected, qualified and acting officials of the Village; and

**WHEREAS,** to protect its residents and their property, the President and the Village Board (collectively, the "Corporate Authorities") desire to ensure that motor vehicles traveling on roadways within the Village are operating safely; and

**WHEREAS,** studies indicate that dispatching, drafting, editing, reading and reviewing electronic data messages, such as e-mails and text messages, ("Driving While Texting") elevates the risk of traffic accidents; and

1

**WHEREAS,** the State of Illinois enacted prohibitions regarding Driving While Texting (the "Prohibitions"); and

**WHEREAS,** the Village desires to amend the Village of Melrose Park Municipal Code (the "Village Code") to adopt the Prohibitions and classify Driving While Texting as an ordinance violation; and

**WHEREAS,** the Corporate Authorities have determined that it is both advisable and in the best interests of the Village and its residents to amend the Village Code to adopt the Prohibitions as part of the Village Code; and

**WHEREAS,** the Corporate Authorities have determined that it is necessary, advisable and in the best interests of the Village and its residents to amend Chapter 10.04 of the Village Code as set forth herein; and

**WHEREAS,** the enactment of this Ordinance directly pertains to and is in furtherance of the health, welfare and safety of the residents of the Village; and

**NOW, THEREFORE, BE IT ORDAINED** by the President and the Board of the Trustees of the Village of Melrose Park, County of Cook, State of Illinois, as follows:

**ARTICLE I.**
**IN GENERAL**

**Section 01.   Incorporation Clause.**

The Corporate Authorities hereby find that all of the recitals hereinbefore stated as contained in the preambles to this Ordinance are full, true and correct and do hereby, by reference, incorporate and make them part of this Ordinance as legislative findings.

**Section 02.   Purpose.**

The purpose of this Ordinance is to amend the Village Code to adopt the Prohibitions to deter individuals from Driving While Texting.

2

**Section 03.** **Invocation of Authority.**

This Ordinance is enacted pursuant to the police powers and authority granted to the Village by the Constitution of the State of Illinois and the Illinois Compiled Statutes.

**Section 04.** **State Law Adopted.**

All applicable provisions of the Illinois Compiled Statutes, including the Illinois Municipal Code, as may be amended from time to time, relating to the purposes of this Ordinance are hereby incorporated herein by reference.

**Sections 05 - 09. Reserved.**

## ARTICLE II.
## AMENDMENT TO CHAPTER 10.04

**Section 10.00** **Amendment to Chapter 10.04 of the Village of Melrose Park Municipal Code, "State Vehicle Code Provisions Adopted."**

Chapter 10.04 of the Village Code, titled "State Vehicle Code Provisions Adopted" is hereby amended notwithstanding any provision, ordinance, resolution or Village Code section to the contrary, by adding Section 10.04.020, which Section shall read as follows:

**"10.04.020** **Adoption by Reference: Electronic Communication Devices**

Section 12-610.2 of the Illinois Vehicle Code, titled "Electronic Communication Devices" (625 ILCS 5/12-610.2), as the same may be amended, is hereby adopted by reference and made a part of this Code as if fully set forth herein.

**Section 10.01** **Other Actions Authorized.**

The officers, employees and/or agents of the Village shall take all action necessary or reasonably required to carry out, give effect to and consummate the transactions contemplated by this Ordinance and shall take all action necessary in conformity therewith including, without limitation, the execution and delivery of any and all documentation required to be delivered in connection with this Ordinance.

3

Sections 11.00 – 15.00  Reserved.

## ARTICLE III.
## HEADINGS, SAVINGS CLAUSES,
## PUBLICATION, EFFECTIVE DATE

### Section 16.00 Headings.

The headings for the articles, sections, paragraphs and subparagraphs of this Ordinance are inserted solely for the convenience of reference and form no substantive part of this Ordinance nor should they be used in any interpretation or construction of any substantive provision of this Ordinance.

### Section 17.00 Severability.

The provisions of this Ordinance are hereby declared to be severable and should any provision, clause, sentence, paragraph, subparagraph, section or part of this Ordinance be determined to be in conflict with any law, statute or regulation by a court of competent jurisdiction, said provision, clause, sentence, paragraph, subparagraph, section or part shall be excluded and deemed inoperative, unenforceable and as though not provided for herein, and all other provisions shall remain unaffected, unimpaired, valid and in full force and effect. It is hereby declared to be the legislative intent of the Village Board that this Ordinance would have been adopted had such unconstitutional or invalid provision, clause, sentence, paragraph, subparagraph, section or part thereof not been included.

### Section 18.00 Superseder.

All code provisions, ordinances, resolutions and orders, or parts thereof, in conflict herewith are, to the extent of such conflict, hereby superseded.

4

**Section 19.00 Publication.**

. A full, true and complete copy of this Ordinance shall be published in pamphlet form or in a newspaper published and of general circulation within the Village as provided by the Illinois Municipal Code, as amended.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Section 20.00 Effective Date.**

This Ordinance shall be in full force and effect upon its passage, approval and publication, as provided by law.

On The Individual Poll And Voice Vote Of The Board Of Trustees:

AYE VOTES:     Trustee Italia, Trustee Prignano, Trustee Mota,
Trustee Taconi, Trustee Anguiano, Trustee Abruzzo

NAY VOTES:

ABSTAIN:

ABSENT:

SO PASSED, ADOPTED, APPROVED AND ENACTED IN AND AT THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS, THIS EIGHTH DAY OF FEBRUARY, 2010, A.D.

APPROVED:

RONALD M. SERPICO
VILLAGE PRESIDENT

ATTEST:

Mary Ann Paolantonio Salemi
Village Clerk

*(SEAL)*

Recorded in the Municipal Records: February 8, 2010
Published in Pamphlet Form: February 9, 2010

## Chapter 10.04

## STATE VEHICLE CODE
## PROVISIONS ADOPTED

Sections:

   10.04.010    Adoption by reference.

10.04.010    Adoption by reference.

The village's adoption of the Illinois Code, Illinois Revised Statutes, Chapter 95-1/2, is amended by adopting by reference the following sections from the Illinois Vehicle Code (Ill. Rev. Stat. Chapter 95-1/2):

| | |
|---|---|
| 3–112(b) | Failure to transfer title within five days |
| 3–401(a) | No valid registration—never applied |
| 3–404 | No bill of lading or manifest/dispatch record |
| 3–411(a) | Failure to carry registration card or reciprocity permit—second division vehicle |
| 3–413(a, b) | Improper display or license plates |
| 3–413(f) | Operation of vehicle with expired registration plate or sticker |
| 3–416 | Failure to notify the Secretary of State of name/address change |
| 3–417(a) | Failure to immediately apply for replacement registration card, plate or sticker |
| 3–701(1) | No valid registration—no valid plate or sticker obtained |
| 3–701(2) | No valid registration—reciprocity, prorate or apportionment |
| 604-1 | Operation of snowmobile without required: |
| (a) | One white headlamp during darkness; |
| (b) | One rear taillight during darkness; |
| (c) | Brake system in good mechanical condition; |
| (d) | Reflective material on each side of cowling; |
| (e) | Adequate sound suppression equipment. |

| | |
|---|---|
| 605-1(D) | Operation of snowmobile without lighted headlamp and taillight |
| 11-1419.01 | Failure to display Illinois Motor Fuel Tax Identification Card |
| 11-1419.02 | Failure to display external Illinois Motor Fuel Tax Identification device |
| 11-1507(a) | Operation of bicycle without lamp and reflector |
| 11-1507.1 | Operation of motorized pedacycle without lamp and reflector |
| 12-101(a) | Operation of vehicle with unsafe equipment |
| 12-201(a) | Operation of motorcycle without lighted headlamp |
| 12-201(b) | Driving vehicles other than motorcycles without two lighted headlamps and tail lamps when required |
| 12-201(c) | No white rear registration light |
| 12-202(a, b) | Insufficient clearance, identification or side marker lamps and reflectors—second division vehicle |
| 12-203(a) | Failure to use parking lights while vehicle is standing on highway |
| 12-204 | Improper lamp or flat on projecting load |
| 12-205 | Improper use of lamps on towing and towed vehicles |
| 12-207(a) | Improper use or more than one spot lamp |
| 12-207(b) | Improper use of more than three auxiliary driving lamps |
| 12-208(a) | No stop signal lamp or device |
| 12-209(c) | Defective backup lights |
| 12-210(a) | Failure to dim headlights/auxiliary driving lamps within 500 feet on approach of vehicle |
| 12-210(b) | Failure to dim headlights/auxiliary driving lamps within 300 feet of vehicle in same direction |
| 12-211(a) | Improper lighting on vehicles other than motorcycles—only one headlamp |

| | |
|---|---|
| 12-211(b) | Improper use of more than four lighted headlights/auxiliary driving lamps |
| 12-212(a) | Improper use of red light visible from front of vehicle |
| 12-212(b) | Unlawful use of flashing lights |
| 12-215 | Unlawful use of oscillating, rotating or flashing lights |
| 12-301 | Use of defective brakes |
| 12-401 | Unlawful use of metal studded tire |
| 12-405(d) | Use of unsafe tire |
| 12-501(a) | Operation of vehicle without windshield |
| 12-502 | Operation of vehicle without rear reflecting mirror |
| 12-503(a) | Obstructed view of windshield or side windows adjacent to drive |
| 12-503(b) | Unlawful application of tinted film to windshield or window(s) adjacent to driver—all vehicles manufactured after 12/31/81 |
| 12-503(c) | Obstructed view of any window by stationary or suspended object(s) |
| 12-503(d) | Operation of vehicle without windshield cleaning device; operation of vehicle with view obstructed by snow, ice or moisture |
| 12-503(e) | Obstructed view due to defective condition or repair of any window |
| 12-601(a) | Operation of vehicle with defective horn |
| 12-601(b) | Unlawful possession or use of siren |
| 12-602 | Operation of vehicle with defective or modified |
| 12-603(b) | Operation of vehicle without two front seat safety belts—vehicles of 1961 or later model years |
| 12-603.1 | Failure of driver front seat occupant(s) to use seat safety belt |
| 12-604(a) | Operation of vehicle with television receiver visible to driver |
| 12-606 | Operation of tow truck without: |
| (a) | Identifying sign attached on each side; |

| | |
|---|---|
| (b) | Required equipment-one broom, shovel, trash can and fire extinguisher; |
| (c) | Removing roadway debris and spreading dirt or sand on oil grease deposits; |
| (d) | Insurance policy in cab. |
| 12-607(a) | Operation of vehicle with unlawfully altered vehicle suspension system—body lifted in excess of three inches from chassis |
| 12-607.1(a) | Operation of first division vehicle with frame in excess of 22 inches above ground |
| 12-607.1(b) | Operation of second division vehicle with frame in excess of specified limits above ground—refer to statute |
| 12-608(a) | Operation of vehicle with a gross vehicle weight rating (GVWR) of 9000 pounds or less or a recreational vehicle without two bumpers |
| 12-608(a) | Operation of vehicle with unlawful bumper height |
| 12-610(a) | Operation of vehicle while wearing headset receiver |
| 12-702(a) | Operation of second division vehicle without carrying flares/warning devices |
| 12-702(c, d, e, f, g) | Failure to use flares/warning devices when second division vehicle is disabled |
| 12-704(a) | Failure to placard vehicle transporting explosives |
| 12-704(b) | Failure to carry two fire extinguishers within vehicle transporting explosives |
| 12-707 | Overloaded school bus, commuter van or motor vehicle used for hire |
| 12-711 | Operation of garbage truck, roll-off hoist or roll-on container without audible backing warning system |
| 12-806 | Failure to cover school bus sign |
| 12-808 | Operating school bus without fire extinguisher |

10.04.010

| 12-809 | Operating school bus without first aid kit |
| 12-810 | Transporting handicapped passenger(s) without restraining device |
| 1203-1 | Operation of all-terrain vehicle or off-highway motorcycle without valid registration |
| 1203-4(b) | Operation of all-terrain vehicle or off-highway motorcycle without affixed registration decal |
| 1203-4(c) | Operation of all-terrain vehicle without registration certificate in possession of operator |
| 1203-9 | Failure to renew registration certificate |
| 1204-3 | Operation of all-terrain vehicle or off-highway motorcycle without safety helmet and eye protection |
| 1204-6 | Operation without head lamp and tail lamp when required |
| 1204-7 | Operation without operational service brake |
| 1204-8 | Operation without adequate muffler system |
| 1204-10 | Operation with modified exhaust system |
| 13-111 | Operation without certificate of valid safety test attached to windshield—second division vehicle |
| 13A-104(c) | Failure to display valid unexpired emission inspection sticker (affected Illinois counties only) |
| 15-105 | Load projecting in any excess beyond left fenders or six inches beyond right fenders of first division vehicle |
| 15-106 | Failure to fasten loose projecting member |
| 15-108 | Failure to plank edge of pavement for any vehicle in excess of 8,000 pounds |
| 15-109(a) | Spilling load on highway |
| 15-109(b) | Operating loading vehicle without securely fastened covering |

| 15-109.1 | Operating second division vehicle with load falling, blowing or dropping to highway |
| 15-114 | Unlawful pushing or disabled vehicle |
| 18-4104(a) | Operation without registration—intrastate or interstate |
| 18-4604(1) | Operation without current cab card and Illinois identifier stamp |
| 1-4604(3) | Use of a cab card and Illinois identifier stamp issued to another carrier |
| 1-4604(4) | Failure to display or present a cab card and Illinois identifier stamp |
| 1-4701(1) | Operating without trade name, license and registration number of carrier painted or affixed to both doors of power unit |

(Ord. 201-A § 1, 1992)

295

# EXHIBIT 3

**Incident Number:** 201600026297     **Agency:** MPPD - Melrose Park PD

**Activity:** THEFT - Theft / All Offenses          **Disposition:** OR - OFF/INC Report

**Common Place Name:** Costco
**Location:** 8400 W North Av, Melrose Park IL 60160

**Route:** MPZ4  **Beat:** MP4E  **Fire:** MP200  **EMS:**   **Zone:** 000811

**Complainant:** Secuirty    (801) 319-3117

| Units | Officers | Dispatch Times | |
|---|---|---|---|
| MP1152 | MP2294 | Reported | 11/19/2016 12:23:57 |
| | | Dispatched | 11/19/2016 12:24:44 |
| | | Completed | 11/19/2016 13:05:58 |

**Log:**

| | | |
|---|---|---|
| 11/19/2016 12:24:37 | dp43 | secuirty in the parking lot west of the gas station |
| 11/19/2016 12:26:18 | dp43 | subject is walking n/b on 1st ave at this time |
| 11/19/2016 12:27:10 | dp43 | subject is in the self storage parking lot inside the building |
| 11/19/2016 12:27:33 | dp43 | caller is wearing blu jeans and blk shirt |
| 11/19/2016 12:29:38 | dp43 | caller advised subject is still inside the self storage |
| 11/19/2016 12:58:43 | dp35 | DeAssigned Unit-MP1132 |
| 11/19/2016 12:58:43 | dp33 | Removed Unit - MP1132 |
| 11/19/2016 12:58:43 | dp33 | Removed Officer - MP1703 |
| 11/19/2016 13:05:58 | MP2294 | Incident Closed by MDT |

**Blotter:**

west of the gas station

m/w wearing blu jeans and bro jkt
Offender Stoller opened and a shrimp coctail container, ate several shrimp inside totaling $11.99 then took
a pair of gloves, placed them in his pocket totaling $24.99 and passed the last point of purchase without
paying for said items. Citation and
criminal tresspass warning given to stoller. Due to dollar amount, complainant did not wish to sign
complaints at this time.

| **Persons** | **Vehicles** |
|---|---|

**Name:** Stoller, Chris N   **DOB:** 12/29/1948

MO LTD 3

# EXHIBIT 6

Page 1

COOK COUNTY, ILLINOIS
VILLAGE OF MELROSE PARK

VILLAGE OF MELROSE PARK,       )
                               )
        Plaintiff,             )
                               )
            vs.                ) MPPD 16-26297
                               )
CHRISTOPHER STOLLER,           )
                               )
        Defendant.             )

REPORT OF PROCEEDINGS of the
above-entitled cause before the Honorable
Russell Syracuse, Judge of said court, at
One North Broadway Avenue, Melrose Park, Illinois,
on the 21st day of November, 2017, at the hour of
1:00 p.m.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 2

1    APPEARANCES:

2

          DAMICO LAW OFFICES
3         MS. LISA T. DAMICO
          53 West Jackson Boulevard
4         Suite 721
          Chicago, Illinois   60604
5         312.583.9000
          lisa@damicolawoffices.com
6
              Appeared on behalf of the Plaintiff;
7

8         MR. PHILLIP M. KISS
          MR. WAYNE RHINE
9         5250 Grand Avenue
          Suite 14-408
10        Gurnee, Illiniois   60031

11            Appeared on behalf of the Defendant.

12

13

14

15

16

17

18

19

20

21

22

23

24

89061323-a097-456b-93f9-4d5a42fa70f2

Page 3

1                          I N D E X

2
     WITNESS                              EXAMINATION
3

4    CHRISTINE CARLSON

5         Direct by Ms. Damico                   10

6         Cross by Mr. Kiss                       26

7         Redirect by Ms. Damico                  56

8         Recross by Mr. Kiss                      63

9

10   MICHAEL D. DECARLO, JR.

11        Direct by Ms. Damico                    66

12        Cross by Mr. Kiss                        71

13

14

15

16

17

18

19

20

21

22

23

24

89061323-a097-456b-93f9-4d5a42fa70f2

```
 1                  P R O C E E D I N G S

 2              THE CLERK:  Stoller.

 3              THE COURT:  All right.  Good afternoon.

 4              MR. KISS:  Phillip Kiss, one of the

 5      counsel for Christopher Stoller.

 6              THE COURT:  Okay.  Could you repeat for

 7      the benefit of the court reporter so she can

 8      hear you now?

 9              MR. KISS:  Phillip Kiss, one of the

10      attorneys for Christopher Stoller.

11              MR. RHINE:  Wayne Rhine, R-h-i-n-e,

12      also on behalf of Mr. Stoller.

13              THE COURT:  This is ticket C 102277.

14              MS. DAMICO:  Lisa Damico, D-a-m-i-c-o,

15      on behalf of the Village of Melrose Park.

16              THE COURT:  All right.  How many

17      witnesses do you have?

18              MR. KISS:  I think we are only going to

19      have the one.

20              THE COURT:  How many witnesses do you

21      have?

22              MS. DAMICO:  Two.

23              THE COURT:  All right.  Let's swear the

24      witnesses.
```

1          MR. KISS:  We have one -- We may have

2     some adverse witnesses.  We've subpoenaed --

3     Just for the record, we have subpoenaed some

4     people to be here.  I'm not sure that they are

5     in fact here.  They are all Costco employees.

6     They were all listed in the police report as

7     tendered by Ms. Damico to Mr. Rhine and myself.

8          MS. DAMICO:  I didn't receive copies of

9     the subpoenas.

10          THE COURT:  Okay.  Is there a

11    Jeff Erickson present?

12          MS. CARLSON:  If I may, Your Honor?

13          THE COURT:  Yes.

14          MS. CARLSON:  We received the subpoenas

15    on Saturday.  They were for a civil subpoena, so

16    with advice of counsel I was told to disregard

17    them.

18          MS. DAMICO:  They are stamped

19    November 17th.

20          MS. CARLSON:  They are all witnesses to

21    after the fact.  I was the only witness that

22    witnessed what the ticket is issued for.

23          MS. DAMICO:  I'm going to move to quash

24    the subpoenas for the witnesses to testify

89061323-a097-456b-93f9-4d5a42fa70f2

1    today.  They are not timely, I wasn't given any

2    copies of them, and we are ready to proceed

3    today.

4              THE COURT:  Okay.  Well, first of all,

5    the subpoenas were issued by the Clerk of the

6    Court.  While I do have authority to issue

7    subpoenas, no one applied to me to issue a

8    subpoena.

9              Yes.  These weren't issued by me.

10             MR. KISS:  Okay.  And Your Honor is

11   making a ruling then that they are defective for

12   that reason?

13             THE COURT:  Yes.  The subpoenas are of

14   no effect.  They were issued by the Clerk of the

15   Circuit Court.  This is not a proceeding in the

16   Circuit Court.  I do have limited authority to

17   issue subpoenas on application by one of the

18   parties, no one made such application to me,

19   so for that reason I am disregarding the

20   subpoenas.

21             MR. KISS:  Okay.  Then as a first

22   matter, we would ask to exclude witnesses.

23             THE COURT:  All right.  Let me swear

24   everybody in and then we will exclude them.

89061323-a097-456b-93f9-4d5a42fa70f2

1              All parties who are going to

2     testify today, raise your right hand.

3                   (Witnesses sworn.)

4              THE COURT:  Okay.  Who do you want

5     first?

6              MS. DAMICO:  Christine Carlson.

7              MR. KISS:  Your Honor, before we start,

8     we have a few housekeeping matters.

9              THE COURT:  Okay.

10             MR. KISS:  We have two motions to

11    tender, one is a motion in limine and the other

12    is a motion -- My understanding is there's a

13    pair of gloves, which we have never seen, they

14    have never been shown to us, and so we would

15    need -- we would ask that we be allowed to do

16    some testing on the gloves to make sure that

17    they are even relevant.

18             It is my understanding that, just

19    in reviewing the reports, the gloves were never

20    found or never tendered.

21             THE COURT:  I don't know anything about

22    gloves.  I don't know anything about what's

23    involved in this case yet.

24             MR. KISS:  In the reports, there is

89061323-a097-456b-93f9-4d5a42fa70f2

1    reference to a pair of gloves that were

2    allegedly taken by Mr. Stoller.  We have never

3    seen the gloves.  They have never been tendered.

4    And I believe that -- I believe that in the

5    police report there were no gloves found, but

6    he's being charged with it, and so we --

7               THE COURT:  I don't know what he's

8    being charged with taking at this point.  The

9    ticket only says retail theft.

10              As far as -- I don't know if we

11   even have these gloves in evidence.

12              MR. KISS:  Well, then we would

13   certainly ask that if you don't have the gloves,

14   we would certainly ask that they be barred.

15              MS. DAMICO:  It seems to me that that

16   would be a question of fact.  I think it's

17   fodder for examination, if there's testimony

18   about gloves.

19              THE COURT:  Yes.  I haven't seen any

20   testimony on gloves at all yet.  Let me find out

21   what this is about.

22              You are just tendering this motion

23   today?

24              MS. DAMICO:  This is the first time I

89061323-a097-456b-93f9-4d5a42fa70f2

Page 9

1    have seen both of them.

2             THE COURT:  I'm going to reserve ruling

3    on your motions until I see what this case is

4    about.

5             MR. KISS:  Okay.

6             THE COURT:  Anything else?

7             MR. KISS:  Nothing at this point.

8             THE COURT:  Okay.  Other than -- I'm

9    sorry.  You are?

10            MS. CARLSON:  Christine Carlson.

11            THE COURT:  The other witnesses -- Is

12   Officer DeCarlo the only other witness?

13                 You are excused for the moment.

14   We will call for you when we need you.

15            MR. DECARLO:  Okay.

16            THE COURT:  All right.

17            MR. STOLLER:  Excuse me, Judge.  With

18   the Court's permission, I am disabled.  I have a

19   bad back and stage 4 arthritis.  Can I have your

20   permission to sit down until I am called?

21            THE COURT:  Absolutely.  Yes.

22            MR. STOLLER:  Thank you.

23            THE COURT:  Would it help if we put a

24   chair up here for you?

89061323-a097-456b-93f9-4d5a42fa70f2

Page 10

1          MR. STOLLER:  That would be better.

2     This way I can be next to counsel here.  I am

3     scheduled for surgery.

4          THE COURT:  All right.  You may begin.

5               (Witness previously sworn.)

6               CHRISTINE CARLSON,

7  called as a witness herein, having been first duly

8  sworn, was examined and testified as follows:

9               DIRECT EXAMINATION

10 BY MS. DAMICO:

11     Q.   Please state your first name and spell

12 your last name.

13     A.   Christine Carlson, C-a-r-l-s-o-n.

14          THE COURT:  Just one minute.

15               Sir, who are you?

16          UNIDENTIFIED SPEAKER:  I am his

17 brother.

18          THE COURT:  Okay.

19          MR. RHINE:  He's not a witness.  He's

20 here for moral support.

21          THE COURT:  Okay.

22          MS. DAMICO:  We good?

23          THE COURT:  Yes, we are.

24

89061323-a097-456b-93f9-4d5a42fa70f2

Page 11

1    BY MS. DAMICO:

2         Q.    Christine -- May I call you Christine?

3         A.    Yes.

4         Q.    Are you employed?

5         A.    Yes, I am.

6         Q.    Where are you employed?

7         A.    Costco Wholesale.

8         Q.    And what is your title at Costco

9    Wholesale?

10        A.    Loss prevention agent.

11        Q.    Are you employed at a particular

12   Costco?

13        A.    The Costco in Melrose Park.

14        Q.    Where is that located?

15        A.    At 8400 West North Avenue.

16        Q.    And where you employed in loss

17   prevention on November 19, 2016?

18        A.    Yes.

19        Q.    Were you working that day?

20        A.    Yes.

21        Q.    What time did you start?

22        A.    10:00 in the morning.

23        Q.    Okay. And at approximately 12:15 in

24   the afternoon that day, did you observe anything

L.A. Court Reporters, L.L.C.
312-419-9292

89061323-a097-456b-93f9-4d5a42fa70f2

1   unusual?

2        A.    I observed that at 11:25 a.m. -- 12:15

3   is the time I tried to make a stop.

4        Q.    Okay.

5        A.    At 11:25, I observed Christopher Stoller

6   eating shrimp out of a pre-made deli shrimp

7   platter.

8        Q.    Okay.  Where were you positioned when

9   you first made your observations at about 11:15 in

10  the morning?

11       A.    I was near the back of the store in one

12  of the shopping aisles.

13       Q.    Okay.  And did you observe this -- Did

14  you observe the subject through any kind of

15  recording equipment or did you actually have your

16  own eyes on the subject?

17       A.    I saw him in person.

18       Q.    Okay.  Describe the subject that you

19  observed.

20       A.    He was an elderly white Caucasian male.

21  He was in a motorized scooter.

22       Q.    What did you observe him doing?  When

23  you first saw him, what did you see him doing?

24       A.    I saw him eating cocktail shrimp and

89061323-a097-456b-93f9-4d5a42fa70f2

1     putting the tails in the -- back in the platter.

2          Q.    Okay.  Did you see where he had

3     retrieved the package for the cocktail shrimp?

4          A.    It was in the front part of his

5     motorized scooter.

6          Q.    Okay.  Is that subject here in court

7     today?

8          A.    Yes, he is.

9          Q.    Okay.  Could you point him out?

10         A.    Standing to my right -- sitting to my

11    right.

12         Q.    Identify an article of clothing.

13         A.    In the brown jacket.

14         Q.    Okay.  What, if anything, did you

15    observe him do with the container of shrimp?

16         A.    After I saw him eat about ten shrimp,

17    he disposed of the container in a trash can.

18         Q.    Did you locate that container in the

19    trash can where you saw him place it?

20         A.    I did.

21         Q.    Was it still full or was it empty?

22         A.    It was empty.  There was only a couple

23    shrimp left.

24         Q.    Was the container marked?

L.A. Court Reporters, L.L.C.
312-419-9292

Page 14

```
 1         A.    Yes.

 2         Q.    What kind of markings were on the

 3    container?

 4         A.    The Costco UPC tag.

 5         Q.    Was there also some sort of marking in

 6    addition to that indicating the cost of the item?

 7         A.    Yes.  It was 11.99.

 8         Q.    Did you make any other observations of

 9    Mr. Stoller while he was in the Costco?

10         A.    I observed him via still MPTZ cameras

11    at that point.

12         Q.    What does that mean, via still MPTZ

13    cameras?

14         A.    I went to the office to alert

15    management that I would be approaching Mr. Stoller

16    about the shrimp while I kept an eye on him via

17    our recording system.  I watched him grab three

18    pairs of gloves, and he concealed one pair of

19    gloves and disposed of the other ones.

20         Q.    Okay.  So there was a point in time

21    after you went to the trash can and you removed

22    the container of shrimp.  Did you also notify any

23    other loss prevention officers of what you

24    observed?
```

89061323-a097-456b-93f9-4d5a42fa70f2

Page 15

```
 1          A.    No.   Just my management team.

 2          Q.    Okay.   And then at that point in time

 3   you left the floor, is that correct?

 4          A.    That's correct.

 5          Q.    Okay.   When you left the floor, where

 6   did you go?

 7          A.    I went to the main office.

 8          Q.    Okay.   What equipment is in the main

 9   office?

10          A.    I have three DVR camera systems.

11          Q.    Okay.   And were you able then to locate

12   Mr. Stoller on any of these camera systems?

13          A.    Yes.

14          Q.    Okay.   And when you located Mr. Stoller

15   on the camera systems, what did you observe him

16   doing?

17          A.    I observed him select -- He did some

18   shopping, and then he selected three pairs of

19   leather gloves and he placed those in his

20   motorized scooter.

21          Q.    Okay.   And when you say he placed them

22   in his motorized scooter, how did he do that?   Was

23   there some sort of basket system on the scooter?

24          A.    There is a metal basket at the front.
```

89061323-a097-456b-93f9-4d5a42fa70f2

Page 16

```
 1        Q.    Is this a scooter that belongs to
 2   Costco?
 3        A.    Yes.
 4        Q.    Then what did he do -- How many pairs
 5   of gloves?
 6        A.    Three.
 7        Q.    And are these gloves in some sort of
 8   packaging?
 9        A.    They come in a box.  Yes.
10        Q.    They are in a box?
11        A.    Yes.
12        Q.    Okay.  Did he place the gloves in the
13   boxes -- Are they in individual boxes?
14        A.    They are in individual boxes.  Yes.
15        Q.    And he placed those in the basket on
16   the scooter?
17        A.    Correct.
18        Q.    What did he do after that?
19        A.    He went to the back wall of one of the
20   aisles.  He removed one pair of gloves from the
21   box and he placed it in his left jacket pocket.
22        Q.    Okay.  And you observed this on the
23   camera, correct?
24        A.    Yes.
```

89061323-a097-456b-93f9-4d5a42fa70f2

1          Q.     From the time that you came into the

2    office and located Mr. Stoller on the camera, did

3    you at any point in time leave the office?

4          A.     I'm sorry?

5          Q.     While you are observing this, did you

6    at all leave the office?

7          A.     No.

8          Q.     So you maintained your visual contact

9    of him while he was on the camera at all times?

10         A.     That's correct.

11         Q.     And he went to the back of the store

12   and you said he removed the gloves from the

13   packaging?

14         A.     Correct.

15         Q.     How many pairs of gloves did he remove

16   from packaging?

17         A.     Just one.

18         Q.     Where did he place those gloves?

19         A.     In his left jacket pocket.

20         Q.     What kind of jacket was he wearing?

21   Was it like a winter coat --

22         A.     It was a winter jacket.

23         Q.     -- or like a topcoat or suit jacket

24   like he's wearing today?

89061323-a097-456b-93f9-4d5a42fa70f2

Page 18

1     A.     It was a winter jacket.

2     Q.     Okay.  What did you observe him do

3  after he secreted the gloves in his winter jacket?

4     A.     He then placed the other two pairs of

5  gloves on a clothing table in the middle of the

6  store and he covered those up with a jacket and

7  then he proceeded to the registers to check out.

8     Q.     Okay.  Is it fair to say then when he

9  left, he only had one pair of gloves left that he

10  had secreted in his jacket?

11     A.     Correct.

12     Q.     Did he have anything else in the basket

13  of the motorized scooter?

14     A.     He had approximately five to six

15  grocery items.

16     Q.     And where did he proceed after you

17  observed him place the other gloves back on a

18  shelf?

19     A.     I'm sorry?

20     Q.     Where did he go after he placed those

21  gloves back on the shelf and covered them with the

22  jacket?

23     A.     He went to the registers and he made

24  his payment.

89061323-a097-456b-93f9-4d5a42fa70f2

1       Q.    Okay.  And did you have constant visual

2   on him from the time that he placed the other

3   gloves on the shelf and covered them with the

4   jacket until he went to the registers?

5       A.    I did not.  That's why I did not stop

6   him for the gloves.  I stopped him simply for the

7   shrimp in hopes that I could also obtain the

8   gloves when interviewing him.

9       Q.    So when he went to the registers, did

10  you observe him while he was at the registers?

11      A.    Yes.

12      Q.    Okay.  What did you observe him do when

13  he approached the cashier or the cash register?

14      A.    He paid for the belongings that were in

15  the metal cart.

16      Q.    Okay.  Did he place any gloves on the

17  belt to pay for the gloves?

18      A.    No.

19      Q.    Did he place any empty shrimp container

20  on the belt to also pay for the shrimp container?

21      A.    No.

22      Q.    Okay.  Did you observe him make a

23  transaction then with the cashier for the items

24  that he did place on the register belt?

89061323-a097-456b-93f9-4d5a42fa70f2

Page 20

1       A.      Yes.

2       Q.      What did he do after he paid for those

3    items?

4       A.      He then went to the food court and made

5    a food purchase.

6       Q.      Okay.  Where is the food court located

7    in proximity of the cash registers?

8       A.      Just past the cash registers,

9    approximately 20 feet.

10      Q.      Okay.  And then what's located after

11   the food court?

12      A.      After he went to the food court, he

13   also went to the bathroom, and then he proceeded

14   to exit the store.

15      Q.      Okay.  How long after he made his

16   purchases after -- How long after he made his

17   purchases and then went to the food court, how

18   long was he in the bathroom?

19      A.      Approximately two minutes.

20      Q.      And then what happened after he left

21   the bathroom?

22      A.      He went to get his food.  It was -- he

23   was waiting for it.  So he got his food, he

24   consumed it, and then he left.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 21

1    Q.    Okay.  And after he left, he departed

2  out the -- which entrance?

3    A.    The exit entrance.

4    Q.    Okay.  And that's located where in

5  proximity of the registers in the store?

6    A.    It is to the left.  It is probably

7  about 50 yards.

8    Q.    Okay.  What happened after he left the

9  store?

10    A.    I stopped him when we were in the

11  vestibule and I introduced myself as security for

12  Costco.

13    Q.    Okay.  And what else did you say to him

14  when you introduced yourself as security for

15  Costco?

16    A.    I asked if he would come back in the

17  store with me to have a discussion.

18    Q.    Okay.  Who else was present with you

19  when you had this discussion with him?

20    A.    At that time, just me.

21    Q.    And what did he say to you, if

22  anything, in response to that?

23    A.    He said, I'm not going to go back in

24  the store.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 22

1        Q.    What did you do after that?

2        A.    I said, if you don't come back in the

3   store, I am going to take your groceries, in order

4   to entice him to stay.  And he said, fine, keep

5   them.  And at some point he told me to F off.

6        Q.    Did he come back in the store at that

7   point?

8        A.    No.

9        Q.    What happened after that?

10       A.    He then left the parking lot.  That's

11  when I contacted management that the shoplifter

12  had left.

13       Q.    Okay.  What did management, if you

14  know, do once you contacted them that the

15  shoplifter had left?

16       A.    They attempted to locate him in the

17  parking lot.

18       Q.    Okay.  Did they locate him in the

19  parking lot?

20       A.    Yes, they did.

21       Q.    Were you present when this occurred?

22       A.    Not during the initial location, but I

23  did meet up with them a few minutes after.

24       Q.    How long after you learned that they

89061323-a097-456b-93f9-4d5a42fa70f2

Page 23

1    located him in the parking lot did you arrive?

2         A.    Approximately a minute.

3         Q.    Okay.  What, if anything, did you or

4    any of the other personnel for Costco do after

5    Mr. Stoller was located in the parking lot?

6         A.    They had lifted up his scooter

7    approximately an inch off the ground, and I

8    informed them that we cannot hold him against his

9    will, and that if he wants to leave, he will

10   leave.  And that's when management called the

11   police.

12        Q.    Okay.  The scooter, are we talking

13   about the Costco scooter?

14        A.    The Costco scooter.  Yes.

15        Q.    Okay.  Was the police -- The police

16   were called?

17        A.    Yes.

18        Q.    Okay.  Were you there when the police

19   arrived on the scene?

20        A.    They arrived after he had left.  They

21   found him in the storage unit across the street.

22   They made contact with him there and then he

23   brought him back to Costco.

24        Q.    Okay.  I'm sorry.  I'm confused.  Let's

89061323-a097-456b-93f9-4d5a42fa70f2

1    step back.

2             When the loss prevention locate

3    Mr. Stoller in the parking lot, and then you come

4    up while they have located Mr. Stoller in the

5    parking lot, he was still on the Costco scooter,

6    correct?

7        A.    Correct.

8        Q.    Okay.  What happened after you arrived

9    and he was on the Costco scooter in the parking

10   lot with you and with loss prevention?

11       A.    It was just management.  I am the only

12   loss prevention agent at Costco.

13       Q.    Okay.

14       A.    Management was talking to him.  They

15   had lifted up his scooter approximately an inch

16   off the ground.  I told them, we can't do that, so

17   they let him go.  He drove the scooter for a

18   little more and then he walked off the property.

19       Q.    Okay.  He took the scooter through the

20   parking lot?

21       A.    Correct.

22       Q.    Okay.  Then he got off the scooter?

23       A.    Correct.

24       Q.    And walked to where?  Could you see

1    where he walked to?

2          A.    He was walking southbound on First

3    Avenue, and that's when we went back into the

4    store.

5          Q.    Okay.  And at that point, is that when

6    the police were called?

7          A.    I believe they were called during the

8    interaction with him.  Another person had called

9    the police.

10         Q.    Okay.  Did you or any other management

11   personnel from Costco conduct any kind of search

12   of Mr. Stoller?

13         A.    No.

14         Q.    Okay.  Did you or any other management

15   of Costco locate the gloves that you saw

16   Mr. Stoller secrete in his winter jacket?

17         A.    No.

18         Q.    Okay.  The shrimp container, where was

19   that ultimately located?

20         A.    In the garbage can where he threw it.

21   I brought it to the office.

22         Q.    And that garbage can was inside the

23   store?

24         A.    Correct.

89061323-a097-456b-93f9-4d5a42fa70f2

1          Q.    Did Mr. Stoller make any statements to

2     you regarding consuming the shrimp inside of the

3     store?

4          A.    No.

5                MS. DAMICO:   Okay.  I have nothing

6       further.

7                THE COURT:   Okay.  Mr. Kiss?

8                     CROSS-EXAMINATION

9     BY MR. KISS:

10         Q.    From the first time you saw Mr. Stoller

11    until this incident was over, approximately how

12    much time did it take?

13         A.    Approximately 45 minutes.  Close to an

14    hour.

15         Q.    Okay.  And you said that you were

16    actually on the floor when you first observed

17    Mr. Stoller?

18         A.    Correct.

19         Q.    What brought Mr. Stoller to your

20    attention?

21         A.    That someone was eating shrimp in the

22    store.

23         Q.    And that's a very rare -- that's a very

24    rare thing to see?

L.A. Court Reporters, L.L.C.
312-419-9292

Page 27

1        A.    Yes.

2        Q.    Now, did you approach Mr. Stoller and

3    inquire as to why he was eating the shrimp?

4        A.    No.

5        Q.    Is that the company policy not to

6    approach a customer --

7             MS. DAMICO:  Objection, relevance.

8             MR. KISS:  It is relevant.

9             THE COURT:  Overruled.  I will let her

10    answer.

11                If you know.

12             THE WITNESS:  Did you want to finish

13    the question?

14    BY MR. KISS:

15        Q.    Yes.  Did you approach Mr. Stoller and

16    ask him why he was eating shrimp or whether or not

17    that was even Costco shrimp -- maybe he brought it

18    in with him -- or ask him about the circumstances?

19        A.    No.

20        Q.    Is that Costco policy or is it just --

21    Was that just your decision?

22        A.    It was my decision.

23        Q.    And what is Costco policy with respect

24    to that issue?

89061323-a097-456b-93f9-4d5a42fa70f2

Page 28

1     A.    Costco policy in regards to grazing is

2  based on what your management team wants you to

3  do.

4     Q.    Okay.  And your management team decided

5  that if you see people, as you say, grazing, that

6  you are not to approach them?

7     A.    Correct.

8     Q.    And so you saw -- well, strike that.

9           So the management policy is if someone

10  is grazing, you are not to approach them.  Are you

11  then to ignore the fact that they are grazing?

12    A.    No.  What I usually do under normal

13  circumstances is approach them when they are at

14  the register to leave them little decision to pay

15  for it.

16    Q.    Okay.  And did you do that with

17  Mr. Stoller?

18    A.    That was my intentions until I saw him

19  conceal gloves.

20    Q.    Okay.  And what is Costco policy with

21  respect to a customer concealing some piece of

22  property of Costco's?  Do you confront that

23  person?  Do you ask them why they are taking

24  something?  Or do you just let them walk out of

1    the store?

2         A.    We stop them once they are in the

3    vestibule, which is what we consider the last

4    point of purchase.

5         Q.    Okay.  Describe what you consider the

6    vestibule.  Is that where, like, the shopping

7    carts are?  Or is that before the shopping carts?

8         A.    Correct.  It is in between the outdoor

9    entrance and the entrance to the warehouse.

10        Q.    Okay.  Now, you said that Mr. Stoller

11   was under your direct observation?

12        A.    Correct.

13        Q.    And when you weren't observing him,

14   there obviously was some sort of time period where

15   you went up to wherever the cameras are, I assume

16   they are up in some office up on the second

17   floor --

18        A.    On the first floor.  But, yes, in a

19   separate office.

20        Q.    Okay.  And what would you estimate

21   would be the time period during which Mr. Stoller

22   was not under observation?

23        A.    Between one and two minutes.

24        Q.    Okay.  Then after that you were able to

89061323-a097-456b-93f9-4d5a42fa70f2

1    observe him on the cameras?

2         A.    Correct.

3         Q.    And who else was doing this

4    observation?  Was it just you solely or somebody

5    else?

6         A.    Just me.

7         Q.    So approximately how long was it

8    between the time you first observed Mr. Stoller

9    and the time that you observed him on the camera?

10   How much time had lapsed?

11        A.    I don't understand the question.  I'm

12   sorry.

13        Q.    Okay.  You first saw Mr. Stoller.

14   Something drew your attention to Mr. Stoller.  You

15   said -- I believe you testified it was his

16   grazing.  And then at some point you left

17   Mr. Stoller to go to where the cameras were.

18        A.    Correct.

19        Q.    Okay.  Approximately what was that time

20   difference from the time you first saw him grazing

21   to the time you went to observe him on the

22   cameras?

23        A.    After I first saw him grazing, I

24   maintained observation on him on the floor for

1    approximately five minutes and then I went to the

2    office.

3         Q.    Okay.  So it was approximately five

4    minutes before you went to the office?

5         A.    Correct.

6         Q.    How long were you in the office?

7         A.    The remainder of his shopping trip.

8    Approximately 45 minutes.

9         Q.    And then after that 45 minutes was up,

10   what, if anything, did you do?

11        A.    That's when he was making his way to

12   the exit and I followed behind him.

13        Q.    Okay.  Where is the office in

14   relationship to the cash registers?

15        A.    It is approximately 30 yards away.

16        Q.    Okay.  And did you have somebody

17   following -- or somebody observing Mr. Stoller on

18   the cameras while you covered that distance of

19   30 yards?

20        A.    No.

21        Q.    And then you said, after he went to the

22   cash register, he went to go get something to eat?

23        A.    Correct.

24        Q.    And then presumably after he ate, I

89061323-a097-456b-93f9-4d5a42fa70f2

Page 32

1    presume it was after he ate, he went to the

2    bathroom?

3         A.    It was in between him ordering food and

4    eating he went to the bathroom.

5         Q.    So he ordered the food and paid for it.

6    And while the food was being prepared, he went to

7    the bathroom?

8         A.    Correct.

9         Q.    And you had somebody follow him into

10   the bathroom, is that correct?

11        A.    That's correct.

12        Q.    And who followed him into the bathroom?

13        A.    An employee named Omar.

14        Q.    I presume Omar is not here today?

15        A.    Correct.

16        Q.    And what was the purpose of having Omar

17   follow him into the bathroom?

18        A.    To see if he was going to drop the

19   gloves.

20        Q.    Okay.  And did you have any discussion

21   with Omar?

22        A.    I asked him to follow Mr. Stoller and

23   to let me know if he had disposed of anything in

24   the bathroom.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 33

1    Q.    Okay.  And after Mr. Stoller came out,

2    what, if anything, did he do?

3    A.    Omar followed behind him and told me he

4    had not disposed of anything.

5    Q.    Okay.  And at some point Mr. Stoller

6    stopped to eat?

7    A.    Correct.

8    Q.    Okay.  Roughly how long did that take?

9    A.    I don't remember.  A couple minutes.

10   Five minutes.

11   Q.    And did you observe anything unusual

12   about his demeanor during any of this time?

13   A.    No.

14   Q.    When he finished eating, then

15   presumably he went to the vestibule?

16   A.    Correct.

17   Q.    Was he still in the vestibule or was he

18   outside in the street when you first approached

19   him?

20   A.    In the vestibule.

21   Q.    Okay.  What, if anything, did you say

22   to him?

23   A.    I asked him to come back into the store

24   with me for a discussion.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 34

1      Q.    Okay.  Was that the extent of your

2  conversation?

3      A.    He replied -- responded with, no, I'm

4  not going back in the store with you.  At some

5  point he told me to F off.  And I asked him that

6  if he doesn't come back in the store with me, I'm

7  going to take his groceries.  And he told me,

8  fine, keep them.

9      Q.    Did you, in fact, take his groceries?

10     A.    I did.

11     Q.    And did he offer any resistance to your

12  taking his groceries?

13     A.    No.  He said, fine, keep them.

14     Q.    And at any point did you advise him

15  that you thought that he had a pair of gloves on

16  him that belonged to Costco?

17     A.    No.  I only talked about the shrimp.

18     Q.    Did Costco retain the container for the

19  shrimp as evidence?

20     A.    I did for the moment, and then I threw

21  it away.

22     Q.    Okay.  When you say you did for the

23  moment, I presume you mean that you took it out of

24  the garbage, you looked at it, and then you threw

1    it away?

2         A.    I brought it back to the office.

3         Q.    And what's Costco's policy with respect

4    to evidence of theft?  What are you told to do

5    if --

6         A.    There's no formal policy.

7         Q.    Okay.  And is that, again, just a

8    policy that's made up by the current management?

9         A.    Correct.

10              MS. DAMICO:  Objection, relevance.

11              THE COURT:  The question was already

12    answered, so...

13   BY MR. KISS:

14        Q.    Now, when you said you took it to the

15   office, that was during that time period you said

16   you left Mr. Stoller and you went to the office to

17   see what was going on on the cameras?

18        A.    Correct.

19        Q.    How many security people were working

20   that day?

21        A.    One.

22        Q.    Just yourself?

23        A.    Correct.

24        Q.    Is that normal?

1     A.    Yes.

2         Q.    Now, tell me what was the contents of

3   that garbage can when you took the packaging out?

4         A.    There was the empty container of

5   shrimp, a couple shrimp that had fallen out, and a

6   few papers.  It was a fairly empty garbage can.

7         Q.    Now, when you took the contents of the

8   garbage can out, my impression is you just took

9   the specific container the shrimp was in, is that

10  correct?

11        A.    Correct.

12        Q.    Okay.  And you didn't take the bag out

13  or any of the other contents to preserve what was

14  in there?

15        A.    No.

16        Q.    So as we are standing here today, you

17  have absolutely no idea what the other contents of

18  that garbage can was?

19        A.    No.

20        Q.    Okay.  Now, you confront Mr. Stoller in

21  the vestibule and he leaves the physical store, is

22  that correct?

23        A.    That's correct.

24        Q.    And before he leaves, you have that

89061323-a097-456b-93f9-4d5a42fa70f2

1    short conversation with him?

2         A.    Correct.

3         Q.    And apparently you took his groceries?

4         A.    Correct.

5         Q.    Once he leaves the store, did you have

6    another conversation with him?

7         A.    With him personally?  No.

8         Q.    Let me ask you this.  You said that you

9    had Omar go into the bathroom and follow him, and

10   you talked to Omar when Mr. Stoller came out and

11   Mr. Stoller had his food and Omar was there.  Was

12   Omar present when you talked to Mr. Stoller in the

13   vestibule?

14        A.    No.

15        Q.    What, if anything, did Omar do after

16   you talked to him when Mr. Stoller was eating his

17   food?

18        A.    What did he -- I don't know what he

19   did.

20        Q.    Okay.  You didn't ask Omar to stay?

21   You didn't ask Omar to help you?

22        A.    No.

23        Q.    Is that typical?

24        A.    Yes, because he is not a loss

1    prevention officer.

2        Q.    Okay.  And that would be, I presume,

3    that they wouldn't want Omar to do that because he

4    doesn't have the training?

5        A.    It wasn't necessary to have him there

6    to help me.

7        Q.    Well, I know.  But that's not what you

8    said.  You said he didn't do that because he was

9    not a loss prevention officer.  So there, I

10   presume -- maybe I am wrong.  Tell me.  Is there a

11   company policy that says that if you are not a

12   loss prevention officer, then you shouldn't

13   confront a customer?

14       A.    No.

15       Q.    So then the reason Omar didn't stay

16   with you had nothing to do with the company policy

17   because you said there is no company policy.

18       A.    Correct.  He was a male that was in the

19   vicinity when I was observing Mr. Stoller go to

20   the bathroom, so I asked the first male I saw to

21   go into the bathroom.

22       Q.    Again, why would you have sent Omar

23   away?  Why wouldn't you have had Omar come with

24   you when you knew that you were going to confront

Page 39

1    Mr. Stoller in the vestibule?

2         A.    I didn't send him away.

3         Q.    Okay.  Why didn't you ask Omar to stay

4    with you then?

5         A.    Because I did not need assistance.

6         Q.    Okay.  And who called the police?

7         A.    I believe it was my assistant manager

8    Matt.

9         Q.    And while all of this was going on,

10   where was Matt?

11        A.    Matt was outside with us.

12        Q.    So Matt was physically outside the

13   store?

14        A.    Correct.

15        Q.    So Matt had not observed anything that

16   went on in the store?

17        A.    Correct.

18        Q.    So Matt was outside the store.  Did he

19   call the Melrose Park Police Department on his

20   cell phone?

21        A.    Yes.

22        Q.    Was it his cell phone or a company cell

23   phone?

24        A.    I don't know.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 40

1    Q.    Does the company issue cell phones?

2    A.    I don't know.

3          MS. DAMICO:  Objection, relevance.

4          THE COURT:  Sustained.

5                What difference does it make?

6          MR. KISS:  Well, what the difference is

7    is that I don't think this matter is going to go

8    any further, but if it should go further and it

9    is a company cell phone, we would want to

10   subpoena the records with respect to that cell

11   phone.  And obviously this is the first time

12   that I heard that it was done a cell phone.  I

13   would have assumed it was done by a landline.

14   And that may or may not --

15         THE COURT:  What would be the relevance

16   of that, Counsel?

17         MR. KISS:  The relevance?

18         THE COURT:  Yes.  Whether there was a

19   phone call made from a company cell phone.  This

20   is a $100 civil offense ticket.

21         MR. KISS:  I understand.

22         MS. DAMICO:  It is a trial on a ticket,

23   Judge.  This isn't a discovery deposition.

24         THE COURT:  This is not a criminal

89061323-a097-456b-93f9-4d5a42fa70f2

1    charge.  I certainly appreciate the effort you

2    are putting into this case, but we don't need to

3    get bogged down in minutia.  Let's keep it

4    moving.

5              MR. KISS:  I understand what you are

6    saying.  At the same time, since we have a

7    record, irrespective of what this is for, when

8    the State is bringing an action against a

9    citizen, the citizen has a 14th Amendment due

10   process right and he is entitled to test the

11   veracity of any and every piece of evidence that

12   comes in against him, whether it is by testimony

13   or documents or anything else.  Therefore, we

14   are entitled to know -- we are entitled to get

15   information with respect to what possible pieces

16   of evidence are out there that we have not yet

17   seen.  And my client is entitled to vigorously

18   defend against the State bringing whatever

19   charge, whether it be a $100 fine or a $10 fine

20   or, here, just sign this and go home.  If he

21   feels he has been wronged and he wants to

22   contest it, then he has every right to bring up

23   every defense he possibly has under the

24   14th Amendment to the due process clause.

89061323-a097-456b-93f9-4d5a42fa70f2

1          THE COURT:  And I'm assuming that's

2     what you are doing, so proceed.

3          MR. KISS:  That's right.

4     BY MR. KISS:

5          Q.   So Matt makes this phone call.  When do

6     the police arrive?

7          A.   They arrived about ten minutes later

8     with Mr. Stoller in the squad car.

9          Q.   So when you next saw Mr. Stoller, he

10    was already presumably under arrest or at least in

11    a squad car?  You don't know whether or not they

12    actually arrested him?

13         A.   Correct.

14         Q.   And while Matt was calling the police,

15    what, if anything, did Mr. Stoller do?

16         A.   Mr. Stoller left the property on foot.

17         Q.   Now, at what point did you go back to

18    the table where Mr. Stoller put the other two

19    pairs of gloves to check on the gloves?

20         A.   Probably about a half hour later.

21         Q.   A half hour later?

22              Now, how close were you to Mr. Stoller

23    when you saw him put the gloves on the table?

24         A.   I was in the office.

Page 43

1     Q.    Okay.  But you actually saw him put the
2  gloves on the table, right?

3     A.    Correct.  In the cameras.

4     Q.    And so were you -- did he put each
5  individual glove on the table, one, then he took
6  out another one and put another one on the table?

7     A.    They were both put on the same table.

8     Q.    Okay.  Tell me what you saw --
9  specifically what you saw with respect to
10 Mr. Stoller putting the gloves on the table.

11    A.    I saw him remove the packages of gloves
12 and place them on a table and he placed a jacket
13 that was on the table over the gloves.

14    Q.    Okay.  And you saw this on a CCTV
15 camera, but you didn't go back there to see how
16 many gloves he placed there until a half hour
17 later?

18    A.    Correct.

19    Q.    Do you have any way of knowing as to
20 how many pairs of gloves Mr. Stoller actually put
21 there?

22    A.    I don't understand your question.

23    Q.    Okay.  You said you saw him put two
24 packages of gloves on the table.

89061323-a097-456b-93f9-4d5a42fa70f2

1        A.    Correct.

2        Q.    Is it possible that he put two packages

3    plus the other gloves on the table as well?

4        A.    No.

5        Q.    Why is that impossible?

6        A.    Because I had a good image.  He was

7    right below my camera.

8        Q.    Okay.  And so you are saying that the

9    image was that good that you could discern the two

10   individual packages and you could tell that there

11   were absolutely -- there was no way in the world

12   he could have had a loose pair of gloves that he

13   put back on the table?

14       A.    That's possible.

15       Q.    Pardon me?

16       A.    It's possible.

17       Q.    It's possible that he could have put it

18   back on the table.  Right.

19             So it is possible that he never even

20   left the store with the pair of gloves?

21       A.    That's possible.

22       Q.    And is that the reason that you didn't

23   ask for the gloves before he left the store?

24       A.    Correct.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 45

1         Q.    Now, with respect to Mr. Stoller

2    leaving, after you and Matt were outside and you

3    saw Mr. Stoller and he was still -- When

4    Mr. Stoller exited the store, the vestibule, was

5    he still on your cart?

6         A.    Yes.

7         Q.    And did he drive off on your cart or

8    did he get out of the cart and walk away at that

9    point?

10        A.    He stayed on the cart.

11        Q.    And you saw him driving the cart away?

12        A.    Yes.

13        Q.    Did anyone make any effort to follow

14   him on the cart?

15        A.    A few minutes later.  Yes.

16        Q.    But not immediately?  Not when he left?

17        A.    Correct.

18        Q.    How many minutes later would you say

19   that he was followed and -- strike that.

20              How many minutes was he on that cart

21   alone going somewhere?

22        A.    Probably about one or two minutes.

23        Q.    Okay.  And do you know approximately

24   what distance he traveled?

89061323-a097-456b-93f9-4d5a42fa70f2

Page 46

1          A.    He was at the far end of the parking

2     lot when he was seen again approximately a hundred

3     yards away from the store.

4          Q.    And who stopped him when he was

5     approximately a hundred yards away from the store?

6     Was it someone from the store or was it the

7     Melrose Park police department?

8          A.    It was store employees.

9          Q.    Okay.  Do you know which employees?

10         A.    I believe it was Jeff and Omar had made

11    first contact with him.

12         Q.    Is that the same Omar that followed him

13    into the bathroom?

14         A.    That's correct.

15         Q.    And did Omar, again, just happen to be

16    out in the parking lot at that time or did

17    somebody tell Omar to go follow Mr. Stoller in the

18    cart?

19         A.    I don't know.

20         Q.    But you didn't?

21         A.    I didn't what?

22         Q.    You didn't tell Omar to follow

23    Mr. Stoller?

24         A.    No.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 47

1      Q.     The last interaction you had with Omar

2   was inside the store after Mr. Stoller got done

3   eating?

4      A.     That's correct.

5      Q.     Were you there when Jeff and Omar

6   actually talked to Mr. Stoller when he was a

7   hundred yards away?

8      A.     I arrived shortly after.

9      Q.     And what, if anything, did Mr. Stoller

10  do at that point?

11     A.     At what point?

12     Q.     At the point that you arrived.

13     A.     He was in the cart and he was saying

14  that he used to be a lawyer, that he is a lawyer,

15  and that we were doing something illegal.  I

16  don't...

17     Q.     Okay.  And after Mr. Stoller made

18  whatever statement he made, what, if anything, did

19  he do next?

20     A.     He drove the scooter another ten yards

21  and then he walked off the property.

22     Q.     Okay.  And did you talk to the

23  Melrose Park Police Department at all?

24     A.     Yes.

89061323-a097-456b-93f9-4d5a42fa70f2

1      Q.    Okay.  Was that before or after

2   Mr. Stoller came back in the squad car?

3      A.    After.

4      Q.    Was Matt -- As far as you know, was

5   Matt the only person that talked to the

6   Melrose Park Police Department beforehand?

7      A.    As far as I know, yes.

8      Q.    My understanding is that you saw Matt

9   outside the vestibule of the store and you only --

10  and Matt made that phone call, but there wasn't

11  much of an interaction between you and Matt?

12     A.    After I attempted to stop Mr. Stoller?

13     Q.    Right.

14     A.    I used my radio to call for manager

15  assistance.  Matt was the first one to show up and

16  I explained what happened before we went in the

17  parking lot together.

18     Q.    Okay.  So then whatever Matt told the

19  police, that was not based on his firsthand

20  knowledge, it was just based on whatever it is

21  that you told him?

22          MS. DAMICO:  Objection, speculation.

23          MR. KISS:  Okay.  Let me rephrase that.

24          THE COURT:  Go ahead.

L.A. Court Reporters, L.L.C.
312-419-9292

89061323-a097-456b-93f9-4d5a42fa70f2

Page 49

1    BY MR. KISS:

2        Q.    What, if anything, did you tell Matt

3    prior to him making that phone call?

4        A.    I told him that the guy didn't want to

5    stop.

6        Q.    That's all you told him?

7              Tell me exactly word for word what you

8    told -- what you remember telling Matt with

9    respect to what you saw before he made that phone

10   call.

11             MS. DAMICO:  Objection, asked and

12    answered.  And it is argumentative at this

13    point.

14   BY MR. KISS:

15       Q.    Okay.  So your answer is -- If it was

16   asked and answered, then the only answer is that

17   you told Matt --

18             THE COURT:  Okay.  Wait a minute,

19    Counsel.  It is argumentative.  Rephrase your

20    question.  Regroup and rephrase your question.

21             MR. KISS:  Okay.

22   BY MR. KISS:

23       Q.    What, if anything, did you tell Matt

24   before he made the phone call?

89061323-a097-456b-93f9-4d5a42fa70f2

Page 50

1      A.    When I was in the office observing

2   Mr. Stoller, I had informed all of the managers

3   that I seen him eating shrimp and that I was going

4   to be stopping him.  And then once in the

5   vestibule, Matt showed up and I said, he didn't

6   want to stop.

7      Q.    Okay.  To the best of your recollection

8   is that exactly what you told Matt and the other

9   managers?

10     A.    Yes.

11     Q.    Now, as far as you know, the only

12  person who talked to the Melrose Park Police

13  Department was Matt?

14     A.    Correct.

15     Q.    And so you talked to the Melrose Park

16  Police Department after they brought Mr. Stoller

17  back in the squad car?

18     A.    Correct.

19     Q.    And did the Melrose Park Police

20  Department say -- excuse me.  Did the Melrose Park

21  Police Department ask you or any representative of

22  the store whether they wanted to bring charges

23  against Mr. Stoller?

24     A.    Yes.  He asked me.

89061323-a097-456b-93f9-4d5a42fa70f2

1      Q.    And what, if anything, did you say?

2      A.    I said, don't arrest him, give him a

3    ticket.

4      Q.    So you specifically said:  Don't arrest

5    him, give him a ticket?

6      A.    Yes.

7      Q.    Did you tell them what they should give

8    him a ticket for?

9      A.    No.

10     Q.    So what, if anything, did you tell the

11   Melrose Park Police Department that Mr. Stoller

12   should get a ticket for?

13     A.    I said, I saw him consuming shrimp, he

14   disposed of the container, didn't pay for it, and

15   I thought he might also have a pair of gloves on

16   him.

17     Q.    Did you show the Melrose Park Police

18   Department any of the contents of the garbage can

19   that you took out, the shrimp container or

20   anything else?

21     A.    No.

22     Q.    So the Melrose Park Police Department

23   were basing their decision on what you told them

24   to do?

Page 52

1                    MS. DAMICO:  Objection, speculation.

2                    THE COURT:  Sustained.

3                        The police officer is here.

4                    MR. KISS:  Okay.

5       BY MR. KISS:

6          Q.   Did you ever tell the police officer

7       due to the dollar amount you did not wish to sign

8       a complaint at this time?

9          A.   Correct.

10         Q.   When did you tell him that?

11         A.   When he had brought Mr. Stoller back

12      and we were talking in the vestibule.

13         Q.   Okay.  Well, is there anything else

14      that you can now recall that you talked to the

15      police officer about?

16                   MS. DAMICO:  Objection, it's

17        argumentative as to anything else you can recall

18        now, suggesting that she can't recall.

19                   MR. KISS:  Well, I asked her basically

20        that same question, and she didn't recall

21        telling the police officer that she didn't sign

22        a complaint until I read it to her.

23                   MS. DAMICO:  No.

24                   THE COURT:  I believe she answered

89061323-a097-456b-93f9-4d5a42fa70f2

Page 53

1    that, give him a ticket instead of arresting

2    him.

3              MS. DAMICO:  Correct.

4              THE COURT:  Go ahead.

5    BY MR. KISS:

6        Q.    Okay.  Now, were you there when the

7    police wrote out the ticket?

8        A.    Yes.

9              MR. KISS:  Can we mark this as

10   Defendant's Exhibit No. 1 for identification?

11             THE COURT:  Is that the ticket?

12                  That's the complaint.  You don't

13   need to admit it.  It's already here.

14             MR. KISS:  Okay.

15   BY MR. KISS:

16       Q.    Did you actually see a copy of the

17   ticket that they gave Mr. Stoller?

18             MS. DAMICO:  Objection, relevance and

19   beyond the scope of direct.

20             THE COURT:  Sustained.

21   BY MR. KISS:

22       Q.    At any point did the police officer

23   show you the ticket?

24             MS. DAMICO:  Objection, relevance.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 54

1    Also beyond the scope of direct.

2              THE COURT:  I will let her answer that

3    one.

4              THE WITNESS:  No.

5    BY MR. KISS:

6        Q.   During this time -- during the time

7    that you had the conversation with the police

8    officer, was Mr. Stoller in the squad car?

9        A.   Yes.

10       Q.   And so he was not privy to any of the

11   conversations that you had with the police

12   officer?

13       A.   I don't believe so.

14       Q.   Okay.  Now, often -- strike that.

15             What's the store's procedure for

16   disposing of spoiled food?

17       A.   It goes by a case-by-case situation.

18       Q.   Okay.  And if, as an example, one of

19   the employees saw some shrimp spoiled in the

20   refrigeration case, would he leave it there or is

21   he supposed to dispose of it?

22             MS. DAMICO:  Objection, relevance.

23             THE COURT:  I'm going to say that's

24   really not relevant and somewhat off track here,

89061323-a097-456b-93f9-4d5a42fa70f2

Page 55

```
 1    so...

 2    BY MR. KISS:

 3         Q.    What day of the week was this?

 4         A.    It was a Saturday.

 5         Q.    On Saturdays, specifically, don't you

 6    have quite a bit of food demonstrations?

 7              MS. DAMICO:  Objection, relevance, and

 8       beyond the scope of direct.

 9              MR. KISS:  Okay.  Well --

10              THE COURT:  What is the relevance?

11              MR. KISS:  You know, we will ask that

12       question when we call her in our case.

13              THE COURT:  Okay.

14    BY MR. KISS:

15         Q.    As Mr. Stoller was sitting in the squad

16    car, did you have any other interaction between

17    yourselves or did the police officer just drive

18    off with Mr. Stoller in the squad car?

19         A.    The officer let Mr. Stoller out of the

20    squad car and he, once again, left on foot.

21         Q.    Did you talk to him?

22         A.    No.

23         Q.    And did you see him do anything other

24    than walk away?
```

89061323-a097-456b-93f9-4d5a42fa70f2

Page 56

1          A.    No.

2                MR. KISS:  Okay.  I have no more

3      questions of -- No more cross-examination

4      questions of this witness, but I reserve the

5      right to recall her in our case.

6                THE COURT:  Okay.

7                MS. DAMICO:  Short redirect.

8                     REDIRECT EXAMINATION

9      BY MS. DAMICO:

10         Q.    When you first observed Mr. Stoller,

11     what drew your attention to him was that he was

12     eating out of a container, correct?

13         A.    Correct.

14         Q.    And you were able to clearly see this

15     while you were on the floor, correct?

16         A.    Correct.

17         Q.    And you were able to see that the

18     container that he was eating out of contained

19     shrimp?

20         A.    Correct.

21         Q.    And it was a container that belongs to

22     Costco, correct?

23         A.    Correct.

24         Q.    And as a result of that, you then

89061323-a097-456b-93f9-4d5a42fa70f2

Page 57

1    watched him further?

2         A.    Correct.

3         Q.    And you saw him then dispose that

4    container into a trash can?

5         A.    Correct.

6         Q.    And that trash can was located within

7    the Costco premises, correct?

8         A.    Correct.

9         Q.    After that, you then proceeded to the

10   office, correct?

11        A.    Correct.

12        Q.    And when you proceeded to the office,

13   you located him on the circuit cameras, right?

14        A.    Yes.

15        Q.    And when you saw him on the cameras,

16   you saw him take three packages of gloves?

17        A.    Yes.

18        Q.    And you saw him place the gloves

19   initially in the basket of the stroller, correct?

20        A.    Yes.

21             MR. KISS:  I'll object.  All of this

22    has been asked and answered already.

23             MS. DAMICO:  This is redirect.

24             THE COURT:  Yes.  It's redirect.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 58

1   BY MS. DAMICO:

2       Q.    You saw him place the packages into the

3   basket of the stroller that he was on that

4   belonged to Costco, correct?

5       A.    Correct.

6       Q.    And then you also observed him drive

7   that scooter with the packages of gloves --

8           MR. KISS:  I'm going to object as

9   leading.  Even on redirect, this is way beyond.

10          THE COURT:  Okay.  That is sustained.

11  It is a leading question.

12  BY MS. DAMICO:

13      Q.    After you saw him place three packages

14  of gloves into the basket of the scooter, where

15  did you see him go next?

16      A.    He went to the back hard lines bulk

17  wall, is what we call it, the wall against the

18  store.

19      Q.    And you testified that you saw him then

20  place gloves onto a shelf and then cover them with

21  a jacket, right?

22      A.    After that, yes.

23      Q.    How many gloves were you able to see

24  him -- How many packages of gloves did you see him

89061323-a097-456b-93f9-4d5a42fa70f2

Page 59

1   place there?

2        A.    Two packages.

3        Q.    And then did you see him do anything

4   else with gloves after that?

5        A.    No.

6        Q.    Did you make any observations of him

7   placing any objects inside of his coat?

8        A.    Before he placed the packages on the

9   table, he removed one pair of gloves from the

10  package and put those in his left jacket pocket.

11       Q.    And the packaging that the gloves were

12  in, describe the packaging.  Was it a box?

13       A.    It is a rectangle box the size of

14  gloves.  The gloves aren't attached to the box.

15  They are just kind of slid in.

16       Q.    Were you able to see him use his hands

17  and open the box on the television that you were

18  watching?

19       A.    No.

20       Q.    Did you see him pull gloves out of the

21  box?

22       A.    Yes.

23       Q.    Then you saw him place those inside of

24  his jacket, correct?

89061323-a097-456b-93f9-4d5a42fa70f2

Page 60

1    A.    In his jacket pocket.  Outside jacket

2    pocket.

3    Q.    Did he close the pocket?

4    A.    It had no zipper on it.

5    Q.    And after that is when you observed him

6    then go to the cash registers, correct?

7    A.    Correct.

8    Q.    Okay.  And your testimony was regarding

9    grazing.  Once you went back up to the office and

10   had observed him place the gloves inside of his

11   jacket, that's why you watched him even further on

12   the camera, is that correct?

13   A.    Correct.

14   Q.    Okay.  Is it fair to say that grazing

15   is when you take like one or two pieces of

16   something and you are eating it while you are in

17   the store?  Is that a fair assumption?

18   A.    Without the intention to pay for it,

19   yes.

20   Q.    And you found the entire packaging that

21   the shrimp were in that he was eating out of

22   thrown in the trash, correct?

23   A.    Correct.

24   Q.    He didn't remove the -- He didn't

89061323-a097-456b-93f9-4d5a42fa70f2

1   remove the price tag off of that packaging and

2   take that with him, did he?

3        A.    No.  No.

4        Q.    You didn't see him take the lid off of

5   that packaging and take it up with him to the cash

6   register, correct?

7        A.    Correct.

8        Q.    He made no attempt to inform the

9   cashier that he had consumed all of the shrimp

10  that were contained in that container and tried to

11  pay for that, correct?

12       A.    Correct.

13       Q.    When the Melrose Park Police Department

14  arrived on scene, you had a conversation with them

15  where you said that you didn't want to sign any

16  complaints against Mr. Stoller?

17       A.    That's correct.

18       Q.    Do you remember that testimony?

19             And is your understanding that you

20  didn't want to sign complaints against him that

21  you didn't want to have him charged criminally?

22       A.    That's correct.

23       Q.    Instead, you wanted a citation to be

24  issued for his conduct while on the premises?

89061323-a097-456b-93f9-4d5a42fa70f2

Page 62

1       A.      That's correct.

2       Q.      And after the Melrose Park Police

3   Department issued a citation, Mr. Stoller was

4   actually released from their custody, correct?

5       A.      That's correct.

6       Q.      He was let out of the squad car and

7   allowed to walk to his car?

8       A.      Yes.

9       Q.      And from the time that he -- I don't

10  know what that -- from the time that he rolled on

11  the scooter out of Costco until he got to the end

12  of Costco property, did you make any observations

13  of whether he was able to discard anything?  Did

14  he discard anything?

15      A.      I could not see.

16      Q.      Okay.  And after he got to the end of

17  Costco's property, your testimony was he got out

18  of the stroller and then walked off, correct?

19      A.      That's correct.

20      Q.      Were you able to see where he walked

21  off to?

22      A.      He walked down towards First Avenue and

23  he was walking southbound.

24      Q.      Okay.  So he walked southbound on First

89061323-a097-456b-93f9-4d5a42fa70f2

Page 63

1    Avenue from Costco, correct?

2        A.    That's correct.

3        Q.    Did you see where he went after he

4    walked southbound on First Avenue from Costco?

5        A.    No.

6        Q.    Okay.  And were you able to determine

7    while he was walking southbound -- Were you able

8    to see while he was walking southbound on First

9    Avenue from Costco whether he discarded anything

10   from his coat pocket?

11       A.    I could not see.

12             MS. DAMICO:  I have nothing further.

13             MR. KISS:  I just have one or two more

14    questions.

15                  RECROSS-EXAMINATION

16   BY MR. KISS:

17       Q.    So you saw him by the table -- or

18   strike that.

19             When did you see him remove the gloves

20   from the box?

21       A.    I can't recall the exact time.

22       Q.    I'm not asking for the exact time.

23   Where was he when you saw him remove the gloves

24   from the box?

89061323-a097-456b-93f9-4d5a42fa70f2

Page 64

1          A.     He was at the hard lines bulk wall.

2          Q.     Okay.  Where was it that he put the

3     gloves -- the other two boxes of gloves in with

4     the clothing?

5          A.     That's in the center of the store.

6          Q.     Okay.  And you observed him go from

7     wherever you said that was, the hard line?

8          A.     Bulk wall.

9          Q.     You observed him go from there to where

10    he put the two boxes of gloves?

11         A.     I did not maintain constant visual

12    observation.

13         Q.     Okay.  Where did he put the empty box

14    of gloves?

15         A.     I found an empty box down aisle 106,

16    which is the aisle he used to get from the bulk

17    wall to the clothing area.

18         Q.     Okay.  When did you find that?

19         A.     Approximately a half hour.

20         Q.     Approximately what time?

21         A.     Half hour later.

22         Q.     Okay.  And how were you able to

23    identify that box as being the exact box that

24    Mr. Stoller had?

89061323-a097-456b-93f9-4d5a42fa70f2

Page 65

1      A.    I can't.

2      Q.    So what you are testifying to is you

3    found an empty box somewhere in the store and you

4    assumed it was the box that Mr. Stoller had?

5      A.    That's correct.

6      Q.    And it could be that Mr. Stoller put

7    the box of gloves anywhere during that period from

8    the bulk wall back to the clothing, he could have

9    put that down anywhere because he didn't want the

10   gloves?

11     A.    That's possible.

12           MR. KISS:  I have no more questions.

13           THE COURT:  Okay.

14           MS. DAMICO:  I have nothing.

15           THE COURT:  Okay.  Do you have another

16   witness?

17           MS. DAMICO:  Yes, the officer.

18           THE COURT:  DeCarlo?

19           MS. DAMICO:  Officer DeCarlo.

20           MR. KISS:  Your Honor, I may recall

21   her, so she's not excused.

22           THE COURT:  Yes.  She's not leaving

23   yet.  She's just going out there and sending

24   Officer DeCarlo in.

Page 66

```
 1              MR. KISS:  Okay.

 2                  (Witness previously sworn.)

 3              MICHAEL D. DECARLO, JR.,

 4   called as a witness herein, having been first duly

 5   sworn, was examined and testified as follows:

 6                  DIRECT EXAMINATION

 7   BY MS. DAMICO:

 8       Q.    Officer, state your name and badge

 9   number, please.

10       A.    Officer DeCarlo, 52.

11       Q.    You are employed as a patrol officer

12   with Melrose Park Police Department, correct?

13       A.    Correct.

14       Q.    And were you on duty on November 19,

15   2016, at approximately 12:00 p.m.?

16       A.    Yes.

17       Q.    Okay.  Were you dispatched to the area

18   of 8400 West North Avenue, Melrose Park?

19       A.    Yes.

20       Q.    What is located at 8400 West

21   North Avenue, Melrose Park?

22       A.    Costco.

23       Q.    What is the call for service that you

24   received that day?
```

89061323-a097-456b-93f9-4d5a42fa70f2

1        A.    A retail theft.

2        Q.    Were you given any information via

3    dispatch regarding the retail theft?

4        A.    Yes, I was.

5        Q.    What information do you recall that you

6    were given?

7              MR. KISS:  Objection, hearsay.

8              MS. DAMICO:  Course of investigation.

9              THE COURT:  Sustained.

10             No.  I'm sorry.  Go ahead.  You

11   can answer the question.

12             THE WITNESS:  An elderly white male

13   with gray hair, blue jeans, and a brown jacket.

14   BY MS. DAMICO:

15       Q.    Okay.  Were you given any other

16   information about what the suspect had done?

17       A.    Yes.  He opened up --

18             MR. KISS:  Objection, hearsay.

19             MS. DAMICO:  Course of investigation.

20             THE WITNESS:  He opened up a box of --

21             THE COURT:  It's overruled.

22             THE WITNESS:  He opened up a box of --

23             MR. KISS:  It's overruled.

24             MS. DAMICO:  Right.  He can answer it.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 68

1               MR. KISS:  Okay.  I'm sorry.

2               THE WITNESS:  He opened up a box of

3       shrimp, ate several shrimp, and then he took a

4       pair of gloves and put them in his front pocket.

5    BY MS. DAMICO:

6        Q.    When you arrived on scene at Costco,

7    did you locate any subjects matching this

8    description?

9        A.    Yes.

10       Q.    Where did you locate the subject

11   matching the description?

12       A.    Another officer that I was with located

13   the offender at a storage facility about 200 feet

14   away from Costco.

15       Q.    Was this -- In what direction?  Where

16   was the storage facility located, on what street?

17       A.    It was on First Avenue.  So it was

18   directly north of Costco.

19       Q.    Was he inside the structure or outside

20   of the structure?

21       A.    He was inside of the structure.

22       Q.    Okay.  Did you approach the subject

23   when you located him --

24       A.    Yes.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 69

```
 1        Q.    -- at the storage facility?

 2        A.    Yes.

 3        Q.    Did you speak with the subject?

 4        A.    Yes.

 5        Q.    Did he make any statements to you?

 6        A.    Something about why we were talking to

 7   him.  We explained that he matched the description

 8   of someone we were looking for for a retail theft.

 9   At that point in time we placed him in handcuffs

10   and brought him back to the location.

11        Q.    Okay.  You brought him back to Costco,

12   and what happened when you brought him back to

13   Costco?

14        A.    He was positively identified by the

15   agent as the offender of a retail theft.

16        Q.    And what did you do after he was

17   identified by the agent as the offender of the

18   retail theft that happened?

19        A.    I issued him a verbal trespass warning

20   and a village citation for retail theft.

21        Q.    Okay.  You did not arrest him for any

22   criminal offense, correct?

23        A.    At that point in time they did not want

24   to sign complaints because of the dollar amount.
```

89061323-a097-456b-93f9-4d5a42fa70f2

Page 70

1       Q.   And after you issued the citation, what
2   did you do?
3       A.   I issued a citation, explained that the
4   items that he did purchase he left, he could
5   retrieve those.  He refused to and walked away.
6       Q.   I'm sorry.  I didn't hear what you
7   said.
8       A.   He refused to pick up the items he
9   actually paid for and then just walked away.
10      Q.   When you located -- and the subject
11  that you located at the self storage, is that
12  subject here in court today?
13      A.   Yes, he is.
14      Q.   Can you point to him and identify an
15  article of clothing that he is wearing?
16      A.   He is to the right with the camel skin
17  jacket.
18      Q.   And when you located Mr. Stoller at the
19  storage facility, did you conduct any kind of
20  search of his person?
21      A.   Basic just pat down for officer safety.
22      Q.   And did you recover or retrieve any
23  items that you believed were from the Costco
24  facility?

1          A.    No, I did not.

2          Q.    Okay.  Did you or any of the

3     Melrose Park police officers conduct a search of

4     the area within the storage facility where he was

5     located for any items?

6          A.    A very brief search.

7          Q.    Okay.  Was anything located there?

8          A.    No, it was not.

9          Q.    Was anything located on the route that

10    Mr. Stoller was walking down First Avenue in order

11    to get to the storage facility?

12         A.    No, it was not.

13         Q.    And after you issued the citation, did

14    you let Mr. Stoller go on his own?

15         A.    Yes.

16               MS. DAMICO:  Okay.  I have nothing

17      further.

18               THE COURT:  All right.

19                    CROSS-EXAMINATION

20    BY MR. KISS:

21         Q.    The description that you were given of

22    the person that you were looking for at Costco,

23    who gave you that description?

24         A.    Dispatch, originally, and then when I

89061323-a097-456b-93f9-4d5a42fa70f2

Page 72

1   pulled up, I spoke to Agent Carlson.

2        Q.    And what, if anything, did Agent

3   Carlson tell you when you first spoke to her?

4        A.    She saw a male -- an elderly male with

5   gray hair, blue jeans, and a brown jacket eating

6   several pieces of shrimp and then take a pair of

7   gloves, put them in his front pocket, walk towards

8   the point of purchase, pay for several other

9   items, not for those items, and then walk out.

10  And she said she saw that via surveillance

11  footage.

12       Q.    Okay.  And yet you didn't find any

13  gloves, is that correct?

14       A.    Correct.

15       Q.    Didn't you think that was odd?

16       A.    No.

17       Q.    Why not?

18       A.    He could have thrown them.  And he

19  already ate shrimp that he didn't pay for, so he

20  still committed retail theft.

21            MR. RHINE:  Objection to the conclusion

22       that he committed retail theft.

23            THE COURT:  Sustained.

24

89061323-a097-456b-93f9-4d5a42fa70f2

Page 73

1    BY MR. KISS:

2        Q.    Did Agent Carlson show you any evidence

3    that in fact he had eaten the shrimp?

4        A.    No.

5        Q.    The box that it came in or anything

6    else of that nature?

7        A.    There would have been a printed

8    receipt, which is what we always use for retail

9    thefts.

10       Q.    Okay.  And what kind of printed receipt

11   would that be?

12       A.    She would just show us a printed

13   receipt of how much that would cost.

14             MR. KISS:  Okay.  And may I approach

15     the witness?  I just want to show him this.

16             THE COURT:  Yes.  Go ahead.

17   BY MR. KISS:

18       Q.    Is this the type of printed receipt

19   that you would have been given?

20       A.    Correct.

21       Q.    And would that be at exactly -- it

22   would have void transaction?

23       A.    I don't know.

24       Q.    Okay.  Now, I believe the description --

89061323-a097-456b-93f9-4d5a42fa70f2

1    well, strike that.

2            The first description that you got --

3    or strike that.

4            You actually placed Mr. Stoller under

5    arrest before you talked to Agent Carlson, isn't

6    that correct?

7        A.    No, it's not correct.

8        Q.    Okay.  Where was Mr. Stoller when you

9    arrested him?

10       A.    The storage facility.

11       Q.    Where was Agent Carlson?

12       A.    Costco.

13       Q.    So you went to Costco first, then you

14   talked to Agent Carlson, is that correct?

15       A.    Correct.

16       Q.    And she told you that he's at the

17   storage facility?

18       A.    My partner searched the area.  He

19   located him at the storage facility.

20       Q.    Okay.  You said that you were the one

21   that issued the citation?

22       A.    Correct.

23       Q.    Okay.  And is this the citation that

24   you issued? (Indicating)

89061323-a097-456b-93f9-4d5a42fa70f2

Page 75

1      A.    Yes.

2      Q.    And is that your signature and badge

3    number on the citation?

4      A.    Yes.

5      Q.    Did you have any discussion with Agent

6    Carlson concerning the fact that there were no

7    gloves on Mr. Stoller?

8      A.    I'm sure.  I don't recall, but I would

9    imagine I would have said that we didn't locate

10   the gloves.

11     Q.    Do you recall what, if anything, she

12   said to you about the gloves?

13     A.    No.

14     Q.    Did it ever come to issue that maybe if

15   she was wrong about the gloves, she may be wrong

16   about the shrimp?

17     A.    No.

18           MR. KISS:  We have no more questions.

19           THE COURT:  Okay.

20           MS. DAMICO:  Nothing else.

21           THE COURT:  Okay.  Thank you, Officer.

22               Do you anticipate recalling

23   Officer DeCarlo?

24           MR. KISS:  If he can wait for a couple

Page 76

1     minutes outside.

2                THE COURT:  Okay.  Anything else?

3                MS. DAMICO:  That's it.

4                THE COURT:  Okay.

5                MR. KISS:  Are they resting?

6                MS. DAMICO:  Yes.

7                MR. KISS:  We would ask for a directed

8     finding.  We have a written motion of directed

9     finding.  And it is based on two things.  It is

10    based on the evidence itself, but aside from

11    that, it is also based on the fact that my

12    client --

13                MS. DAMICO:  May I have a copy?

14                MR. KISS:  Oh, I'm sorry.  Here.

15                It is also based on the fact that

16    my client was not charged with retail theft.  He

17    was charged with some sort of auto violation.

18                If I may?

19                MS. DAMICO:  Judge, I'm going to object

20    to a couple of the exhibits that are attached to

21    this motion for directed finding because they

22    are not in evidence.  They didn't come in during

23    the direct.

24                THE COURT:  I haven't gotten to it yet.

89061323-a097-456b-93f9-4d5a42fa70f2

Page 77

1           MR. KISS:  That's fine.

2               We would also ask that the Court

3     take judicial notice of the charge in the

4     ticket.

5           THE COURT:  Retail theft.

6           MR. RHINE:  Paying particular attention

7     to the ordinance, the listing of the ordinance,

8     the ordinance number.

9           THE COURT:  Did you attach the text of

10    that ordinance as well?

11          MR. KISS:  Yes, we did.

12          THE COURT:  Cecilia, do you have a code

13    book?  Can you bring it, please?

14              (Brief recess.)

15          THE COURT:  The citation shows

16    Chapter 10, Section 04010.  The ordinance you

17    gave me is Chapter 10.04.  10.04, I want to make

18    sure it is the same thing.

19          MR. KISS:  That's fine.

20          MR. STOLLER:  For the record,

21    Christopher Stoller, Judge.  I appeared in front

22    of Marianne Salemi in her office upstairs.  I

23    showed her a copy of the complaint and the

24    ticket.  She went into that ordinance book,

89061323-a097-456b-93f9-4d5a42fa70f2

1    which was in counsel's -- the office of her

2    lawyer right next to her, and she said she's

3    very familiar with it.  She said that ordinance

4    is the traffic ordinance 1005 of the Village of

5    Melrose Park, which she attested to and gave me

6    that copy.  She said it is the Motor Vehicle

7    Code.

8              THE COURT:  Okay.  Do you want to see

9    it?

10             MS. DAMICO:  Sure.

11             THE COURT:  It is the Motor Vehicle

12   Code.

13             Do you want to respond?

14             MS. DAMICO:  One, I was not given

15   notice of the motion.

16                  Two, the statements of Mr. Stoller

17   regarding what Ms. Salemi stated are not

18   currently in this record.

19                  Three, I would seek leave to amend

20   the complaints to conform with the testimony of

21   the witnesses.

22             THE COURT:  Okay.

23             MR. KISS:  If we can respond?

24                  One, the State rested.  They

89061323-a097-456b-93f9-4d5a42fa70f2

1    can't -- Once they rest, they can't just decide,

2    well, we don't have enough evidence, so we are

3    going to bring in some more evidence.

4            Two, it is a motion for -- We

5    filed a motion for directed verdict.  We can

6    file that at any time --

7            THE COURT:  That's fine.

8            MR. KISS:   -- and we are entitled to a

9    ruling on that.

10           THE COURT:  Uh-huh.

11           MR. KISS:  And, three, we were not

12   given -- Again, a due process violation.  We

13   were not given notice of what we were charged

14   with.  We were told we were charged under this

15   statute, and the only evidence the State chose

16   to put on is with regards to a retail theft, and

17   therefore we are entitled to a directed verdict.

18           THE COURT:  No, actually, you are not.

19   This is not a criminal proceeding.  In your

20   complaint, it all referred to the criminal code

21   and the criminal proceeding.

22           This is not a criminal proceeding.

23   This is a civil matter.  Illinois is a -- I find

24   that even though the complaint is clearly -- it

89061323-a097-456b-93f9-4d5a42fa70f2

1    doesn't cite the correct statute, that the

2    description of the offense retail theft is still

3    sufficient to inform the respondent as to what

4    the charge is.

5                    With regard to the arguments here,

6    as I said, this is all well and good if it was a

7    criminal case, but it is not, therefore the

8    motion for a directed finding is denied.

9              MR. KISS:  If I can make a record?

10                   First of all, this is a

11   quasi-criminal matter.

12             THE COURT:  No.

13             MR. KISS:  Yes, it is.  The State -- As

14   long as the State is imposing -- or can impose a

15   fine, I believe it is a quasi-criminal matter.

16   But we will find out when -- you know, if we

17   need to with the Appellate Court.

18                   But in addition to that, he wasn't

19   given enough notice with respect to what he was

20   charged with.  Retail theft has I don't know how

21   many subparagraphs, and we can only assume that

22   he wasn't charged with all of them.  He must

23   have been specifically charged with one thing.

24   For example, retail theft is -- a person commits

1    retail theft when he takes possession or carries

2    away, alters or transfers.  There's been no

3    testimony, so we should be found not guilty of

4    altering or transferring.  That's part of retail

5    theft.  Unless you want to go through and make

6    an individual decision with respect to each one

7    of the allegations within retail theft.  We have

8    no idea of what retail theft statute we are

9    charged with.  We went by what we were provided

10   by the State.  We were provided a chapter and

11   section that said, you guys violated this.

12        MS. DAMICO:  There is a description on

13   the ticket for retail theft.  They have

14   discovery with police reports, reports of a loss

15   prevention officer.  They were adequately placed

16   on notice what it is.

17        MR. KISS:  1625 is retail theft.  We

18   weren't given adequate notice of any permissive

19   inferences.  We weren't given notice with

20   respect to venue.  None of that was -- Normally

21   if you are charged with a statute, you are given

22   a statute and you are told, you violated 1625(a)

23   (3)(4) so you know what to defend against.  What

24   we were told to defend against is whatever we

89061323-a097-456b-93f9-4d5a42fa70f2

1    want to introduce in court.

2              MR. RHINE:  I'd like to just add

3    something.  Assuming we are correct that this is

4    a civil proceeding, even in a civil proceeding,

5    after a matter has gone to trial and the village

6    has rested in this case, to allow them at that

7    point after they have rested their case to amend

8    their complaint on something totally different --

9              THE COURT:  I haven't granted leave to

10   amend.

11             MR. RHINE:  Okay.  All right.

12             THE COURT:  I haven't granted your

13   motion to dismiss either.

14             MR. RHINE:  Okay.

15             MR. KISS:  I understand.

16             MS. DAMICO:  He sufficiently placed on

17   notice what the complaint is against him, not to

18   mention the pages of discovery -- written

19   discovery that was tendered.

20             THE COURT:  I'm aware of all of that,

21   but this is the complaint.

22             MS. DAMICO:  And the extent of the

23   cross-examination of the witnesses shows that

24   they were very much prepared and knew exactly

89061323-a097-456b-93f9-4d5a42fa70f2

Page 83

1    what it is that he needed to defend against.

2            MR. RHINE:  We are being punished

3    because counsel does an excellent job.  That's

4    an unfair comment.

5            MS. DAMICO:  Well, he certainly wasn't

6    caught by surprise given the length of the

7    cross-examination of both witnesses.

8            MR. RHINE:  Well, it was based on the

9    testimony that was heard in open court.

10           MR. KISS:  I was cross-examining based

11   on --

12           THE COURT:  No, but --

13           MS. DAMICO:  I mean, we heard some

14   unique questions about spoilage, and policies,

15   and whether he brought containers in himself.

16           THE COURT:  Well, for that matter, as

17   far as the evidence that I have heard thus far,

18   I believe there is sufficient evidence to

19   support the violation.

20               However, due to the defect in the

21   complaint, I'm going to dismiss the complaint.

22           MR. STOLLER:  Thank you.

23               (Which were all of the

24                   proceedings had.)

89061323-a097-456b-93f9-4d5a42fa70f2

Page 84

1    STATE OF ILLINOIS )
                       )   SS:
2    COUNTY OF DUPAGE  )

3

4                I, Amy M. Englund, CSR, a Certified

5    Shorthand Reporters of said state, do hereby

6    certify that I reported in shorthand the

7    proceedings had at the taking of said trial and

8    that the foregoing is a true, complete and correct

9    transcript of my shorthand notes so taken as

10   aforesaid, and contains all of the proceedings

11   given at said trial.

12              This transcript is signed this 7th day

13   of December, 2017.

14

15

16
                    Amy M. Englund
17                  Illinois CSR License Number 084-003825

18

19

20

21

22

23

24

89061323-a097-456b-93f9-4d5a42fa70f2

# EXHIBIT 7

OFFICER'S COPY

**STATE OF ILLINOIS** } IN THE ADMINISTRATIVE HEARING DEPARTMENT OF THE VILLAGE OF MELROSE
**COUNTY OF COOK** } PARK, IN THE NAME AND BY THE AUTHORITY OF THE VILLAGE OF MELROSE PARK,
**VILLAGE OF** } ILLINOIS, A MUNICIPAL CORPORATION, PLAINTIFF VS.
**MELROSE PARK**

OFFICER'S COURT KEY  G

CFT - 1-17-1

**COMPLIANCE VIOLATION NUMBER**
**C102277**

COURT DATE

DEFENDANT'S NAME (PRINT)   Last  Sloller   First  Chris   M.I. U.

| MONTH 12 | DATE 6 | YEAR 16 |

ADDRESS  415  City  Wesley Ave  State  Oak Park  Zip Code  60302

on / or / at HOUR 1:00 M   in the courtroom

Birth Date  2 / 24 / 48   Sex M   Weight 197   Height 5o7   Oper. License ☐ Chauf. ☐   3 4 8 4 1 4 3 2 3   Lic. State

ONE N. BROADWAY

Day of Week  Mo. 11  Day 19  Yr. 20 6   at 1:25 o'clock ☐A M☐   Did then drive and operate a certain motor vehicle, to wit, a   Make of Vehicle   License Plate No. 16-26297   State   Yr.

MELROSE PARK, ILLINOIS

upon a public highway of this state, to wit,  8400  W. North av

**Pay on or before the court date or appear in court on that date.**

situated within the Village aforesaid, in Cook County, Illinois, and did then and there unlawfully violate  **CHAPTER** 10  **SECTION** 04 010  OF ITS LOCAL ORDINANCE

REMIT PAYMENT IN PERSON:
Melrose Park Police Dept.
One N. Broadway

BY (Describe)  retail theft

Melrose Park, IL 60160
Phone: (708) 344-8409
Hours: 9 am - 5 pm (Mon - Fri)

THIS COMPLAINANT FURTHER STATES THAT HE HAS JUST AND REASONABLE GROUNDS TO BELIEVE AND DOES BELIEVE THAT THE PERSON
NAMED ABOVE COMMITTED THE OFFENSE HEREIN SET FORTH, CONTRARY TO THE ORDINANCES OF THE VILLAGE AFORESAID.

Subscribed and sworn to before me  11 - 19  20 16   Officer   Star No.

OR USE ATTACHED MAILER ENVELOPE
PAYABLE via internet: www.melroseparkpd.com

_____   _____
Judge or Clerk        Deputy Clerk

The Village has issued you this Municipal Code Violation Citation. If you pay the penalty amount shown below, before the court date, you will not have to appear in court and this
violation will not be reported on your driving record (if applicable). If you wish to avoid a court appearance, you must mail this Citation to the address on the reverse side of this
envelope, along with the required penalty amount. Failure to pay this Citation before the court date will require you to appear on the date and time shown above. If you are found liable
after hearing, penalties required by law may be assessed against you, including fines up to $750.00 per violation. Failure to appear in court will result in a default judgment
against you for the maximum penalty permitted by law and reporting of the violation to the Secretary of State (if applicable).

Penalty for this violation must be paid BEFORE Court Date $ 100 .00

Si usted tiene alguna pregunta, favor
de llamarnos al tel. 708-344-8409.

WITHOUT ADMITTING GUILT I PROMISE TO COMPLY WITH THE TERMS OF THIS CITATION.
X _____

# EXHIBIT 8

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

## VILLAGE OF MELROSE PARK
## COOK COUNTY, ILLINOIS

### ORDINANCE NO. 1354

**AN ORDINANCE AMENDING CHAPTER 10.04 OF THE VILLAGE OF MELROSE PARK MUNICIPAL CODE REGARDING THE OPERATION OF MOTOR VEHICLES, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.**

**ADOPTED BY THE
PRESIDENT AND BOARD OF TRUSTEES
OF THE
VILLAGE OF MELROSE PARK**

**THIS 8TH DAY OF FEBRUARY 2010**

RONALD M. SERPICO, Village President
MARY ANN PAOLANTONIO SALEMI, Village Clerk

**Board Of Trustees**

CATHLEEN COSSIDENT ITALIA
ANTHONY J. PRIGNANO
ARTURO J. MOTA
MARY RAMIREZ TACONI
JAIME ANGUIANO
ANTHONY N. ABRUZZO

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

Published by authority of the
President and Board of Trustees
Of the Village of Melrose Park,
Cook County, Illinois on
This 9TH day of FEBRUARY 2010



ORDINANCE NO. 1354

**AN ORDINANCE AMENDING CHAPTER 10.04 OF THE VILLAGE OF MELROSE PARK MUNICIPAL CODE REGARDING THE OPERATION OF MOTOR VEHICLES, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.**

\*       \*       \*       \*       \*

**WHEREAS,** the Village of Melrose Park, County of Cook, State of Illinois (the "Village") is a duly organized and existing municipality and unit of local government created under the provisions of the laws of the State of Illinois, and is operating under the provisions of the Illinois Municipal Code, and all laws amendatory thereof and supplementary thereto, with full powers to enact ordinances and adopt resolutions for the benefit of the residents of the Village; and

**WHEREAS,** the Village President (the "President"), the Honorable Ronald M. Serpico, the Village Clerk, the Honorable Mary Ann Paolantonio Salemi, and the Board of Trustees of the Village (the "Village Board"), the Honorable Cathleen Cossident Italia, Arturo J. Mota, Anthony J. Prignano, Mary Ramirez Taconi, Jaime Anguiano and Anthony N. Abruzzo, having taken office on April 30, 2009, constitute the duly elected, qualified and acting officials of the Village; and

**WHEREAS,** to protect its residents and their property, the President and the Village Board (collectively, the "Corporate Authorities") desire to ensure that motor vehicles traveling on roadways within the Village are operating safely; and

**WHEREAS,** studies indicate that dispatching, drafting, editing, reading and reviewing electronic data messages, such as e-mails and text messages, ("Driving While Texting") elevates the risk of traffic accidents; and

1

（省略）
（省略）

**WHEREAS,** the State of Illinois enacted prohibitions regarding Driving While Texting (the "Prohibitions"); and

**WHEREAS,** the Village desires to amend the Village of Melrose Park Municipal Code (the "Village Code") to adopt the Prohibitions and classify Driving While Texting as an ordinance violation; and

**WHEREAS,** the Corporate Authorities have determined that it is both advisable and in the best interests of the Village and its residents to amend the Village Code to adopt the Prohibitions as part of the Village Code; and

**WHEREAS,** the Corporate Authorities have determined that it is necessary, advisable and in the best interests of the Village and its residents to amend Chapter 10.04 of the Village Code as set forth herein; and

**WHEREAS,** the enactment of this Ordinance directly pertains to and is in furtherance of the health, welfare and safety of the residents of the Village; and

**NOW, THEREFORE, BE IT ORDAINED** by the President and the Board of the Trustees of the Village of Melrose Park, County of Cook, State of Illinois, as follows:

### ARTICLE I.
### IN GENERAL

**Section 01.  Incorporation Clause.**

The Corporate Authorities hereby find that all of the recitals hereinbefore stated as contained in the preambles to this Ordinance are full, true and correct and do hereby, by reference, incorporate and make them part of this Ordinance as legislative findings.

**Section 02.  Purpose.**

The purpose of this Ordinance is to amend the Village Code to adopt the Prohibitions to deter individuals from Driving While Texting.

**Section 03.    Invocation of Authority.**

This Ordinance is enacted pursuant to the police powers and authority granted to the Village by the Constitution of the State of Illinois and the Illinois Compiled Statutes.

**Section 04.    State Law Adopted.**

All applicable provisions of the Illinois Compiled Statutes, including the Illinois Municipal Code, as may be amended from time to time, relating to the purposes of this Ordinance are hereby incorporated herein by reference.

**Sections 05 - 09.  Reserved.**

### ARTICLE II.
### AMENDMENT TO CHAPTER 10.04

**Section 10.00   Amendment to Chapter 10.04 of the Village of Melrose Park Municipal Code, "State Vehicle Code Provisions Adopted."**

Chapter 10.04 of the Village Code, titled "State Vehicle Code Provisions Adopted" is hereby amended notwithstanding any provision, ordinance, resolution or Village Code section to the contrary, by adding Section 10.04.020, which Section shall read as follows:

> **"10.04.020    Adoption by Reference: Electronic Communication Devices**
>
> Section 12-610.2 of the Illinois Vehicle Code, titled "Electronic Communication Devices" (625 ILCS 5/12-610.2), as the same may be amended, is hereby adopted by reference and made a part of this Code as if fully set forth herein.

**Section 10.01   Other Actions Authorized.**

The officers, employees and/or agents of the Village shall take all action necessary or reasonably required to carry out, give effect to and consummate the transactions contemplated by this Ordinance and shall take all action necessary in conformity therewith including, without limitation, the execution and delivery of any and all documentation required to be delivered in connection with this Ordinance.

Sections 11.00 – 15.00  Reserved.

## ARTICLE III.
## HEADINGS, SAVINGS CLAUSES,
## PUBLICATION, EFFECTIVE DATE

### Section 16.00 Headings.

The headings for the articles, sections, paragraphs and subparagraphs of this Ordinance are inserted solely for the convenience of reference and form no substantive part of this Ordinance nor should they be used in any interpretation or construction of any substantive provision of this Ordinance.

### Section 17.00 Severability.

The provisions of this Ordinance are hereby declared to be severable and should any provision, clause, sentence, paragraph, subparagraph, section or part of this Ordinance be determined to be in conflict with any law, statute or regulation by a court of competent jurisdiction, said provision, clause, sentence, paragraph, subparagraph, section or part shall be excluded and deemed inoperative, unenforceable and as though not provided for herein, and all other provisions shall remain unaffected, unimpaired, valid and in full force and effect.  It is hereby declared to be the legislative intent of the Village Board that this Ordinance would have been adopted had such unconstitutional or invalid provision, clause, sentence, paragraph, subparagraph, section or part thereof not been included.

### Section 18.00 Superseder.

All code provisions, ordinances, resolutions and orders, or parts thereof, in conflict herewith are, to the extent of such conflict, hereby superseded.

**Section 19.00 Publication.**

. A full, true and complete copy of this Ordinance shall be published in pamphlet form or in a newspaper published and of general circulation within the Village as provided by the Illinois Municipal Code, as amended.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Section 20.00 Effective Date.**

This Ordinance shall be in full force and effect upon its passage, approval and publication, as provided by law.

On The Individual Poll And Voice Vote Of The Board Of Trustees:

AYE VOTES:          Trustee Italia, Trustee Prignano, Trustee Mota,
                    Trustee Taconi, Trustee Anguiano, Trustee Abruzzo

NAY VOTES:

ABSTAIN:

ABSENT:

SO PASSED, ADOPTED, APPROVED AND ENACTED IN AND AT THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS, THIS EIGHTH DAY OF FEBRUARY, 2010, A.D.

APPROVED:

RONALD M. SERPICO
VILLAGE PRESIDENT

ATTEST:

Mary Ann Paolantonio Salemi
Village Clerk

*(SEAL)*

Recorded in the Municipal Records: February 8, 2010
Published in Pamphlet Form: February 9, 2010

## Chapter 10.04

## STATE VEHICLE CODE
## PROVISIONS ADOPTED

Sections:
   10.04.010    Adoption by reference.

10.04.010    Adoption by reference.

The village's adoption of the Illinois Code, Illinois Revised Statutes, Chapter 95-1/2, is amended by adopting by reference the following sections from the Illinois Vehicle Code (Ill. Rev. Stat. Chapter 95-1/2):

| | |
|---|---|
| 3-112(b) | Failure to transfer title within five days |
| 3-401(a) | No valid registration—never applied |
| 3-404 | No bill of lading or manifest/dispatch record |
| 3-411(a) | Failure to carry registration card or reciprocity permit—second division vehicle |
| 3-413(a, b) | Improper display or license plates |
| 3-413(f) | Operation of vehicle with expired registration plate or sticker |
| 3-416 | Failure to notify the Secretary of State of name/address change |
| 3-417(a) | Failure to immediately apply for replacement registration card, plate or sticker |
| 3-701(1) | No valid registration—no valid plate or sticker obtained |
| 3-701(2) | No valid registration—reciprocity, prorate or apportionment |
| 604-1 | Operation of snowmobile without required: |
| (a) | One white headlamp during darkness; |
| (b) | One rear taillight during darkness; |
| (c) | Brake system in good mechanical condition; |
| (d) | Reflective material on each side of cowling; |
| (e) | Adequate sound suppression equipment. |

| | |
|---|---|
| 605-1(D) | Operation of snowmobile without lighted headlamp and taillight |
| 11-1419.01 | Failure to display Illinois Motor Fuel Tax Identification Card |
| 11-1419.02 | Failure to display external Illinois Motor Fuel Tax Identification device |
| 11-1507(a) | Operation of bicycle without lamp and reflector |
| 11-1507.1 | Operation of motorized pedacycle without lamp and reflector |
| 12-101(a) | Operation of vehicle with unsafe equipment |
| 12-201(a) | Operation of motorcycle without lighted headlamp |
| 12-201(b) | Driving vehicles other than motorcycles without two lighted headlamps and tail lamps when required |
| 12-201(c) | No white rear registration light |
| 12-202(a, b) | Insufficient clearance, identification or side marker lamps and reflectors—second division vehicle |
| 12-203(a) | Failure to use parking lights while vehicle is standing on highway |
| 12-204 | Improper lamp or flat on projecting load |
| 12-205 | Improper use of lamps on towing and towed vehicles |
| 12-207(a) | Improper use or more than one spot lamp |
| 12-207(b) | Improper use of more than three auxiliary driving lamps |
| 12-208(a) | No stop signal lamp or device |
| 12-209(c) | Defective backup lights |
| 12-210(a) | Failure to dim headlights/auxiliary driving lamps within 500 feet on approach of vehicle |
| 12-210(b) | Failure to dim headlights/auxiliary driving lamps within 300 feet of vehicle in same direction |
| 12-211(a) | Improper lighting on vehicles other than motorcycles—only one headlamp |

| | |
|---|---|
| 12-211(b) | Improper use of more than four lighted headlights/auxiliary driving lamps |
| 12-212(a) | Improper use of red light visible from front of vehicle |
| 12-212(b) | Unlawful use of flashing lights |
| 12-215 | Unlawful use of oscillating, rotating or flashing lights |
| 12-301 | Use of defective brakes |
| 12-401 | Unlawful use of metal studded tire |
| 12-405(d) | Use of unsafe tire |
| 12-501(a) | Operation of vehicle without windshield |
| 12-502 | Operation of vehicle without rear reflecting mirror |
| 12-503(a) | Obstructed view of windshield or side windows adjacent to drive |
| 12-503(b) | Unlawful application of tinted film to windshield or window(s) adjacent to driver—all vehicles manufactured after 12/31/81 |
| 12-503(c) | Obstructed view of any window by stationary or suspended object(s) |
| 12-503(d) | Operation of vehicle without windshield cleaning device; operation of vehicle with view obstructed by snow, ice or moisture |
| 12-503(e) | Obstructed view due to defective condition or repair of any window |
| 12-601(a) | Operation of vehicle with defective horn |
| 12-601(b) | Unlawful possession or use of siren |
| 12-602 | Operation of vehicle with defective or modified |
| 12-603(b) | Operation of vehicle without two front seat safety belts—vehicles of 1961 or later model years |
| 12-603.1 | Failure of driver front seat occupant(s) to use seat safety belt |
| 12-604(a) | Operation of vehicle with television receiver visible to driver |
| 12-606 | Operation of tow truck without: |
| (a) | Identifying sign attached on each side; |

| | |
|---|---|
| (b) | Required equipment-one broom, shovel, trash can and fire extinguisher; |
| (c) | Removing roadway debris and spreading dirt or sand on oil grease deposits; |
| (d) | Insurance policy in cab. |
| 12-607(a) | Operation of vehicle with unlawfully altered vehicle suspension system—body lifted in excess of three inches from chassis |
| 12-607.1(a) | Operation of first division vehicle with frame in excess of 22 inches above ground |
| 12-607.1(b) | Operation of second division vehicle with frame in excess of specified limits above ground—refer to statute |
| 12-608(a) | Operation of vehicle with a gross vehicle weight rating (GVWR) of 9000 pounds or less or a recreational vehicle without two bumpers |
| 12-608(a) | Operation of vehicle with unlawful bumper height |
| 12-610(a) | Operation of vehicle while wearing headset receiver |
| 12-702(a) | Operation of second division vehicle without carrying flares/warning devices |
| 12-702(c, d, e, f, g) | Failure to use flares/warning devices when second division vehicle is disabled |
| 12-704(a) | Failure to placard vehicle transporting explosives |
| 12-704(b) | Failure to carry two fire extinguishers within vehicle transporting explosives |
| 12-707 | Overloaded school bus, commuter van or motor vehicle used for hire |
| 12-711 | Operation of garbage truck. roll-off hoist or roll-on container without audible backing warning system |
| 12-806 | Failure to cover school bus sign |
| 12-808 | Operating school bus without fire extinguisher |

| | | | | |
|---|---|---|---|---|
| 12-809 | Operating school bus without first aid kit |
| 12-810 | Transporting handicapped passenger(s) without restraining device |
| 1203-1 | Operation of all-terrain vehicle or off-highway motorcycle without valid registration |
| 1203-4(b) | Operation of all-terrain vehicle or off-highway motorcycle without affixed registration decal |
| 1203-4(c) | Operation of all-terrain vehicle without registration certificate in possession of operator |
| 1203-9 | Failure to renew registration certificate |
| 1204-3 | Operation of all-terrain vehicle or off-highway motorcycle without safety helmet and eye protection |
| 1204-6 | Operation without head lamp and tail lamp when required |
| 1204-7 | Operation without operational service brake |
| 1204-8 | Operation without adequate muffler system |
| 1204-10 | Operation with modified exhaust system |
| 13-111 | Operation without certificate of valid safety test attached to windshield—second division vehicle |
| 13A-104(c) | Failure to display valid unexpired emission inspection sticker (affected Illinois counties only) |
| 15-105 | Load projecting in any excess beyond left fenders or six inches beyond right fenders of first division vehicle |
| 15-106 | Failure to fasten loose projecting member |
| 15-108 | Failure to plank edge of pavement for any vehicle in excess of 8,000 pounds |
| 15-109(a) | Spilling load on highway |
| 15-109(b) | Operating loading vehicle without securely fastened covering |

| | |
|---|---|
| 15-109.1 | Operating second division vehicle with load falling, blowing or dropping to highway |
| 15-114 | Unlawful pushing or disabled vehicle |
| 18-4104(a) | Operation without registration—intrastate or interstate |
| 18-4604(1) | Operation without current cab card and Illinois identifier stamp |
| 1-4604(3) | Use of a cab card and Illinois identifier stamp issued to another carrier |
| 1-4604(4) | Failure to display or present a cab card and Illinois identifier stamp |
| 1-4701(1) | Operating without trade name, license and registration number of carrier painted or affixed to both doors of power unit |

(Ord. 201-A § 1, 1992)

295

# EXHIBIT 9

# EXHIBIT 10

# EXHIBIT 11

# EXHIBIT 12

# EXHIBIT 13

# EXHIBIT 14




the balance small business

RETAIL INDUSTRY ▶ LARGEST U.S. RETAILERS

# Costco Mission Statement Has the Ethics and Compassion of Its Founders

## Customers Sense the Costco Difference in Its Wholesale Warehouse Experience

BY **BARBARA FARFAN**   Updated April 28, 2017

Customers know it when they feel it. There's something that's different about the Costco Wholesale Warehouse experience. It's the physical space, the products, the services, the people, the exclusivity the... something more. The average customer can't identify it, but it's the compassionate culture, the ethical mission and the vision and values woven throughout the Costco culture that they sense with all their senses in every Costco Wholesale Warehouse experience.



the balance small business

## The Costco Mission Statement

"Costco's mission is to continually provide our members with quality goods and services at the lowest possible prices.achieve our mission we will conduct our business with the following Code of Ethics in mind:

- Obey the law
- Take care of our members
- Take care of our employees
- Respect our vendors



the balancesmall business

If we do these four things throughout our
organization, then we will realize our ultimate
goal, which is to reward our shareholders."

**SEE ALSO: All Retail Company Mission
Statements >>**

Advertisement

When you know what you're looking for, it's easy to see that the Costco Mission is achieved
every day by the Costco employee team. What's not so easy to see - but is important to
remember - is that the Costco mission was founded by its founders.

## The Ethics in Costco's Mission from Co-Founder Jeffrey Brotman

Outside of the state of Washington, Jeffrey Brotman might be the less famous co-founder
of Costco, but that doesn't mean he was the less influential co-founder. When looking at
Brotman's life experience, it's easy to see how much influence he had on the Costco Code
of Ethics which is a key part of its corporate mission, vision, and values.



those in need who couldn't help themselves. He was raised Jewish and his personal values were influenced by his Rabbi in and his parents.

Like his father, Jeff played football in high school, where he was influenced by discipline, teamwork, and leadership. Jeff attended University of Washing and received a degree in political science in 1964. He practiced law briefly while finishing his studies, but also worked his way through school in a retail job at Bernie's Clothing Store.

Even though he had attended law school specifically to avoid following in his father's retailing footsteps, Brotman ended up opening a chain of men's clothing stores with his brother Michael. He was an investor in other retail businesses lie Starbucks and Garden Botanica, but it wasn't until he founded Costco with James Sinegal that he was able to use



the balance small business



## Jim Sinegal's Self-Made Success in the Legendary Costco Culture

James Sinegal was born January 1, 1936, to a Catholic family. As early as can be remembered Jim wanted to become a doctor, but his low grades in school prevented him from being able to get into medical school.

Advertisement

Despite his poor grades and the low priority he had previously placed on education, Sinegal enrolled in San Diego Junior College in 1953, and then transferred to San Diego State University after discovering that he liked learning about things that he cared about.

Sinegal worked his way through college as aa bagger at the FedMart retail chain. Just a few years after starting at the store as a mattress unpacker at FedMart, Sinegal became the store manager. He loved his new position so much that he quit his schooling in order to spend all of his time at FedMart, where he rose to the rank of Vice President.

Despite never receiving a college degree, Sinegal worked his way up to become the vice president in charge of merchandising and operations at FedMart. Sol Price, the founder of Fed-Mart, decided in 1979 that he wanted to start a new venture and took Jim with him. Together the two started Price Club and during the process, Sinegal learned about the startup of a retail business.

## RELATED: The Retail Education Debate - Important or Not?

Price Club is credited as being the first retail big box warehouse concept store, which of course, was the natural springboard from which the Costco chain would be launched. Sinegal learned much from his mentor Sol Price. But in an interview with the New York Times, Price admitted that he learned from Sinegal as well.

*"Jim has done a very good job in balancing the interests of the shareholders the employees, the customers and the managers," said Price. "Most companies tilt too much one way or the other."*

 the balancesmall business

consulting firm which specialized in brokering food and non-food products.

All of this learn-by-doing experience was the setup for the founding of Costco in 1983. It is worth noting that by the time Sinegal and Brotman founded Costco, Sinegal already had 29 years of hands-on experience in all aspects of retailing.

Because he lived it and loved it, Sinegal was able to lead it. That refers to the legendary Costco employee culture, of course, which Sinegal led with the kind of clarity and compassion that comes only from experience.

## Double the Visionaries, Double the Innovation

In the case of Costco Wholesale Warehouse, apparently two founders were better than one. Using counter-intuitive retailing strategies Costco has become a wildly popular retail phenomenon around the world that has been referred to "The Costco Craze," The retail industry innovations that are credited to Costco include the addition of fresh food, eye-care clinics, pharmacies and gas stations to the retail warehouse customer experience.

## Innovative Costco Branded Services Sold to Costco Members

### HOME SERVICES:

- Costco Auto Program
Advertisement
- Parts & Service Discount
- Motorcycles & Powersports
- Bottled Water Delivery
- Mortgage Purchase & Refinancing
- Identity Protection

### BUSIN

- Payment Processing
- Business Phone Services
- Payroll Services Advertisement

# EXHIBIT 15

Enter search term, e.g. social media

Retail & Trade › Food & Beverage › Costco's number of warehouses worldwide 2011-2018

# Number of Costco warehouses worldwide from 2011 to 2018



DOWNLOAD  SETTINGS  SHARE

PNG  PDF  XLS  PPT

**DESCRIPTION**  SOURCE  MORE INFORMATION

This statistic shows the number of Costco operating warehouses worldwide from 2011 to 2018. In 2018 Costco operated a total of 762 warehouses worldwide. Of those, there were 527 Costco warehouses in the U.S. and Puerto Rico combined. 2018, Costco generated approximately 138.4 billion U.S. dollars in net sales worldwide, averaging approximately 176 million U.S. dollars in sales per warehouse that year.

Data visualized by +ableau
About this statistic

© Statista 2019
Show source

Costco's average sales per warehouse worldwide 2011-2018

Market share of the leading U.S. food retailers 2016

Leading e-retailers worldwide 2015, based on retail revenue

**Statista Accounts:** Access All Statistics. Starting from **$588 / Year**



**Basic Account**
Get to know the platform

You only have access to basic statistics.
This statistic is **not included** in your account!

**Premium Account**
Your perfect start with Statista

✔ **Instant access** to 1m statistics
✔ **Download** in XLS, PDF & PNG format
✔ Detailed **references**

**Corporate Account**
Full access

Corporate solution including all features.
Send request

* All products require an annual contract.
Prices do not include sales tax.

$49 / Month *   Purchase now

We use cookies to personalize contents and ads, offer social media features, and analyze access to our website. In your browser settings you can configure or disable this, respectively, and can delete any already placed cookies. For details, please see your browser's Help section (by pressing F1). Please see our **privacy statement** for details about how we use data.

OK

## Popular Related Keywords

| Find statistics, forecasts and studies | Statista Search |
|---|---|

Need help with using Statista for your research? Tutorials and first steps

## **Further Content:** Statistics, Studies, and Topic Pages

| Statistics | Topics | Studies |
|---|---|---|
| Number of Canadian Costco stores 2015-2018 | Food retail in Japan | Costco - Annual Report 2018 |
| Number of Costco Korea store chains in South Korea 2010-2015 | Food Retail Industry | Food retail in the United States |
| | Food Shopping Behavior | Costco - Annual Report 2015 |
| Revenue of Canadian Costco stores 2015-2018 | Food Retail in Canada | Costco - Annual Report 2014 |
| Operating income of Canadian Costco stores 2015-2018 | | Costco - Annual Report 2016 |
| SuperValu's number of stores in the U.S. 2014-2018 | | Costco - Annual Report 2013 |
| | | State of the chains 2017 |
| SuperValu's number of stores in the U.S. by business unit | | The Polish Grocery Retail Market |



Do you have any questions about our business solutions?

We provide you with detailed information about our Corporate Account.

Contact us now

We use cookies to personalize contents and ads, offer social media features, and analyze access to our website. In your browser settings you can configure or disable this, respectively, and can delete any already placed cookies. For details, please see your browser's Help section (by pressing F1). Please see our **privacy statement** for details about how we use data.

OK

Leading companies trust Statista:        PayPal    Google    Adobe    P&G    SAMSUNG    

**Related Studies:** Available to Download in PDF or PPTX Format

### Costco Wholesale Corporation

All information
in one
Presentation

**Costco Wholesale
Corporation**

79 page/s      English      PPTX    Detailed references

Everything On "Costco Wholesale Corporation" in One Document:
Edited and Divided into Handy Chapters. Including Detailed
References.

Go to dossier

**OTHER REPORTS & DOSSIERS**

Food retail in the United States



*Statista is a great source of knowledge, and pretty helpful to
manage the daily work.*

**Christof Baron**
CEO, MindShare
Germany

## Statistics on "Costco Wholesale Corporation"

| **Global Overview** | **The most important statistics** |
| --- | --- |
| **U.S. Overview** | Costco's net sales worldwide 2011-2018 |
| **Key Company Figures** | Costco's revenue worldwide 2018-2024 |
| **E-Commerce** | Global revenue of Costco 2017, by quarter |
| **Consumer Behavior** | Costco's average sales per warehouse worldwide 2011-2018 |
| | Costco's net income worldwide 2011-2018 |
| | Costco's number of warehouses worldwide 2011-2018 |
| | Number of Costco warehouses 2018, by country |

We use cookies to personalize contents and ads, offer social media features, and analyze access to our website. In your browser settings
you can configure or disable this, respectively, and can delete any already placed cookies. For details, please see your browser's Help
section (by pressing F1). Please see our **privacy statement** for details about how we use data.

OK